IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-1672

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

      Defendants.

---

## NOTICE OF REMOVAL

---

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

     PLEASE TAKE NOTICE THAT Defendants Suncor Energy (U.S.A.) Inc., a Delaware corporation, Suncor Energy Sales Inc., a Colorado corporation, Suncor Energy Inc., a Canadian corporation, and Exxon Mobil Corporation ("ExxonMobil"; collectively, "Defendants") remove, with reservation of all defenses, Case No. 2018-cv-30349, filed in the Boulder County Combined Court (the "State Court Action" or "action"), to the United States District Court for the District of Colorado pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452 and 1367(a), and 43 U.S.C. § 1349(b).  Without conceding that each defendant has been properly joined and served in this action, all Defendants consent to the removal of the State Court Action to this

1

Court and join in this notice of removal (the "Notice of Removal" or "Notice").  In support of

removal, Defendants state as follows:

## INTRODUCTION

1.      In this action, Plaintiffs seek to hold Defendants liable for the impacts of climate

change in their respective jurisdictions based on Defendants' lawful production, promotion,

refining, marketing and sales of fossil fuels, not only in the United States, but throughout the

world.[1]  Plaintiffs alleged injuries result from greenhouse gas emissions associated with the use

of fossil fuels by billions of consumers worldwide, including Plaintiffs themselves.  Despite

Plaintiffs' efforts to artfully plead their claims as novel state torts, this Court has federal question

jurisdiction over these claims on several independent grounds.

2.      First and foremost, Plaintiffs' claims can only arise—if at all—under federal

common law.  Federal common law applies where, as here, "uniquely federal interests" make

application of state law inappropriate.  *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut*,

564 U.S. 410, 414 (2011) ("*AEP*"); *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988).

One such area is "the general subject of environmental law and specifically . . . ambient or

interstate air and water pollution."  *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849,

855 (9th Cir. 2012); *AEP*, 564 U.S. at 421.  Plaintiffs' claims, rooted in the effects of global

greenhouse gas emissions, implicate uniquely federal interests in environmental, energy, and

national security policy—which necessitate a uniform approach under federal common law.

Courts in the Tenth Circuit and other federal courts have recognized that such transboundary

environmental lawsuits, targeting the broad mix of federal policies and regulations pertaining to

---

[1] Defendant Suncor Energy, Inc. is a Canadian corporation that is not registered to do business in any state in the U.S.

2

climate change, are governed by federal, not state, law. *See United States* v. *Questar Gas Mgmt. Co.,* No. 2:08CV167DAK, 2010 WL 5279832, at *3 (D. Utah Dec. 14, 2010); *AEP*, 564 U.S. at 424; *Kivalina*, 696 F.3d at 855; *City of Oakland et al* v. *BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018).

3.     Applying these same principles, the United States District Court for the Northern District of California recently held that federal court is the proper forum for claims indistinguishable from those asserted against Defendants here.  On June 25, 2018, Judge William H. Alsup granted a motion to dismiss claims brought by the municipalities of San Francisco and Oakland because, among other reasons, the state law causes of action pled in those cases were displaced by uniquely federal interests.  *City of Oakland et al.* v. *BP P.L.C., et al.*, Nos. C 17-6011, C 17-6012, 2018 WL 3109726 (N.D. Cal. June 25, 2018).  In so ruling, Judge Alsup noted that in those cases, as in *AEP*, "Congress has vested in the EPA the problem of greenhouse gases and has given it plenary authority to solve the problem at the point of emissions." *Id.* at *6. Judge Alsup likewise found the state law claims brought by San Francisco and Oakland raise the prospect of liability based on "defendants' placement of fossil fuels into the flow of international commerce," which triggers federal concerns related to the foreign affairs of the United States. *Id.* Given this close nexus with uniquely federal areas of authority, Judge Alsup found that it was "proper for the scope of plaintiffs' claims to be decided under federal law," although he ultimately concluded that "regulation of the worldwide problem of global warming should be determined by our political branches," not the courts. *Id.* at *9.  Consistent with the foregoing precedent and recognizing the uniquely federal interests implicated by this climate change lawsuit, Plaintiffs' claims are properly heard in this federal forum.

4.      Further, as discussed in more detail below, removal is authorized on the following additional grounds:

●      Plaintiffs' claims are completely preempted by the Clean Air Act, which provides an exclusive federal remedy for plaintiffs seeking stricter regulation of the greenhouse gas emissions challenged in this action.

●      This action necessarily and unavoidably raises disputed and substantial "federal issues" that, under *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, a federal court may "entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  545 U.S. 308, 314 (2005).

●      Plaintiffs' claims arise from incidents occurring in federal enclaves, particularly Rocky Mountain National Park and Uncompahgre National Forest, making them removable to a federal court.  *See* U.S. Const., art. I, § 8, cl. 17; *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).

●      This Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA").  43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

●      Plaintiffs' allegations pertain to actions certain Defendants took at the direction of federal officers, and their claims can be met with colorable federal defenses.  *See Equity Staffing Grp. Inc.* v. *RTL Networks, Inc.*, No. 13-CV-3510-WJM-KLM, 2014 WL 2566316, at *2 (D. Colo. June 6, 2014) (citing *Greene* v. *Citigroup, Inc.*, 215 F.3d 1336 (Table), 2000 WL 647190, at *2 (10th Cir. 2000)).

●      Plaintiffs' state-law claims are related to bankruptcy proceedings under Title 11 of the United States Code. 28 U.S.C. §§ 1334(b) and 1452(a).

5.      For all the foregoing reasons, removal is authorized and this action is properly before this Court.

## TIMELINESS OF REMOVAL

6.      Plaintiffs filed their original complaint against Defendants in the Boulder County Combined Court, Case No. 2018-cv-03049, on April 17, 2018, and filed their amended complaint against Defendants on June 11, 2018 (the "Amended Complaint"). Plaintiffs served Suncor Energy (U.S.A.) Inc. and Suncor Energy Sales Inc. with the Amended Complaint on June 13, 2018 and served[2] Suncor Energy Inc. on June 15, 2018. Plaintiffs served ExxonMobil on June 14, 2018. Copies of all process, pleadings, or orders served on Defendants are attached as Exhibit A.

7.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b)(1). All Defendants consent to this removal.[3]

---

[2] Suncor Energy Inc. reserves the right to challenge service of process or sufficiency of service.

[3] In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly preserve, their right to challenge personal jurisdiction, service of process, or sufficiency of service in any federal or state court with respect to this action. A number of Defendants contend that personal jurisdiction in Colorado is lacking over them, and these Defendants will file motions at the appropriate time to dismiss for lack of personal jurisdiction. *See Saucedo* v. *Martinez*, No. 18-CV-00080-NYW, 2018 WL 774342, at *2 (D. Colo. Feb. 8, 2018) (citing *Morris & Co.* v. *Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) ("holding removal of a case to federal court does not constitute a waiver of the right to object to lack of personal jurisdiction")).

**GROUNDS FOR REMOVAL**

8.      This action is removable on the basis of federal question jurisdiction.  Any "civil

action brought in a State court of which the district courts of the United States have original

jurisdiction, may be removed . . . to the district court of the United States for the district and

division embracing the place where such action is pending" unless Congress has expressly

provided otherwise.  28 U.S.C. § 1441(a).  Federal district courts "have original jurisdiction of

all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C.

§ 1331.  Specifically, removal is proper on seven grounds, each of which is independently

sufficient to permit removal.  Each of these separate grounds is addressed in detail below.

9.      Should Plaintiffs challenge this Court's jurisdiction, Defendants reserve the right

to assert further grounds in support of removal in addition to those specified in this Notice.  *See*

*Dart Cherokee Basin Operating Co.* v. *Owens*, 135 S. Ct. 547, 551 (2014) ("To remove a case

from a state court to a federal court, a defendant must file in the federal forum a notice of

removal 'containing a short and plain statement of the grounds for removal'. . . . A statement

'short and plain' need not contain evidentiary submissions." (citing 28 U.S.C. § 1446(a))).

**I.      REMOVAL IS PROPER BECAUSE PLAINTIFFS' CLAIMS ARISE ONLY
UNDER FEDERAL COMMON LAW**

10.     First, this Court has federal question jurisdiction over Plaintiffs' claims because

Plaintiffs' claims can only arise—if at all—under federal common law. 28 U.S.C. § 1331 grants

federal courts original jurisdiction over "claims founded upon federal common law as well as

those of a statutory origin."  *Nat'l Farmers Union Ins. Companies* v. *Crow Tribe of Indians*, 471

U.S. 845, 850 (1985) (quoting *Illinois* v. *City of Milwaukee*, 406 U.S. 91, 100 (1972)

("*Milwaukee I*")).  Although "[t]here is no federal general common law," *Erie R.R. Co.* v.

*Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing

legal rules will be supplied, not by state law, but by "what has come to be known as 'federal

common law.'" *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting

*United States* v. *Standard Oil Co. of Cal.*, 332 U.S. 301, 308 (1947)).

11. Federal common law governs in areas in which there are "uniquely federal

interests" such that application of state law would be inappropriate. *Boyle*, 487 U.S. at 504–07.

*See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*,

39 N.Y.U. L. Rev. 383 (1964). Uniquely federal interests exist, for example, where the issue is

one that by its nature is "within national legislative power" and there is a "demonstrated need for

a federal rule of decision" on that issue. *AEP*, 564 U.S. at 421–22 (citation omitted). Such

interests are also present where "the interstate or international nature of the controversy makes it

inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641.

12. The general subject of environmental law and the regulation of "air and water in

their ambient or interstate aspects" are areas of uniquely federal interests. *AEP*, 564 U.S. 410,

421 (2011) (quoting *Milwaukee I,* 406 U.S. at 103); *see Kivalina*, 696 F.3d at 855.

13. In *AEP*, the Supreme Court held that tort claims arising from climate change are

governed by federal common law. Plaintiffs, including eight states, sued five electric utilities

contending that "defendants' carbon-dioxide emissions" contributed to global warming and

"created a 'substantial and unreasonable interference with public rights,' in violation of the

federal common law of interstate nuisance, or, in the alternative, of state tort law." 564 U.S. at

418. Like Plaintiffs here, the *AEP* plaintiffs "alleged that public lands, infrastructure, and health

were at risk from climate change," and they sought to impose liability on utility companies for

contributing to climate change. *Id.* Holding that the plaintiffs' federal common law claims were displaced by the Clean Air Act, the Supreme Court agreed that "federal common law" governs a public nuisance claim involving the interstate aspects of air and water. *AEP*, 564 U.S. at 421–22. "Environmental protection," the Court reasoned, "is undoubtedly an area 'within national legislative power,' [and] one in which federal courts may fill in 'statutory interstices.'" *Id.* at 421 (quoting *Erie R.R. Co.*, 304 U.S. at 421–22).

14.     Similarly, in *Kivalina*, the Ninth Circuit found tort claims involving climate change subject to federal common law. Kivalina, an Alaskan village and city, asserted public nuisance claims for damages to its property and infrastructure as a result of "sea levels ris[ing]" and other impacts allegedly resulting from energy companies' "emissions of large quantities of greenhouse gases." *Id.* at 853–54. Concluding that the suit fell within federal common law, the Ninth Circuit explained that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855. As such, as the Ninth Circuit concluded, claims arising from injuries allegedly caused by *global* warming involves interstate and, indeed, international aspects that inherently implicate uniquely federal interests and responsibilities. *Id.*; *see also Massachusetts* v. *EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government.").

15.     The Amended Complaint itself references the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences. *See, e.g.*, Am. Compl. ¶¶ 125–30. Causes of action arising from global climate change are not constrained to

particular sources, cities, counties, or states.  They implicate inherently national and international interests, including federal and international regulatory schemes.  Embracing a supra-national agenda, Plaintiffs fault ExxonMobil for having "supplied a substantial portion of all fossil fuels used *worldwide*."  Am. Compl. ¶ 81 (emphasis added).  But "transboundary pollution suits," like Plaintiffs' suit, have long been governed by "federal common law."  *Kivalina*, 696 F.3d at 855; *see also Milwaukee I*, 406 U.S. at 107 n.9 ("Federal common law and not the varying common law of the Individual States is . . . entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain.").

16.     Consistent with the conclusions of the Supreme Court and the Ninth Circuit, federal courts in this circuit have also acknowledged the global nature of climate change and climate policy.  *See, e.g.*, *Amigos Bravos* v. *U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1135 (D.N.M. 2011) (recognizing that "climate change is a global phenomenon whose manmade causes originated decades or centuries ago with the advent of the industrial revolution and continue today.  Thus, climate change is dependent on an unknowable multitude of GHG sources and sinks.").

17.     Under that precedent, Plaintiffs' claims are governed by federal common law.[4] The gravamen of Plaintiffs' claims is that Defendants "*knowingly* caused and contributed to the

---

[4]  Although Plaintiffs purport to style their claims as arising under state law, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiffs' proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court.  *See Lovell* v. *State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) ("This Court reviews a district court's ruling on the propriety of removal de novo.").

alteration of the climate by producing, promoting, refining, marketing and selling fossil fuels at levels that have caused and continue to cause climate change, while concealing and/or misrepresenting the dangers associated with fossil fuels' intended use." Am. Compl. ¶ 5.[5]  These claims implicate uniquely federal interests in environmental protection, which "is undoubtedly an area 'within national legislative power,'. . . in which federal courts may fill in 'statutory interstices.'" *AEP*, 564 U.S. at 421 (quoting *Erie R.R. Co.*, 304 U.S. at 421–22).  Plaintiffs' claims also involve the regulation of "air and water in their ambient or interstate aspects," which are areas of uniquely federal interests governed by federal common law.  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).  As in *AEP* and *Kivalina*, federal common law applies here.

18.    A uniform federal approach to greenhouse gas emissions is needed because "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum." *AEP*, 564 U.S. at 427.  Rather, "as [a] question[] of national [and] international policy," "the environmental benefit potentially achievable" must be weighed against "energy needs and the possibility of economic disruption." *Id.*  For example, the imposition of tort liability for allegedly unreasonable contributions to *global* warming would require a balancing of worldwide emissions traceable to sales of Defendants' products and the benefits of Defendants' global activities.  A patchwork of 50 states' common law rules cannot properly be applied to such claims without impairing federal interests in environmental protection, energy production, and economic development.  As a result, the Supreme Court

---

[5]  Defendants dispute that they have engaged in any wrongful conduct, including that they allegedly concealed or misrepresented any facts related to Plaintiffs' allegations.

expressly recognized in *AEP* that, in the circumstances of global climate change, "borrowing the law of a particular State would be inappropriate." *Id.* at 422.  Global warming-related tort claims are governed by federal common law.

19.     These commonsense principles were recently applied to underscore that a federal court is the proper forum for claims indistinguishable from those asserted against ExxonMobil in this case.  On June 25, 2018, Judge William H. Alsup of the United States District Court for the Northern District of California granted ExxonMobil's motion to dismiss claims brought by the municipalities of San Francisco and Oakland because, among other reasons, the state law causes of action pled in those cases were displaced by uniquely federal interests.  *City of Oakland et al. v. BP P.L.C., et al.*, Nos. C 17-6011, C 17-6012, 2018 WL 3109726 (N.D. Cal. June 25, 2018). Judge Alsup ruled that for such cases "Congress has vested in the EPA the problem of greenhouse gases and has given it plenary authority to solve the problem at the point of emissions." *Id.* at *6.  Judge Alsup likewise found that plaintiffs' state law claims sought to hold the defendants liable for their "placement of fossil fuels into the flow of international commerce," once again triggering federal concerns implicated by foreign affairs.  *Id.*  Judge Alsup held that it "remain[ed] proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach of the alleged wrong" even though plaintiffs had not asserted viable claims.  *Id.* at *9.  So too here.

20.     A federal court's authority to assert jurisdiction over a federal common law claim does not turn on whether the underlying claim has merit or would survive a motion to dismiss. At this stage of the litigation, the relevant question before this Court is whether this uniquely federal case belongs in federal court.  *See Morrison* v. *Nat'l Australia Bank*, 561 U.S. 247, 254

(2010).  The decision that federal common law applies to a particular issue inherently reflects a

determination that state law does *not* apply.  *Helfrich* v. *Blue Cross & Blue Shield Ass'n*, 804

F.3d 1090, 1096 (10th Cir. 2015) ("[A] few areas, involving uniquely federal interests, are so

committed by the Constitution and laws of the United States to federal control that state law is

pre-empted and replaced [by] . . . federal common law") (quoting *Boyle*, 487 U.S. at 504; *see*

*also City of Milwaukee* v. *Illinois & Michigan*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*")

("[I]f federal common law exists, it is because state law cannot be used.").  Whether the suit

might suffer from an impediment, even a fatal one, once in federal court, is irrelevant to the

removability inquiry.

21.     Accordingly, Plaintiffs' claims are governed by federal common law and may be

removed on that basis.

## II.    PLAINTIFFS' CLAIMS ARE COMPLETELY PREEMPTED BY FEDERAL LAW

22.     Second, this action is removable under the doctrine of complete preemption.

Complete preemption makes a case "removable from state to federal court from the outset."

*Hansen* v. *Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011).

23.     The Supreme Court has held that a federal court will have jurisdiction over an

action, even one alleging only state-law claims, on the basis of complete preemption where "the

extraordinary pre-emptive power [of federal law] converts an ordinary state common law

complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."

*Metro. Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 65 (1987).

24.     A cause of action pled as a state law claim is preempted under the "complete

preemption" doctrine when (a) a federal statutory scheme "provide[s] the exclusive cause of

action for the claim asserted," *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 8 (2003); and (b) the state law claim "duplicates, supplements, or supplants" the federal cause of action, *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004). Both of these elements are satisfied here.

25.     First, the Clean Air Act provides the exclusive cause of action for challenging the regulation of nationwide emissions.

26.     The Clean Air Act empowers the Environmental Protection Agency (the "EPA") to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Pursuant to this authority, "emissions have been extensively regulated nationwide" in a comprehensive regulatory scheme setting emissions limits for various pollutants. *North Carolina* v. *Tenn. Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010). This scheme extends to greenhouse gas emissions, which have been the subject of many EPA regulations. *See, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

27.     The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings. *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607. For example, the Commonwealth of Massachusetts obtained, pursuant to this process, a judicial determination that greenhouse gases were air pollutants that could be regulated under the Act,

*Massachusetts,* 549 U.S. at 534–35, which eventually led to the regulation of greenhouse gases from motor vehicles under section 202(a) of the Act, 75 Fed. Reg. 25,324 (May 7, 2010).

28.     Congress's intent that judicial review of the Clean Air Act take place only in federal court is unmistakable.  Challenges to EPA rulemaking under the Act must occur within the U.S. Courts of Appeals.  42 U.S.C. § 7607(b)(1).  In light of the federal forum's exclusive authority over this subject matter, federal courts have recognized that the Clean Air Act preempts state common law nuisance claims.  And for good reason: "If courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern.  Energy policy cannot be set, and the environment cannot prosper, in this way." *North Carolina,* 615 F.3d at 298.  Accordingly, the process established by the Clean Air Act to challenge emissions restrictions is the exclusive mechanism for review.

29.     Second, Plaintiffs' claims duplicate, supplement, or supplant the Clean Air Act's review procedures.

30.     In their Amended Complaint, Plaintiffs directly attack the reasonableness of Defendants' production, promotion, and sale of fossil fuels and the emissions that result from those activities.  *See, e.g.*, Am. Compl. ¶ 453 (Defendants' "interference with public rights is unreasonable.").  Plaintiffs do not allege, however, that Defendants' conduct has violated any federal statute or regulation, including the Clean Air Act or the EPA's nationwide emissions standards.  Rather than petitioning the EPA to amend its emissions standards and revise its regulations, Plaintiffs have improperly brought this action that attempts to usurp the regulatory authority of the federal government by seeking to impose civil liability through novel state tort

claims.  Federal preemption applies to just such an end-run around a comprehensive and exclusive regulatory program.

31.     State tort law is a form of public regulation. The Supreme Court has recognized that "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 n.17 (1996); *see also N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 278 (1964) ("Plainly the Alabama law of civil libel is a 'form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.'" (citation omitted)).

32.     Plaintiffs' state-law tort claims seek to declare unreasonable nationwide emissions that conform to EPA emission standards.  It is irrelevant that Plaintiffs have attempted to artfully craft their pleadings to focus on Defendants' sale or promotion of fossil fuels—as all of Plaintiff's alleged injuries only arise (if at all) from *the emissions* generated from the use and combustion of those fossil fuels by third parties, including Plaintiffs themselves.  Specifically, the Amended Complaint argues that concentrations of greenhouse gases in the atmosphere are too high, unreasonable, and have caused excessive global warming, Am. Compl. ¶¶ 14–15, 123–31, 148–96, and that Plaintiffs' alleged injuries result from a global and undifferentiated atmospheric phenomenon caused by worldwide greenhouse-gas emissions. *Id.* ¶ 15.  In summary, it is the emissions that Plaintiffs are trying to regulate through their claims that commerce relating to fossil fuels—the source of the challenged emissions—is tortious.

33.     Such claims, if allowed to proceed, would supplant rulemaking regarding greenhouse gas emissions. *See, e.g.*, *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through

some form of preventive relief."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992)

(same).  Plaintiffs' claims would require precisely the cost-benefit analysis of emissions that the

EPA is charged with undertaking and, accordingly, would directly interfere with the EPA's

determinations.  Because Congress has established an exclusive mechanism to petition the EPA

for stricter nationwide emissions standards, Plaintiffs must pursue that process to obtain the

regulations they seek.  They cannot invoke state nuisance law to obtain that result while

disregarding the process Congress mandated as the sole means to influence nationwide

emissions.  Accordingly, Plaintiffs' claims are preempted by the Clean Air Act and removable on

that basis.  *See, e.g.*, *City of Oakland*, 2018 WL 3109726 at *6 (noting that, to the extent state

law nuisance claims implicate emissions from within the United States, they are displaced by the

Clean Air Act).

34.      Moreover, to the extent Plaintiffs seek to challenge inherently transnational

activity, to do so in state court would inevitably intrude on the foreign affairs power of the

federal government and is completely preempted.  *See Am. Ins. Ass'n* v. *Garamendi*, 539 U.S.

396, 418 (2003) ("[S]tate action with more than incidental effect on foreign affairs is preempted,

even absent any affirmative federal activity in the subject area of the state [action], and hence

without any showing of conflict.").

## III.      REMOVAL IS AUTHORIZED UNDER *GRABLE & SONS METAL PRODUCTS, INC.* v. *DARUE ENGINEERING & MANUFACTURING*, 545 U.S. 308 (2005)

35.      Third, Plaintiffs' claims are also removable pursuant to *Grable & Sons Metal*

*Prods., Inc.* v. *Darue Eng'g & Mfg.*, because this action necessarily and unavoidably raises

disputed and substantial "federal issues" that should be resolved in a federal forum.  5454 U.S. at

312.  Even if Plaintiffs had only pled state-law claims (which is not the case), *Grable* would

nevertheless call for removal.  Under *Grable*, "a state law claim could give rise to federal question jurisdiction so long as it 'appears from the [complaint] that the right to relief depends upon the construction or application of [federal law]." *Id.* at 313.  Specifically, a claim pled under state law may be removed pursuant to federal question jurisdiction when "the federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013).

36.     Determining whether these factors are present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312–13 (alterations in original) (quoting *Gully* v. *First Nat'l Bank in Meridian*, 299 U.S. 109, 117 (1936)).

37.     The Amended Compliant raises federal issues under *Grable* because it seeks to have a court determine for the entire United States, as well as Canada and other foreign actors, the appropriate balance between the production, sale, and use of fossil fuels and addressing the risks of climate change.  Such an inquiry necessarily entails the resolution of substantial federal questions concerning important federal regulations, contracting, and diplomacy.  Any one of those three federal prerogatives would be sufficient to confer jurisdiction on this Court.  That all three are present here makes federal jurisdiction indisputable.

### A.     The Amended Complaint's Second-Guessing of Congress and Designated Federal Agencies Raises a Substantial Federal Issue under *Grable*

38.     Plaintiffs raise questions about federal policies and regulations pertaining to energy and the environment.  Plaintiffs fault Defendants for selling "an enormous amount of

fossil fuels," which they contend "caused and contributed to climate change."  Am. Compl. ¶¶ 322, 326.  For a court to determine whether Plaintiffs' nuisance and related tort claims are even legally viable, it would have to evaluate whether it was reasonable for Defendants to place fossil fuels into the stream of interstate and foreign commerce and promote the use of those products. *See Safe Sts. All.* v. *Hickenlooper*, 859 F.3d 865, 886 (10th Cir. 2017); *Pub. Serv. Co. of Colo.* v. *Van Wyk*, 27 P.3d 377, 391 (Colo. 2001).  The inquiry, in turn, must focus on the background regulatory scheme against which the reasonableness of Defendants' conduct can be judged.

39.     That context is federal in nature.  Congress and the EPA have weighed the costs and benefits of reliance on fossil fuels, considering both energy and environmental policy.  The federal government has permitted the sale of fossil fuels because affordable energy is fundamental to economic growth and prosperity generally, as well as the national defense.  *Cf. City of Oakland*, 2018 WL 3109726, at *5 ("[O]ur industrial revolution and the development of our modern world has literally been fueled by oil and coal.  Without those fuels, virtually all of our monumental progress would have been impossible.").  Likewise, protecting the environment is a critical imperative that the United States Government has recognized for decades as fundamental to health and quality of life.  Given the diffuse and broad impact of greenhouse gas emissions, Congress has acted through a variety of federal statutes, primarily but not exclusively the Clean Air Act, to strike a balance between energy production, on the one hand, and environmental protection, on the other.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.,*

Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201; Mining and Minerals Policy Act, 30 U.S.C. § 21a.

40.     Congress has also directed federal agencies to facilitate, and even promote, the maximum production of fossil fuels, while balancing environmental protection.  *See, e.g.*, 42 U.S.C. § 13384 ("[T]he Secretary shall transmit a report to Congress containing a comparative assessment of alternative policy mechanisms for reducing the generation of greenhouse gases.").  Likewise, the Executive has ordered federal agencies to "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993).

41.     To determine whether Defendants' conduct is reasonable in light of the existing regulatory framework, a court must evaluate how the federal government struck the balance between energy promotion and environmental protection.[6]  *See, e.g., City of Oakland*, 2018 WL 3109726 at *5.  That inquiry is "inherently federal in character." *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Pet Quarters, Inc.* v. *Depository Tr. &*

---

[6]  Insofar as Plaintiffs ask a court to substitute its judgment on these issues for that of the federal government, it would constitute a "collateral attack on an entire regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotations omitted).  Such an action should be not only removed but also dismissed. *See, e.g., id.* at 724 ("The validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law.").

*Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law).

42.     Insofar as Plaintiffs claim that Defendants misled the United States Government about the relevant policy trade-offs, *see* Am. Compl. ¶¶ 12, 408, they must establish that the government would have adopted different energy and climate policies and consumption patterns absent the alleged misrepresentations.  Such determinations would require a court to construe federal regulatory decision-making standards, and determine how federal regulators would have applied those standards under counterfactual circumstances.  Doing so would also raise a federal issue.

**B.     Plaintiffs' Action Attacks the Federal Government's Own Contracts Requiring Fossil Fuels to Be Developed and Sold, Which Is a Significant Federal Issue under *Grable***

43.     Plaintiffs' action raises a significant federal issue under *Grable* for the further reason that it attacks the decision of the federal government to enter into contracts with Defendant ExxonMobil to (i) extract, develop, and sell fossil fuel resources on federal lands and (ii) supply the federal government with petroleum-based fuels, including the military.  Plaintiffs believe that such activity has harmed them and seek to impose further costs on that activity, which will have the natural effect of reducing Defendants' ability to conduct those activities in an economic manner—if at all.

44.     Further, the Amended Complaint seeks to deprive the federal government of a mechanism for carrying out vital governmental functions and, if successful, would starve the federal treasury of billions of dollars in revenue.  Courts have recognized that the frustration of federal objectives constitutes a federal interest under *Grable*.  *See Gilmore* v. *Weatherford*,

694 F.3d 1160, 1174 (10th Cir. 2012) ("As explained in *Grable*, a 'substantial federal issue' is one that 'indicat[es] a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'  Such an interest is present here." (citation omitted)); *Nicodemus* v. *Union Pac. Corp.*, 440 F.3d 1227, 1236 (10th Cir. 2006) ("We agree that the contested interpretation of the federal land-grant statutes as between these parties involves a substantial federal issue."). The potential for Plaintiffs' lawsuit to deprive the United States Government of its preferred means of implementing federal policy presents another federal issue.

### C.   Plaintiffs' Action Threatens to Interfere with the Political Branches' Conduct of Foreign Affairs, Which Is Another Significant Federal Issue under *Grable*

45.   Plaintiffs' claims also satisfy *Grable* because they have far "more than incidental effect[s] on foreign affairs."  *Garamendi*, 539 U.S. at 418.  Claims that implicate the "exercise of state power that touches on foreign relations" in a significant way "must yield to the National Government's policy."  *Id.* at 13.  That is due to "the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  *Id.* (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).

46.   Addressing climate change has been the subject of international negotiations for decades, from the adoption of the United Nations Framework Convention on Climate Change in 1992 through the Paris Agreement in 2016.  The United States' approach to these delicate negotiations has evolved over time but has always sought to balance environmental policy with robust economic growth.  *See, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily

polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

47.     Plaintiffs' lawsuit asks a court to weigh in on precisely those issues.  To adjudicate their claims, a court must consider whether restrictions and burdens beyond those established in international agreements should limit Defendants' ability to extract, refine, and distribute energy.[7]  That raises another significant federal issue sufficient to satisfy the first element of *Grable*.

48.     All three of the federal issues raised in the Amended Complaint are disputed and substantial, thus satisfying the second and third elements of *Grable* as well.  The issues are disputed because Defendants will seek dismissal of Plaintiffs' claims based on their incompatibility with federal regulations and policy, including those pertaining to energy and the environment, and because the claims undermine federal contracting decisions and the conduct of foreign affairs.  The issues are substantial because they pertain to vital elements of federal

---

[7]  To the extent Plaintiffs seek to regulate global greenhouse gas emissions in a manner inconsistent with the treaties and international commitments of the United States Government, their Complaint is subject not only to removal, but to dismissal as well.  "No State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States* v. *Pink*, 315 U.S. 203, 233–34 (1942).

authority: (i) national energy and environmental policy; (ii) federal contracts for energy development and supply; and (iii) international agreements pertaining to the environment and economic development.  And an adverse ruling could have significant consequences on those issues.  *See, e.g.*, *Tenn. Gas*, 850 F.3d at 724 (finding federal issues substantial where "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law.").  Each of these weighty concerns is independently sufficient to satisfy *Grable*'s requirement that the federal issue be substantial.

> **D.**     **The Significant Federal Issues Plaintiffs Have Raised are Disputed, Substantial, and Properly Resolved in a Federal Forum**

49.     Finally, the exercise of federal jurisdiction over this action is fully "consistent with congressional judgment about the sound division of labor between state and federal courts," *Grable*, 545 U.S. at 313, satisfying *Grable*'s fourth element.  At their core, the issues raised in the Amended Complaint pertain to the appropriate trade-off between national energy production and pollution control.  Those issues are federal in nature, involving the regulation of vital national resources, environmental law, foreign policy and national security.  Federal courts are the traditional forums for adjudicating such claims.  Indeed, permitting state courts to hear these claims would threaten the balance in federal-state relations.  State governments must yield to the federal government in such matters so that its exclusively national power is "entirely free from local interference."  *Hines* v. *Davidowitz*, 312 U.S. 52, 63 (1941).  As Judge Alsup concluded just days ago in *City of Oakland*, the "international reach of the alleged wrong" of climate change requires "the scope of plaintiffs' claims to be decided under federal law," thereby opening the doors to a federal forum for that decision to be made.  2018 WL 3109726, at *9.

50.     Accordingly, the Amended Complaint raises federal issues that satisfy the requirements of *Grable* and provide another basis for removal to federal court.

## IV.     PLAINTIFFS' CLAIMS ARISE IN PART FROM INCIDENTS THAT OCCURRED IN FEDERAL ENCLAVES LOCATED WITHIN PLAINTIFFS' BORDERS

51.     Federal enclave jurisdiction provides another basis for removal.  "The United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'for the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'" *Akin*, 156 F.3d at 1034 (quoting U.S. Const. art. I, § 8, cl. 17).  "Such places are 'federal enclaves' within which the United States has exclusive jurisdiction."  *Id.* Causes of action "which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."  *Id.*

52.     Here, Plaintiffs' claims arise, in part, from incidents occurring in two federal enclaves within their borders: (i) Rocky Mountain National Park, and (ii) Uncompahgre National Forest.

53.     Rocky Mountain National Park is a federal enclave.  The federal government "purchased" the land comprising Rocky Mountain National Park within the meaning of Article I, Section 8, Clause 17 of the Constitution.  The State of Colorado ceded these lands, and exclusive jurisdiction over them, to the federal government.  C.R.S. § 3-1-130 ("Exclusive jurisdiction shall be and the same is hereby ceded to the United States of America over and within all of the territory which is now included in that tract of land in the state of Colorado set aside and dedicated for park purposes by the United States, known as the Rocky Mountain National Park").  No later than January 26, 1915, the federal government accepted jurisdiction over Rocky

Mountain National Park when President Woodrow Wilson signed the Rocky Mountain National Park Act, making it a federal enclave.  *See* 16 U.S.C. §§ 191–195a; *see also* Grand Lake Colo., *History of Rocky Mountain National Park*, https://grandlakechamber.com/rocky-mountain-national-park-history/ (last visited June 27, 2018).  A substantial portion of Rocky Mountain National Park is within the borders of Boulder County.

54.     Plaintiffs' allegations regarding the impact of climate change on their communities arise in part from incidents occurring in the portion of Rocky Mountain National Park that is within Boulder County.  Plaintiffs support their claims by asserting in the Amended Complaint that Defendants are responsible for a recent severe insect outbreak across Rocky Mountain National Park.  Am. Compl. ¶ 183.  Plaintiffs also allege that "climate change will bring more (and more serious) heat waves, wildfires, droughts, and floods to the State," which necessarily includes Rocky Mountain National Park.  *Id.* ¶ 3.  Plaintiffs further allege that "Boulder is projected to see an increase in the intensity of short duration rain events," and "an increased risk of flooding, which threatens people, property and infrastructure in all of Plaintiff[s'] communities," necessarily including Rocky Mountain National Park.  *Id.* ¶¶ 162–63.  The Amended Complaint's claims, therefore, arise from incidents in a federal enclave**.**

55.     Uncompahgre National Forest is a federal enclave.  The federal government "purchased" the land comprising the Uncompahgre National Forest within the meaning of Article I, Section 8, Clause 17 of the Constitution.  The State of Colorado ceded these lands, and exclusive jurisdiction over them, to the federal government.  C.R.S. § 3-1-122.  No later than President Theodore Roosevelt's June 14, 1905 proclamation, the federal government accepted jurisdiction of the Uncompahgre National Forest Reserve and designated it the "The

Uncompahgre Forest Reserve." Proclamation No. 576 (June 14, 1905). A significant portion of Uncompahgre National Forest is within the borders of San Miguel County.

56.      Plaintiffs' allegations regarding the impact of climate change on their communities arise from incidents occurring in the portion of Uncompahgre National Forest that is within San Miguel County. For example, the Amended Complaint alleges that the San Miguel River "connects the communities of the County from the high alpine headwater towns dependent on consistent snow pack, forested landscapes and a healthy river system to the agricultural communities dependent on healthy spring runoff and summer flows." Am. Compl. ¶ 31. This connecting stretch of the San Miguel River runs through the portion of Uncompahgre National Forest that is within San Miguel County. The Amended Complaint alleges that global warming has increased the risk of flooding in this area: "San Miguel County is extremely susceptible to riverine flooding given the steep mountainous terrain and the multitude of creeks and streams that eventually flow into the San Miguel River." *Id.* ¶ 236. Those phenomena occur in the portion of Uncompahgre National Forest where the San Miguel River is found, which is within the borders of San Miguel County. The Amended Complaint's claims, therefore, arise in part from incidents that have occurred or will allegedly occur in a federal enclave.

57.      Where, as here, the Amended Complaint alleges injuries arising from incidents in federal enclaves, removal is appropriate.

## V.   THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

58.      This Court also has original jurisdiction over this action pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1349(b). "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the [outer Continental Shelf

("OCS")] and to provide for the development of those natural resources." *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994).  The OCS includes all submerged lands that belong to the United States but are not part of any state.  43 U.S.C. §§ 1301, 1331.

59.     "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA."  *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  And OCSLA declares it "to be the policy of the United States that . . . the outer Continental Shelf . . . should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the federal government relating to exploration for, and development and production of, minerals of the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

60.     Under OCSLA, the Department of Interior administers an extensive federal leasing program to develop and exploit the oil and gas resources of the OCS.  43 U.S.C. § 1334 *et seq.*  Pursuant to that authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of Abigail

Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Before the H. Comm. on Nat. Res.

(Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.

61.    OCSLA provides for federal jurisdiction over any action that "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1).[8]

62.    Courts have construed OCSLA's statutory language as "straightforward and broad." *See In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). The breadth of this grant of jurisdiction reflects the Act's "expansive substantive reach." *See EP Operating Ltd. P'ship*, 26 F.3d at 569. When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985); *see also Ronquille* v. *Aminoil Inc.*, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014) (finding the arising out of prong satisfied because "at least part of the work that Plaintiff allege[d] caused his exposure to asbestos arose out of or in connection with Shell's OCS operations"). Consistent with Congress' intent, courts have repeatedly found OCSLA jurisdiction where resolution of the dispute could foreseeably affect the efficient exploitation of minerals from the OCS.

---

[8]  Likewise, 43 U.S.C. § 1333(a)(1) states that "[t]he Constitution and laws . . . of the United States are extended to the subsoil and seabed of the outer Continental Shelf . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

63. OCSLA jurisdiction can exist even if a complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. Likewise, courts are not limited to the facts a plaintiff chooses to allege. To determine whether claims fall within OCSLA jurisdiction, courts may consider facts outside the operative complaint. *See, e.g.*, *Plains Gas Solutions* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014).

64. Plaintiffs' claims fall within the reach of OCSLA jurisdiction because they arise from, or are connected to, Defendant ExxonMobil's activities in the OCS. For decades, Defendant ExxonMobil and/or its affiliated companies have participated in the OCS leasing program, and they continue to conduct oil and gas operations on the OCS. *See* Bureau of Ocean Energy Mgmt., Lease Owner Online Query, https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx (search in "Company Name" field for "Exxon Mobil Corporation").

65. Defendant ExxonMobil is a long-standing participant in the program and currently owns lease interests in "one of the largest [deepwater producing] discoveries in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day. ExxonMobil, Worldwide Operations, Crude Trading, Thunder Horse, http://corporate.exxonmobil.com/en/company/worldwide-operations/crude-oils/thunder-horse.

66. In their Amended Complaint, Plaintiffs accuse Defendants of releasing "billions of tons of excess greenhouse gas emissions in the atmosphere" and take issue with all of Defendants' conduct that allegedly "exacerbated dangerous alterations in the climate." Am. Compl. ¶¶ 15, 445. By making all of Defendants' conduct the subject of their lawsuit, Plaintiffs necessarily sweep in Defendant ExxonMobil's activities on the OCS. Likewise, Plaintiffs'

requested relief seeks to impose further costs on the extraction and development of fossil fuels, which will have consequences on Defendants' OCS development activities.  Because Plaintiffs' claims could "alter[] the progress of production activities on the OCS," they "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS."  *Amoco Prod. Co.*, 844 F.2d at 1211.  Where, as here, those concerns are present, "Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349."  *Id.*  Because Plaintiffs' claims are connected to Defendant ExxonMobil's operations on the OCS, they are subject to removal under OCSLA jurisdiction.

## VI.  THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

67.   The action is removable under the Federal Officer Removal Statute because federal officers directed Defendant ExxonMobil to engage in the activities challenged in the Amended Complaint.

68.   The Federal Officer Removal Statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  "A private corporation may remove a case under § 1442(a)(1) if it can show: (1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims."  *Greene*, 2000 WL 647190 at * 2 (citing

*Winters* v. *Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398–400 (5th Cir. 1998)).  All three

elements are satisfied here.[9]

69.    First, Defendant ExxonMobil's alleged improper conduct was undertaken, in part,

at the direction of federal officials.  Defendants have long explored for and produced oil and gas

on federal lands pursuant to leases issued by the federal government.  *See, e.g.*, Ex. B.  Under

these leases, parties such as Defendant ExxonMobil, are required to conduct exploration,

development and production activities that, "in the absence of a contract with a private firm, the

Government itself would have had to perform."  *Watson* v. *Phillip Morris Companies, Inc.*,

551 U.S. 142, 154 (2007).  OCS leases obligate Defendant ExxonMobil to "develop[] . . . the

leased area" diligently, including carrying out exploration, development and production activities

approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate

recovery of hydrocarbons from the leased area."  Ex. C § 10.

70.    Defendant ExxonMobil's OCSLA leases instruct that "[t]he Lessee *shall comply*

with all applicable regulations, orders, written instructions, and the terms and conditions set forth

in this lease" and that "[a]fter due notice in writing, the Lessee *shall drill* such wells and produce

at such rates as the Lessor may require in order that the Leased Area or any part thereof may be

properly and timely developed and produced in accordance with sound operating principles."

Ex. B § 10 (emphasis added).  All drilling takes place "in accordance with an approved

exploration plan (EP), development and production plan (DPP) or development operations

_____

[9]  Defendant ExxonMobil is a corporation that constitutes a "person" within the meaning of the statute.  The Amended Complaint alleges that Defendants are private corporations, Am. Compl. ¶¶ 47, 58, 72, which the Tenth Circuit has found to have the right to remove a case under § 1442(a)(1).  *See Greene*, 2000 WL 647190 at *2.

coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which had to conform to "diligence" and "sound conservation practices." Ex. C §§ 9, 10. Federal officers further have reserved the rights to control the rates of mining, Ex. B § 10, and to obtain "prompt access" to facilities and records. Ex. B § 11; Ex. C § 12.

71. The government also maintains certain controls over the disposition of the leased oil and gas after it is removed from the ground. For example, the government can precondition a lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe," Ex. B § 15(d), Ex. C § 15(d), and mandate that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners," Ex. B § 15(c); Ex. C § 15(c).

72. In light of these restrictions, obligations, and directives, Defendant ExxonMobil was acting at the direction of a federal officer within the meaning of Section 1442(a)(1) when it fulfilled its obligations under the leases. The Tenth Circuit reached a similar conclusion when adjudicating claims arising from an EPA-mandated cleanup. In that case, the Tenth Circuit held that a chemical company was acting under federal direction when it "implemented a remedy selected by the EPA" that governed the cleanup. *Greene*, 2000 WL 647190 at *2. When carrying out its duties under federal leases, Defendant ExxonMobil is likewise following the direction of the federal government.

73. Second, there is a causal nexus between Plaintiffs' claims and the conduct Defendant ExxonMobil performed at the federal officer's direction. Plaintiffs complain about Defendant ExxonMobil's development and promotion of fossil fuels. Am. Compl. ¶¶ 321–26.

They allege that the drilling and production operations Defendant ExxonMobil performed led to the sale of fossil fuels, including to the federal government, which led to the release of greenhouse gases by end-users. But that activity was precisely what the federal leases called upon Defendant ExxonMobil to do. Furthermore, the oil and gas Defendant ExxonMobil extracted—which the federal government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendant ExxonMobil to fuel its military operations—is the very same oil and gas that Plaintiffs allege has created a nuisance and a trespass. Plaintiffs' claims therefore challenge the same conduct that was mandated by the leases.

74.     Third, Defendants have several federal defenses to Plaintiffs' claims that are not just colorable (as required under Section 1442(a)), but meritorious. *See Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"). These defenses include preemption, *see Colorado Dept. of Pub. Health and Envtl., Hazardous Materials and Waste Mgmt. Div.* v. *U.S.*, 693 F.3d 1214, 1222 (10th Cir. 2012); the government contractor defense, *see Boyle*, 487 U.S. at 511–12; *Equity Staffing Grp. Inc.*, 2014 WL 2566316, at *2–3, and that Plaintiffs' claims are barred by the Commerce Clause, Due Process Clause, the First Amendment, and the foreign affairs doctrine. Each of these colorable federal defenses is sufficient to satisfy Section 1442.

75.     Accordingly, the Federal Officer Removal Statute authorizes removal.

## VII.    THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

76.     The Amended Complaint is also removable because it relates to bankruptcy proceedings.

77.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power," 28 U.S.C. § 1452(a), so long as the civil proceedings arise under or are "related to cases under" the bankruptcy code.  28 U.S.C. § 1334(b).

78.     An action is "related" to a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy." *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990).  Removal is appropriate not just for pending bankruptcy cases but even for those in post-confirmation status so long as the action would affect the creditors' recovery under a particular plan. *See In re CF Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).

79.     There are many other bankrupt entities that, while not yet joined, are crucial to Plaintiffs' action.  Plaintiffs' claims are purportedly predicated on historical activities of Defendants, including predecessor companies and companies that Defendants may have acquired or with which they may have merged, as well as the historical activities of numerous unnamed but now bankrupt entities. Am. Compl. ¶¶ 48–62, 73–79.  The claims Plaintiffs raise here could very well have some effect on at least one of those bankrupt estates.

80.     Accordingly, the Bankruptcy Removal Statute provides a further basis for removal to federal court.

81.     Based on the foregoing, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

## VENUE

82.     The United States District Court for the District of Colorado is the appropriate

venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where

Plaintiffs originally filed this case, in the Boulder County Combined Court.  *See* 28 U.S.C.

§ 84(a); 28 U.S.C. § 1441(a).

83.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§ 1391(b)(2)

and 1446(a)

## FILING OF NOTICE OF REMOVAL

84.     Pursuant to 28 U.S.C. § 1446(d), the filing of a copy of this Notice of Removal

with the Clerk of the State Court effects the removal of the State Court Action.  A copy of the

Notice of Filing of Notice of Removal, filed contemporaneously in the State Court Action, is

attached hereto as Exhibit A.

## NO WAIVER

85.     No waiver, and no admission of fact, law, or liability, including, without

limitation, the amount of damages, if any, is intended by this Notice of Removal, and all

defenses, affirmative defenses, and rights are reserved.

## UNANIMITY

86.     All Defendants have consented to removal of this action.

## CONCLUSION

For the reasons set forth above, Defendants remove this action to the United States

District Court for the District of Colorado.

Dated:  June 29, 2018

Respectfully submitted,

*Below-signed counsel certifies that he is a member in good standing of the bar of this Court.*

s/ *Evan Bennett Stephenson*

Hugh Q. Gottschalk
Evan Bennett Stephenson
Wheeler Trigg O'Donnell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202
303-244-1800
gottschalk@wtotrial.com
stephenson@wtotrial.com

Attorneys for Defendants,
Suncor Energy (U.S.A.) Inc., Suncor Energy
Sales Inc., and Suncor Energy Inc.

s/ Colin G. Harris

Colin G. Harris, Atty. Reg. 18215
FAEGRE BAKER DANIELS LLP
1470 Walnut St., Suite 300
Boulder, CO 80302
Telephone: (303) 447-7700
Fax: (303) 447-7800
E-mail: colin.harris@FaegreBD.com

s/ Theodore V. Wells, Jr.

Theodore V. Wells, Jr.
NY Atty. Reg. 3936770
Daniel J. Toal
N.Y. Atty. Reg. 2811578
Jaren Janghorbani N.Y. Atty. Reg. 4284329
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: twells@paulweiss.com
E-mail: dtoal@paulweiss.com
E-mail: jjanghorbani@paulweiss.com

*Attorneys for Defendant Exxon Mobil Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of June 2018, a true and accurate copy of the

foregoing **NOTICE OF REMOVAL** was filed via ECF and served via electronic mail on the

following:

Kevin S. Hannon
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
Telephone: (303) 861-5188
Fax: (202) 466-5189
E-mail: khannon@hannonlaw.com

David Bookbinder
D.C. Bar No. 455525
NISKANEN CENTER
820 First Street, NE, Suite 675
Washington, DC 20002
E-mail: dbookbinder@niskanencenter.org

Michelle C. Harrison
Marco Simons
Alison Borochoff-Porte
EARTHRIGHTS INTERNATIONAL
1612 K Street NW #401
Washington, DC 20006
Telephone: (202) 466-5188
Fax: (202) 466-5189
E-mail: michelle@earthrights.org
E-mail: marco@earthrights.org
E-mail: alison@earthrights.org

*Counsel for Plaintiffs*

s/ *Evan Bennett Stephenson*