IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-1672-WYD-SKC

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

                                                            Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

                                                            Defendants.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

---

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF ARGUMENT .......................................................................... 3

III.  LEGAL STANDARDS ...................................................................................... 5

IV.  ARGUMENT ...................................................................................................... 6

    A. Plaintiffs' Claims Arise Under Federal Common Law ................................. 6

       1. Courts Have Repeatedly Concluded That Federal Common Law Governs
          Global Warming–Based Public Nuisance Claims ..................................... 7

       2. Federal Common Law Governs Plaintiffs' Claims................................... 10

       3. *AEP* and *Kivalina* Did Not Authorize Transboundary Pollution Suits to Be
          Decided Under State Law ........................................................................ 13

       4. Plaintiffs' Purported Distinction Between Producers and Emitters Is
          Unavailing................................................................................................ 15

       5. Plaintiffs' Request for Damages Threatens a Conflict with Federal Statutory
          and Regulatory Schemes.......................................................................... 15

       6. Federal Common Law Is Not a Preemption Defense; It Provides an
          Independent Basis for Federal Question Jurisdiction ............................... 17

       7. Any Potential Displacement of Plaintiffs' Federal Common Law Claims
          Does Not Create State Common Law Claims .......................................... 19

    B. By Seeking to Second-Guess Federal Regulations and Cost-Benefit Analyses,
       Plaintiffs' Claims Raise Disputed, Substantial Federal Issues Under *Grable* ............. 21

       1. The First *Grable* Prong Is Satisfied Because Plaintiffs' Claims Necessarily
          Raise Multiple Federal Issues ................................................................. 22

       2. The Second and Third *Grable* Prongs Are Satisfied Because the Federal
          Interests at Issue Are Both Substantial and Disputed ............................. 27

       3. The Fourth *Grable* Prong Is Satisfied Because Federal Jurisdiction Does Not
          Upset Principles of Federalism ............................................................... 28

    C. This Case Is Removable Because It Is Completely Preempted by Federal Law ........... 29

D. This Action Is Removable Because It Is Based on Defendants' Activities That Occurred at the Direction of the Federal Government, on Federal Lands, and on the Outer Continental Shelf ................................................................................. 32

    1. The Action Is Removable Under the Federal Officer Removal Statute ................. 32

    2. The Action Is Removable Under the Federal Enclave Doctrine ............................ 36

    3. Plaintiffs' Claims Arise Out of Defendants' Operations on the Outer Continental Shelf ............................................................................................. 37

E. The Action Is Removable Under the Bankruptcy Code ................................................. 39

V. CONCLUSION ............................................................................................................. 40

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                  **Page(s)**

*Aetna Health Inc.* v. *Davila*,
    542 U.S. 200 (2004) ..............................................................................................5

*Akin* v. *Ashland Chem. Co.*,
    156 F.3d 1030 (10th Cir. 1998) ....................................................................6, 36

*Am. Elec. Power Co., Inc.* v. *Connecticut*,
    564 U.S. 410 (2011) ..................................................................................... passim

*Am. Ins. Ass'n* v. *Garamendi*,
    539 U.S. 396 (2003) ..............................................................................22, 23, 24, 29

*Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*,
    844 F.2d 1202 (5th Cir. 1988) ....................................................................38, 39

*In re Arch Coal, Inc.*,
    No. 16-40120 (Bankr. E.D. Mo. Oct. 4, 2017), ECF No. 1598 ............................40

*Bader Farms, Inc.* v. *Monsanto Co.*,
    2017 WL 633815 (E.D. Mo. Feb. 16, 2017) .........................................................26

*Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co., LLC*,
    850 F.3d 714 (5th Cir. 2017) ....................................................................4, 26, 28

*Beneficial Nat'l Bank* v. *Anderson*,
    539 U.S. 1 (2003) .................................................................................................30

*Bennett* v. *Sw. Airlines Co.*,
    484 F.3d 907 (7th Cir. 2007) ..............................................................................27

*Blanco* v. *Fed. Express Corp.*,
    2016 WL 4921437 (W.D. Okla. Sept. 15, 2016) ............................................17, 18

*BMW of N. Am., Inc.* v. *Gore*,
    517 U.S. 559 (1996) .............................................................................................16

*Boyle* v. *United Techs. Corp.*,
    487 U.S. 500 (1988) ...............................................................................................3

*California* v. *BP p.l.c.*,
    2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) ................................................ passim

*Breuer* v. *Jim's Concrete of Brevard, Inc.*,
    538 U.S. 691 (2003)............................................................................................5

*Cal. Dump Truck Owners Ass'n* v. *Nichols*,
    784 F.3d 500 (9th Cir. 2015) ................................................................29, 32

*Cerny* v. *Marathon Oil Corp.*,
    2013 WL 5560483 (W.D. Tex. Oct. 7, 2013) ..........................................31

*In re CF & I Fabricators of Utah, Inc.*,
    150 F.3d 1233 (10th Cir. 1998) ................................................................39

*City & Cty. of S.F.* v. *PG & E Corp.*,
    433 F.3d 1115 (9th Cir. 2006) ..................................................................40

*Illinois* v. *City of Milwaukee*,
    406 U.S. 91 (1972).............................................................................6, 8, 9

*City of Milwaukee* v. *Illinois*,
    451 U.S. 304 (1981)....................................................................................13

*City of N.Y.* v. *BP p.l.c.*,
    2018 WL 3475470 (S.D.N.Y. July 19, 2018) ................................. passim

*City of Oakland* v. *BP p.l.c.*,
    2018 WL 3109726 (N.D. Cal. June 25, 2018) ............................... passim

*Cty. of San Mateo* v. *Chevron Corp.*,
    294 F. Supp. 3d 934 (N.D. Cal. 2018),
    *appeal docketed*, No. 18-15499 (9th Cir. Mar. 27, 2018)..........................11, 21, 35

*N.C. ex rel. Cooper* v. *Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ..............................................................31, 32

*Crosby* v. *Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)......................................................................22, 23, 24

*In re Deepwater Horizon*,
    745 F.3d 157 (5th Cir. 2014) ................................................................6, 38

*Devon Energy Prod. Co., L.P.* v. *Mosaic Potash Carlsbad, Inc.*,
    693 F.3d 1195 (10th Cir. 2012) ........................................................6, 18, 32

*EP Operating Ltd. P'ship* v. *Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ......................................................................37

*Massachusetts* v. *EPA*,
   549 U.S. 497 (2007)................................................................................................11, 28

*Erie R.R. Co.* v. *Tompkins*,
   304 U.S. 64 (1938)..................................................................................................3, 7, 19

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)....................................................................................................5

*Exxon Shipping Co.* v. *Baker*,
   554 U.S. 471 (2008)..................................................................................................16

*Exxon Mobil Corp.* v. *Salazar*,
   2011 WL 3612296 (W.D. La. Aug. 12, 2011) ........................................................34

*Exxon Mobil Corp.* v. *Salazar*,
   No. 11-1474 (W.D. La. Jan. 17, 2012), ECF No. 18 .............................................34

*Fadhliah* v. *Societe Air Fr.*,
   987 F. Supp. 2d 1057 (C.D. Cal. 2013) ...................................................................31

*Fayard* v. *Ne. Vehicle Servs., LLC*,
   533 F.3d 42 (1st Cir. 2008)........................................................................................32

*Frontier Airlines, Inc.* v. *United Air Lines, Inc.*,
   758 F. Supp. 1399 (D. Colo. 1989)............................................................................6

*Fung* v. *Abex Corp.*,
   816 F. Supp. 569 (N.D. Cal. 1992) ......................................................................36, 37

*In re Gardner*,
   913 F.2d 1515 (10th Cir. 1990) ............................................................................6, 39

*California* v. *Gen. Motors Corp.*,
   2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ..............................................3, 20, 29

*Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005).......................................................................................... passim

*Greene* v. *Citigroup, Inc.*,
   2000 WL 647190 (10th Cir. May 19, 2000) ............................................................33

*Grynberg Prod. Corp.* v. *British Gas, p.l.c.*,
   817 F. Supp. 1338 (E.D. Tex. 1993)........................................................................27

*Gunn* v. *Minton*,
568 U.S. 251 (2013)..........................................................................................22, 28

*Her Majesty The Queen in Right of the Province of Ont.* v. *City of Detroit*,
874 F.2d 332 (6th Cir. 1989) ..........................................................................31

*Humble Pipe Line Co.* v. *Waggonner*,
376 U.S. 369 (1964)........................................................................................5, 6

*Int'l Paper Co.* v. *Ouellette*,
479 U.S. 481 (1987)....................................................................11, 14, 16, 19

*Missouri* v. *Illinois*,
180 U.S. 208 (1901)............................................................................................6

*Jackson* v. *Johns-Manville Sales Corp.*,
750 F.2d 1314 (5th Cir. 1985) ......................................................................12

*Jefferson Cty.* v. *Acker*,
527 U.S. 423 (1999)..........................................................................................33

*Kurns* v. *R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012)..........................................................................................16

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985) ......................................................................39

*Lindstrom* v. *United States*,
510 F.3d 1191 (10th Cir. 2007) ......................................................................5

*Wyoming* v. *Livingston*,
443 F.3d 1211 (10th Cir. 2006) ......................................................................6

*Lowell Staats Mining Co.* v. *Phila. Elec. Co.*,
651 F. Supp. 1364 (D. Colo. 1987)................................................................5, 6

*Arizona* v. *Manypenny*,
451 U.S. 232 (1981)......................................................................................33, 34

*McKay* v. *City & Cty. of S.F.*,
2016 WL 7425927 (N.D. Cal. Dec. 23, 2016)..............................................26, 29

*Mesa* v. *California*,
489 U.S. 121 (1989)..........................................................................................35

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013)..................................................................12

*Metro. Life Ins. Co.* v. *Taylor*,
    481 U.S. 58 (1987)............................................................................4

*In re Miles*,
    430 F.3d 1083 (9th Cir. 2005) ..........................................................31

*Nat'l Audubon Soc'y* v. *Dep't of Water*,
    869 F.2d 1196 (9th Cir. 1988) ..........................................................14

*Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*,
    471 U.S. 845 (1985)........................................................................3, 4

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
    483 F. Supp. 2d 934 (N.D. Cal. 2007) ..............................................27

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ............................................8, 9

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) ..................................................... passim

*In re Peabody Energy Corp.*,
    No. 16-42529 (Bankr. E.D. Mo. Aug. 28, 2017), ECF No. 3362............40

*In re Peabody Energy Corp.*,
    No. 16-42529 (Bankr. E.D. Mo. Oct. 24, 2017), ECF 3514 ............40

*Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*,
    559 F.3d 772 (8th Cir. 2009) ..........................................................26

*United States* v. *Questar Gas Mgmt. Co.*,
    2010 WL 5279832 (D. Utah Dec. 14, 2010)......................................30

*Richards* v. *Lockheed Martin Corp.*,
    2012 WL 13081667 (D.N.M. Feb. 24, 2012) ....................................37

*Rosseter* v. *Indus. Light & Magic*,
    2009 WL 210452 (N.D. Cal. Jan. 27, 2009)......................................36

*Safe Sts. All.* v. *Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ..........................................................24

*Colorado ex rel. Salazar* v. *ACE Cash Express, Inc.*,
  188 F. Supp. 2d 1282 (D. Colo. 2002) .................................................................32

*Sam L. Majors Jewelers* v. *ABX, Inc.*,
  117 F.3d 922 (5th Cir. 1997) .............................................................................17

*San Diego Bldg. Trades Council* v. *Garmon*,
  359 U.S. 236 (1959) ..........................................................................................16

*United States* v. *Standard Oil Co.*,
  332 U.S. 301 (1947) .......................................................................................3, 24

*Steel Co.* v. *Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................20

*Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ...............................................................................7, 12, 19

*Turgeau* v. *Admin. Review Bd.*,
  446 F.3d 1052 (10th Cir. 2006) .......................................................................6, 17

*Watson* v. *Phillip Morris Co., Inc.*,
  551 U.S. 142 (2007) .............................................................................33, 34, 35

*California* v. *Watt*,
  668 F.2d 1290 (D.C. Cir. 1981) .........................................................................34

*Wayne* v. *DHL Worldwide Express*,
  294 F.3d 1179 (9th Cir. 2002) ...........................................................................17

*Willingham* v. *Morgan*,
  395 U.S. 402 (1969) ...................................................................................33, 34

*In re Wilshire Courtyard*,
  729 F.3d 1279 (9th Cir. 2013) ...........................................................................40

## STATUTES AND REGULATIONS

5 U.S.C. §553 ....................................................................................................30

16 U.S.C. §1451 ................................................................................................25

28 U.S.C. §1334 ...........................................................................................5, 39

28 U.S.C. §1367 ..................................................................................................5

28 U.S.C. §1442 ................................................................................................5, 33, 34

28 U.S.C. §1452 .....................................................................................................5, 39

30 U.S.C. §21a .............................................................................................................25

42 U.S.C. §§4321–70 ..................................................................................................25

42 U.S.C. §7401 .....................................................................................................25, 30

42 U.S.C. §7426 .............................................................................................................4

42 U.S.C. §7604 .....................................................................................................29, 30

42 U.S.C. §7607 .....................................................................................................29, 30

42 U.S.C. §13384 ........................................................................................................25

42 U.S.C. §13389 ........................................................................................................25

42 U.S.C. §13401 ........................................................................................................13

42 U.S.C. §13411 ........................................................................................................13

42 U.S.C. §13415 ........................................................................................................13

43 U.S.C. §1344 ..........................................................................................................34

43 U.S.C. §1349 .....................................................................................................5, 37

43 U.S.C. §1701 ..........................................................................................................25

43 U.S.C. §1802 ..........................................................................................................39

30 C.F.R. §§250.168–77 ............................................................................................34

30 C.F.R. §550.120 .....................................................................................................25

30 C.F.R. §§550.181–85 ............................................................................................34

40 C.F.R. §51.166 .......................................................................................................30

40 C.F.R. §52.21 .........................................................................................................30

43 C.F.R. §§3101.1–2 ................................................................................................25

43 C.F.R. §3162.1 .......................................................................................................25

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ....................................................25

**OTHER AUTHORITIES**

Haynes and Boone, LLP, Oil Patch Bankruptcy Monitor,
    http://www.haynesboone.com/~/media/files/energy_bankruptcy_reports/2017/
    2017_oil_patch_monitor_20171031.ashx/...........................................................................39

Restatement (Second) of Torts §821B cmt. f (Am. Law Inst. 1977)...........................................26

San Miguel Watershed Coalition, State of the San Miguel Watershed (2014),
    http://sanmiguelwatershed.org/wp-content/uploads/2012/05/State-of-the-San-
    Miguel-Watershed-2014.pdf.............................................................................................37

## I.   INTRODUCTION[1]

This case belongs in federal court because it threatens to interfere with longstanding federal policies over matters of uniquely national importance, including energy policy, environmental protection, and foreign affairs.  As two other district courts recently held, claims akin to those brought by the Board of County Commissioners of Boulder County, the Board of County Commissioners of San Miguel County, and the City of Boulder (collectively, "Plaintiffs") are governed by federal common law.  *See California* v. *BP p.l.c.*, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018) (Alsup, J.) ("*CA I*") (denying remand); *City of Oakland* v. *BP p.l.c.*, 2018 WL 3109726 (N.D. Cal. June 25, 2018) (Alsup, J.) ("*CA II*") (dismissing action); *City of N.Y.* v. *BP p.l.c.*, 2018 WL 3475470 (S.D.N.Y. July 19, 2018) (Keenan, J.) ("*NYC*") (same).

Over the past century, the federal government (the "Government")—recognizing that a stable energy supply is critical for the preservation of our economy and national security—has taken steps to promote fossil fuel production and worked to decrease reliance on foreign oil.  In particular, the Government has opened federal lands and coastal areas to fossil fuel extraction, established strategic petroleum reserves, and contracted with producers to develop federal resources.  The Government has thus sought to strike a balance between environmental protection and maintaining a stable energy supply to serve national economic and security needs.  It has also engaged in extensive negotiations with other nations to craft a workable international framework for responding to global warming.  These negotiations have required carefully researching and

---

[1]   Defendants Suncor Energy Inc., a Canadian corporation not registered to do business in the U.S., and Exxon Mobil Corporation ("ExxonMobil") contend that they are not subject to personal jurisdiction in Colorado, and submit this opposition brief subject to and without waiving this jurisdictional objection.

evaluating how national regulations and international commitments could affect the domestic economy, national security, and foreign relations.   This suit challenges these federal decisions, threatening to upend the Government's reasoned determinations, and asks the judiciary to wade into the thicket of the "worldwide problem of global warming"—which for "sound reasons" should be "determined by our political branches, not by our judiciary."   *CA II*, 2018 WL 3109726, at *9.

As the foregoing makes clear, this case is not just national in scope, but international.   It is, after all, about *global* emissions.   Plaintiffs seek to accomplish indirectly what they cannot do directly: reshape national economic and foreign policies by holding four energy companies liable for harms allegedly caused by worldwide fossil fuel production and the global greenhouse gas ("GHG") emissions of countless nonparties.   Indeed, each of Plaintiffs' six causes of action— public nuisance, private nuisance, trespass, unjust enrichment, violation of the Colorado Consumer Protection Act, and civil conspiracy—is premised on the cumulative effects of global GHG emissions.   (*See, e.g.*, Am. Compl. ("AC") ¶¶126–35.)   Such claims belong in federal court.

In arguing the contrary, Plaintiffs assert that their requested remedies—"[m]onetary relief" and "abatement of the hazards" (AC ¶¶532, 534)—would redress only alleged damage "on Plaintiffs' own property in Colorado." (Pls.' Mot. to Remand, ECF No. 44 ("Mot."), at 1.) But Plaintiffs' claims derive from the nationwide and global activities of not only Suncor Energy (U.S.A.) Inc., Suncor Energy Sales Inc., Suncor Energy Inc., and ExxonMobil (collectively "Defendants"), but also billions of fossil fuel consumers.   As such, Plaintiffs seek to hold Defendants liable for global conduct—the vast majority of which involved nonparties and occurred outside of Colorado. (*See* Defs.' Nonparty Designation, ECF No. 45, at 2.)   Put simply, the claims unavoidably require adjudication of whether the benefits of fossil fuel use outweigh its costs—not

just in Plaintiffs' jurisdictions, or even in Colorado, but on a global scale.  Such claims do not "arise out of state common law."  (Mot. at 8.)

Plaintiffs therefore are wrong to suggest that they "have not pled federal claims" regarding fossil fuel exploration, production, promotion, and use.  (*Id.* at 4.)  Plaintiffs target *global* warming, and the transnational conduct that term entails.  (*See, e.g.*, AC ¶¶125–38.)  This is why similar lawsuits have been brought in federal court, under federal law.  It also explains why, when federal courts dismissed those lawsuits, those plaintiffs made no effort to pursue their claims in state courts.  *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut*, 564 U.S. 410 (2011) ("*AEP*"); *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012); *California* v. *Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ("*GMC*").  Defendants thus properly removed this action, and the Court should deny the remand motion.

## II.   SUMMARY OF ARGUMENT

Removal of this action was proper for four overarching reasons:

*First*, federal common law necessarily governs Plaintiffs' claims, no matter how Plaintiffs characterize them.  The Supreme Court has held for decades that cases implicating "uniquely federal interests" "are governed exclusively by federal law."  *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504 (1988); *see also United States* v. *Standard Oil Co.*, 332 U.S. 301, 309–10 (1947) (state law cannot "control" where "the question is one of federal policy," due to "considerations of federal supremacy in the performance of federal functions [and] the need for uniformity").  That includes this case because, even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Kivalina*, 696 F.3d at 855.  And removal of such cases is proper because federal courts have

jurisdiction over "claims founded upon federal common law." *Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985).  Recent rulings from two other district courts confirm this conclusion.  *CA I*, 2018 WL 1064293 at *2–3; *NYC*, 2018 WL 3475470 at *4.

*Second*, suits alleging only state law claims arise under federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  Here, that "stated federal issue" is "the scope and limitations" of "complex federal regulatory framework[s]." *Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co., LLC*, 850 F.3d 714, 725 (5th Cir. 2017) (holding substantial federal issues raised by state law nuisance claims give rise to federal jurisdiction).  Although nominally focused on alleged environmental consequences within Colorado from increased fossil fuel usage, Plaintiffs' claims predicate liability on emissions resulting from the eventual combustion of fossil fuels that Defendants produce or sell worldwide.  As a result, Plaintiffs' purported state law claims second-guess federal policies concerning economics, the environment, and climate change.

*Third*, Plaintiffs' claims are completely preempted by the Government's foreign affairs power and the Clean Air Act ("CAA"), which, respectively, govern the U.S.'s participation in worldwide climate policy efforts and national regulation of GHG emissions.  Federal courts have jurisdiction over state law claims where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim." *Metro. Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 65 (1987).  Congress allows parties to seek stricter nationwide emissions standards by petitioning the Environmental Protection Agency ("EPA"), the exclusive

means by which a party can seek such relief.  *See* 42 U.S.C. §7426(b).  But Plaintiffs' claims, as explained, go far beyond the authority the CAA reserves to states to regulate certain emissions within their own borders; they seek instead to impose liability for global emissions.  Because these claims "duplicate[], supplement[], or supplant[]" federal law, they are completely preempted. *Aetna Health Inc.* v. *Davila*, 542 U.S. 200, 209 (2004).

*Fourth*, this Court has jurisdiction under various federal statutes and doctrines, including the **(i)** federal officer removal statute, 28 U.S.C. §1442(a)(1) ("Federal Officer Removal"); **(ii)** federal enclave doctrine, *Humble Pipe Line Co.* v. *Waggonner*, 376 U.S. 369, 372–73 (1964); **(iii)** Outer Continental Shelf Lands Act, 43 U.S.C. §1349(b) ("OCSLA"); and **(iv)** Bankruptcy Code, 28 U.S.C. §§1334(b), 1452(a) ("Bankruptcy Removal").

In sum, this case implicates fundamental federal issues of national energy and environmental policy, foreign affairs, and national security.  As a result, federal jurisdiction is present and removal was proper.

## III.   LEGAL STANDARDS

In the Tenth Circuit, a party seeking removal "must carry the burden of proving [jurisdiction] by a preponderance of the evidence."  *Lindstrom* v. *United States*, 510 F.3d 1191, 1193 (10th Cir. 2007).  But where the removing party has shown that "the subject matter of an action qualifies it for removal, the burden is on a plaintiff to find an express exception."  *Breuer* v. *Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 698 (2003).  Jurisdiction over *even a single claim* renders removal proper because federal courts have supplemental jurisdiction over related claims. *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); 28 U.S.C. § 1367.  Courts should not "sanction devices intended to prevent a removal to a federal court where one has that

right." *Lowell Staats Mining Co.* v. *Phila. Elec. Co.*, 651 F. Supp. 1364, 1365 (D. Colo. 1987).  In particular, Plaintiffs cannot defeat removal by artfully "framing claims in terms of state law when" they are "truly federal."  *Frontier Airlines, Inc.* v. *United Air Lines, Inc.*, 758 F. Supp. 1399, 1406 (D. Colo. 1989); *Turgeau* v. *Admin. Review Bd.*, 446 F.3d 1052, 1060 (10th Cir. 2006) (same).

Removal pursuant to federal question jurisdiction is proper where **(i)** the "state law claims are completely pre-empted," or **(ii)** "there is a substantial, disputed federal-law issue necessarily embedded in [the] state law claims."  *Devon Energy Prod. Co., L.P.* v. *Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203–04 (10th Cir. 2012).  The paradigmatic example of such an inherently federal controversy is a "transboundary pollution suit[]."  *Kivalina*, 696 F.3d at 855; *see also Illinois* v. *City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*") ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law.").  Indeed, federal common law has applied to such suits for more than a century.  *Missouri* v. *Illinois*, 180 U.S. 208, 243–45 (1901) (applying federal common law to cross-boundary water pollution case).  Further, various applicable statutes and doctrines have their own removal standards which are broadly construed, including **(i)** Federal Officer Removal; **(ii)** the federal enclave doctrine, *Waggonner*, 376 U.S. at 371–72; **(iii)** OCSLA; and **(iv)** Bankruptcy Removal.[2]

## IV.   ARGUMENT

### A.    Plaintiffs' Claims Arise Under Federal Common Law

Plaintiffs assert that "[n]o federal claims—statutory or common law—are found in [the

---

[2]   *See also, e.g.*, *Wyoming* v. *Livingston*, 443 F.3d 1211, 1224 (10th Cir. 2006) (Federal Officer Removal); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (OCSLA); *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 n.1 (10th Cir. 1998) (federal enclave doctrine); *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990) (Bankruptcy Removal).

AC].” (Mot. 7.)  Quite the opposite.  Supreme Court precedent establishes that Plaintiffs' global warming–based claims in this "transboundary pollution suit[]," *Kivalina*, 696 F.3d at 855, are governed by federal common law, *see AEP*, 564 U.S. at 421.  Because federal common law governs, this action falls within this Court's jurisdiction.  *See CA I*, 2018 WL 1064293, at *2–3; *NYC*, 2018 WL 3475470, at *4.

In response to these two arguments, Plaintiffs' offer five rebuttals.  *First*, they contend that *AEP* and *Kivalina* authorized transboundary pollution suits to be decided under state law.  *Second*, Plaintiffs attempt to distinguish their claims from those in *AEP* and *Kivalina* because Plaintiffs seek to impose liability on producers, not emitters.  *Third*, Plaintiffs claim that, by seeking damages as opposed to injunctive relief, they have managed to skirt any conflict that may arise between federal statutory and regulatory schemes.  *Fourth*, Plaintiffs assert that federal common law can only serve as an ordinary preemption defense, which is not applicable at the remand stage.  *Finally*, Plaintiffs argue that displacement of their federal common law claims would permit state common law to govern an area of uniquely federal interest.  None of these arguments has merit.

### 1.     Courts Have Repeatedly Concluded That Federal Common Law Governs Global Warming–Based Public Nuisance Claims

Although "[t]here is no federal general common law," *Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938), the Supreme Court has long recognized that the law in "some limited areas" will be supplied by "federal common law."  *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).  One such area in which "our federal system does not permit the controversy to be resolved under state law" is where the subject matter implicates "uniquely federal interests," such as where "the interstate or international nature of the controversy makes it inappropriate for state law to control."  *Id.* at 640–41.  Common law actions involving "air and water in their ambient or

interstate aspects" manifestly fit that description, and thus are governed by "federal common law." *AEP*, 564 U.S. at 421.

Plaintiffs' alleged injuries necessarily arise from nationwide (and worldwide) activities and emissions. *See id.*; *Kivalina*, 696 F.3d at 855. And a common law claim alleging pollution from multiple states involves "an overriding federal interest in the need for a uniform rule of decision," calling "for applying federal law." *Milwaukee I*, 406 U.S. at 105 n.6. This commonsense principle has prevailed in many similar climate suits, including the following:

**AEP.** In *AEP*, plaintiffs, including eight states, sued five electric utilities, contending that defendant utility companies' GHG emissions contributed to global warming and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law." 564 U.S. at 418. Like Plaintiffs here, *AEP* plaintiffs "alleged that public lands, infrastructure, and health were at risk from climate change." *Id.* at 418–19. The Supreme Court held that federal common law governs claims involving "air and water in their ambient or interstate aspects," and flatly rejected the notion that global warming nuisance claims could be governed by state law. *Id.* at 421–22. In fact, the Court ruled that "borrowing the law of a particular State would be inappropriate." *Id.* at 422.

**Kivalina.** In *Kivalina*, the Ninth Circuit held that federal common law governed a public nuisance claim premised on allegations nearly identical to Plaintiffs' here. 696 F.3d at 855–56. An Alaskan village asserted a public nuisance claim for damages to its property allegedly resulting from defendant energy companies' "emissions of large quantities of [GHGs]." *Id.* at 853–54. The village asserted its claim under, alternatively, federal and state common law. *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009). The district court

dismissed the federal claim and declined to exercise supplemental jurisdiction over related state law claims. *Id.* at 882–83.  On appeal, a threshold issue was whether federal common law applied to plaintiffs' nuisance case.  696 F.3d at 855.  Citing *AEP* and *Milwaukee I*, the Ninth Circuit held that it did: "[F]ederal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.*  Given the interstate and transnational character of claims asserting damage from global GHG emissions, the court concluded that the suit fell within the rule that "transboundary pollution suits" are governed by "federal common law." *Id.*

**CA I & II.**  In *CA I*, the district court denied motions to remand global warming–based claims brought by Oakland and San Francisco.  2018 WL 1064293, at *1.  The court held that claims addressing "the national and international geophysical phenomenon of global warming . . . are necessarily governed by federal common law." *Id.* at *2.  Citing *AEP*, the court explained that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.*  The court determined that, "as in *Milwaukee I*, *AEP*, and *Kivalina*, a uniform standard of decision is necessary to deal with the issues raised in plaintiffs' complaints." *Id.* at *3.  "If ever a problem cried out for a uniform and comprehensive solution," the court elaborated, "it is the geophysical problem described by the complaints." *Id.*  Indeed, "the scope of the worldwide predicament demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law." *Id.*  For that reason, a "patchwork of fifty different answers to the same fundamental global issue would be unworkable." *Id.*  In subsequently dismissing the case for failure to state a claim, the court affirmed the reasoning in its remand decision: "Although the scope of plaintiffs' claims

is determined by federal law, there are sound reasons why regulation of the worldwide problem of global warming should be determined by our political branches, not by our judiciary." *CA II*, 2018 WL 3109726, at * 9.

*NYC.* In *NYC*, the district court similarly held that global warming–based claims are governed by federal common law because "a federal rule of decision is necessary to protect uniquely federal interests." 2018 WL 3475470, at *3. New York City's claims there, like Plaintiffs' here, relied on "[d]efendants' worldwide fossil fuel production and the use of their fossil fuel products which continue to emit [GHGs] and exacerbate global warming." *Id.* at *4. Unsurprisingly, the court rejected the City's contention that its claims were based on "defendants' production and sale of fossil fuels." *Id.* The court observed that the City was "seeking damages for global-warming related injuries resulting from [GHG] emissions, and not only the production of [d]efendants' fossil fuels." *Id.* Because the City's claims were "based on the 'transboundary' emission of [GHGs]," the court concluded that the "claims arise under federal common law and require a uniform standard of decision." *Id.*

## 2.    Federal Common Law Governs Plaintiffs' Claims

Like the cases discussed above, Plaintiffs' suit—which entails a global assessment of the reasonableness of Defendants' worldwide production, sale, and use of fossil fuels, and the eventual emission of GHGs by billions of nonparties worldwide—is a classic "transboundary pollution suit[]." *Kivalina*, 696 F.3d at 855. As such, under *AEP* and its progeny, federal common law governs. Indeed, Plaintiffs' global warming–related claims are based on national and worldwide emissions of GHGs over the course of decades, even centuries, allegedly resulting in part from the use of fossil fuel products produced or sold by Defendants and many others, and consumed

throughout the world.  (*See, e.g.*, AC ¶¶2–18.)  Federal common law applies to such claims because they inherently implicate interstate and international concerns that are of uniquely federal interest. *See Kivalina*, 696 F.3d at 855–56; *Massachusetts* v. *EPA*, 549 U.S. 497, 519–20 (2007) (recognizing that the "sovereign prerogatives" to force other states to reduce GHG emissions and negotiate emissions treaties are "lodged in the [f]ederal [g]overnment").

Adjudicating Plaintiffs' claims would necessarily require determining "what amount of [$CO_2$] emissions is unreasonable" in light of what is "practical, feasible and economically viable." *AEP*, 564 U.S. at 428.  Any judgment about the reasonableness of Defendants' lawful conduct thus raises an inherently federal question implicating the Government's unique interests in setting national policy regarding energy, the environment, the economy, and national security.  *See id.* at 427–28.  Indeed, even the one court that incorrectly remanded similar claims to state court recognized that global warming–based claims "raise national and perhaps global questions." *Cty. of San Mateo* v. *Chevron Corp.*, 294 F. Supp. 3d 934, 938 (N.D. Cal. 2018).  That decision is now on appeal to the Ninth Circuit.  *Id.*, *appeal docketed*, No. 18-15499 (9th Cir. Mar. 27, 2018).

Allowing Plaintiffs' claims to be governed by state law would conceivably permit suits alleging global warming–related injuries to proceed under 50 different state laws.  This scenario runs counter to Supreme Court precedent, which warns against subjecting out-of-state sources of pollution "to a variety of . . . vague and indeterminate" state standards, thereby allowing states to "do indirectly what they could not do directly—regulate [interstate] conduct." *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 495–96 (1987).

Downplaying this action's broad scope, Plaintiffs repeatedly analogize their claims to run-of-the-mill, state-based product liability claims.  (Mot. 15, 17.)  That analogy is flawed.  In the

end, Plaintiffs are seeking not to address discrete local harms caused by the sale of a product, but rather the global effects caused by the production and (global) use of fossil fuels. The cases Plaintiffs cite concerning local harms are therefore distinguishable.

Plaintiffs' reliance on *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 725 F.3d 65 (2d Cir. 2013) ("*MTBE*"), is illustrative of this distinction. There, the Second Circuit held that the CAA did not preempt New York City's state tort claims against MTBE manufacturers for allegedly contaminating the City's "groundwater well system." *Id.* at 82. Unlike this case, *MTBE* concerned allegations of localized harm. The City alleged that activity within New York resulted in contamination of New York wells. *Id.* Here, by contrast, Plaintiffs' claims stem from the cumulative impact of global fossil fuel emissions and require an assessment of the reasonableness of Defendants' (and others') worldwide production, sale, and use of fossil fuels. The same analysis undermines Plaintiffs' reliance on *Jackson* v. *Johns-Manville Sales Corp.*, 750 F.2d 1314 (5th Cir. 1985), which involved traditional product liability claims for personal injuries caused by a specific product—not claims based on transboundary emissions. There, the court distinguished personal injury claims from those involving transboundary pollution, the latter of which it recognized applies "federal common law." *Id.* at 1324. Here, uniquely federal interests in energy, the economy, interstate pollution, and foreign affairs give rise to federal common law.

Plaintiffs have also tried to distract from the transboundary nature of their lawsuit by asserting that there is "no uniquely federal interest in Defendants' liability for their specific tortious conduct." (Mot. 17.) But that assertion ignores the "uniquely federal interests" raised by Plaintiffs' claims—interests that necessitate a "federal rule of decision." *Tex. Indus.*, 451 U.S. at 640. Those interests include the Government's ability to **(i)** negotiate with foreign nations to

address global warming, and **(ii)** develop policy that will ensure a stable energy supply for the military and national economy. *See NYC*, 2018 WL 3475470 at *4. (*See also infra* Part IV.B.1.)[3]

### 3.   *AEP* and *Kivalina* Did Not Authorize Transboundary Pollution Suits to Be Decided Under State Law

Plaintiffs try to distinguish *AEP* and *Kivalina* on the ground that those cases left open the possibility that *some* global warming–based claims might be governed by state law, and that Plaintiffs have pleaded such claims. (Mot. 12–14.) This argument is meritless.

The determination that federal common law applies to a particular cause of action *necessarily* means that state law does *not*. As the Supreme Court explained, "if federal common law exists, it is because state law cannot be used." *City of Milwaukee* v. *Illinois*, 451 U.S. 304, 313 n.7 (1981). Accordingly, by holding that a global warming–related public nuisance claim was governed by federal common law, *AEP* and *Kivalina* necessarily established that state law *cannot* be applied to such claims, however packaged. Indeed, *AEP* stated that "borrowing the law of a particular State would be inappropriate" to adjudicate interstate and transnational global warming–related nuisance claims. *AEP*, 564 U.S. at 422. Instead, such claims could only be governed by a uniform "federal rule of decision." *Id.* Plaintiffs' claims thus arise under federal law regardless of any state law label affixed to them.

Although Plaintiffs contend that *AEP* "explicitly left open" the viability of state law claims

---

[3]   To help further the interest in a stable energy supply, Congress has repeatedly promoted domestic oil and gas production. *See, e.g.*, 42 U.S.C. §13401 ("It is the goal of the [U.S.] in carrying out energy supply and energy conservation research and development . . . to strengthen national energy security by reducing dependence on imported oil."); *id.* §13411(a) (directing Secretary of Energy "to increase the recoverability of domestic oil resources"); *id.* §13415(b)–(c) (authorizing creation of a research center to increase "petroleum recovery").

addressing harms related to climate change (Mot. 13), the Court in fact left "open for consideration on remand" only the narrow question whether the CAA preempted state law interstate nuisance claims based on "the law of each State where the defendants operate power plants," *AEP*, 564 U.S. at 429.  That theory, derived from *Ouellette*, 479 U.S. at 488, has no relevance here.  The question in *Ouellette* was whether the Clean Water Act ("CWA") preempted a claim brought by Vermont plaintiffs in a Vermont court, under Vermont law, to abate a nuisance in New York.  *Id.* at 483–84.  The Court said that, "[i]n light of [the CWA's] pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, it is clear that the only state suits that remain available are those specifically preserved by the Act."  *Id.* at 492.  The Court concluded that "[n]othing in the Act gives each affected State th[e] power to regulate discharges" in other states through nuisance actions.  *Id.* at 497.  The CWA, however, did not preclude "aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State," because the CWA "allows States . . . to impose higher standards on their own point sources."  *Id.*

That narrow carve-out for state law claims is inapplicable here because Plaintiffs have not pleaded claims under the laws of the states (and nations) in which the GHG emissions occurred or the fossil fuel activities took place.  Rather, Plaintiffs have pleaded claims *under Colorado law* that take issue with fossil fuel production, sales, and related emissions in *all jurisdictions—precisely* the claims that *AEP* and *Kivalina* held are governed by federal common law.  Plaintiffs' alleged injuries necessarily hinge on the collective effect of worldwide GHG emissions, thereby implicating the kind of "interstate dispute previously recognized as requiring resolution under federal law," such that it would be "inappropriate for state law to control."  *Nat'l Audubon Soc'y* v. *Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988).  Accordingly, even though *AEP* left open

14

the possibility that a narrow type of state law nuisance claim might be viable, that ruling has no

relevance here because Plaintiffs have not pleaded such a claim.[4]

### 4.     Plaintiffs' Purported Distinction Between Producers and Emitters Is Unavailing

Plaintiffs purport to distinguish their claims from those in *AEP* and *Kivalina* by claiming

that they seek to impose liability on producers, not emitters.  (Mot. 15.)  But it is of no consequence

that Plaintiffs have "fixated on an earlier moment in the train of industry"—production or sales

rather than emissions.  *CA I*, 2018 WL 1064293 at *4.  Indeed, this argument is belied by the AC

itself, which contains more than 100 references to GHG "emissions."  (*See, e.g.*, AC ¶15

("Defendants are responsible for billions of tons of the excess *[GHG] emissions* in the

atmosphere." (emphasis added)); *id.* at ¶123 ("[T]he *emission of GHGs into the atmosphere,*

*primarily from the increasing combustion of fossil fuels* – including, in significant part,

Defendants' fossil fuels – has increased the concentration of those gases in the atmosphere."

(emphasis added)); *id.* at ¶376 ("Defendants caused billions of tons of excess $CO_2$ emissions and

contributed to the dangerous and inexorable rise in atmospheric $CO_2$.").)  In other words, absent

GHG emissions, Plaintiffs' claims do not exist.  This suit thus remains a "transboundary pollution

suit[]" governed by federal common law.  *Kivalina*, 696 F.3d at 855.

### 5.     Plaintiffs' Request for Damages Threatens a Conflict with Federal Statutory and Regulatory Schemes

Plaintiffs assert their suit will not impair the strong federal interest in uniform decision

---

[4]   Plaintiffs' assertion that *Kivalina* "expressly contemplated litigation in state court" mischaracterizes that decision.  (Mot. 14.)  Although the concurrence mused that plaintiff could refile its state law claims in state court, *see* 696 F.3d at 868 (Pro, J., concurring), the viability of those claims was neither presented to, nor addressed by, the majority.

making because it merely seeks "monetary damages awarded by a Colorado court"—not injunctive relief. (Mot. 19–20.)[5] But damages can carry the same effect as any other regulation of conduct. As the Supreme Court explained long ago, "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959); *see also Kurns* v. *R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012); *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 n.17 (1996).

Suits seeking damages, whether punitive or compensatory, can compel producers to "adopt different or additional means of pollution control" than those contemplated by Congress's regulatory scheme. *Ouellette*, 479 U.S. at 498 n.19. For these reasons, the Supreme Court recognizes that damages claims against producers of interstate products would be "irreconcilable" with the CAA and the uniquely federal interests involved in regulating interstate emissions. *Id.*[6]

Plaintiffs here, like those in *AEP*, *Kivalina*, *CA I & II*, and *NYC*, hope to decrease global GHG emissions to purportedly remedy past harms, and protect against future ones. (*See, e.g.*, AC ¶¶321, 326, 411.) Even if Defendants only "bear some of the external costs of their conduct," however, Plaintiffs ignore the implications on oil and gas—including their emissions—in the

---

[5]  Despite Plaintiffs' assertion that they do not seek injunctive relief, the AC shows that Plaintiffs want to induce Defendants to take *action* to reduce emissions. (*See* AC ¶7 (complaining of "unchecked production, promotion, refining, marketing and sale of fossil fuels"); *id.* ¶17 (noting that "Defendants plan to increase their fossil fuel activities in the future"); *id.* ¶435 (highlighting "unabated" fossil fuel activities).)

[6]  Plaintiffs' reliance on *Exxon Shipping Co.* v. *Baker*, 554 U.S. 471 (2008), is misplaced. In *Baker*, defendant argued that the CWA preempted damages arising from an oil spill. *Id.* at 488. Here, by contrast, Plaintiffs seek damages for both past and *future* conduct. (*See, e.g.*, AC ¶534.) Plaintiffs' requested relief is thus plainly intended to regulate future conduct in a manner akin to injunctive relief.

stream of commerce.  (Mot. 2–3.)  Whether Defendants need to **(i)** modify production methods, **(ii)** reduce production activities, or **(iii)** shift costs to consumers, these apportioned damages will inevitably implicate GHG emissions.  Moreover, the relief sought by Plaintiffs would tread directly on the Government's unique interest in promoting fossil fuel production and crafting international agreements to address global warming.  Plaintiffs' claims therefore squarely implicate, and interfere with, the strong federal interest in addressing transboundary pollution suits in a uniform manner.  *Kivalina*, 696 F.3d at 855.  Federal common law must control.

### 6.  Federal Common Law Is Not a Preemption Defense; It Provides an Independent Basis for Federal Question Jurisdiction

Plaintiffs insist that Defendants' invocation of federal common law is nothing more than an "ordinary preemption" defense, which "does not support removal."  (Mot. 9.)  But, as Plaintiffs concede, an "ordinary preemption" defense is generally raised when a plaintiff pleads a state law claim that arguably conflicts with a federal statute.  (*Id.* at 32.)  Here, Defendants do not contend merely that Plaintiffs' claims *conflict* with federal law—rather, Plaintiffs' claims *arise under* federal common law.  (*See supra* Part IV.A.2.)  The well-pleaded complaint rule does not allow Plaintiffs to evade removal where a federal question exists on the face of the complaint.  *See Turgeau*, 446 F.3d at 1060; *Wayne* v. *DHL Worldwide Express*, 294 F.3d 1179, 1184 (9th Cir. 2002); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997); *CA I*, 2018 WL 1064293, at *5.

*Blanco* v. *Federal Express Corp.*, 2016 WL 4921437 (W.D. Okla. Sept. 15, 2016), is instructive.  There, plaintiff brought two state law causes of action—negligent investigation and conversion—stemming from the loss of a package plaintiff had shipped using FedEx's services. *Id.* at *1.  FedEx removed to federal court, arguing in part that plaintiff's state law claims were

"thinly veiled attempts" to avoid federal jurisdiction, and plaintiff in turn moved to remand. *Id.* The court denied plaintiff's motion to remand, finding that claims for lost goods transported by common air carriers arose under federal common law. *Id.* at *2–3. In reaching this decision, the court rejected the argument that state law claims pleaded "on the face of [plaintiff's] state court" filing prevented removal, noting that plaintiff had used "artful pleading" to "circumvent[] the federal common law." *Id.* at *3. "[D]ue to the nature of the issue presented and the recovery sought," federal law controlled the action. *Id.* The same is true here.

Plaintiffs protest that the federal common law doctrine could "swallow" the "substantial federal issue" rule of *Grable* or the complete preemption doctrine. (Mot. 10–11.) That concern is misplaced. The Supreme Court in *Grable* found federal jurisdiction over state law claims that involved disputed and substantial federal questions. 545 U.S. 308. As discussed below, the doctrine is applicable here, but is distinct from Defendants' argument that the AC actually asserts *federal causes of action*. *See CA I*, 2018 WL 1064293, at *5. As the *CA I* court explained, Plaintiffs' claims, "though pled as state-law claims, depend on a global complex of geophysical cause and effect involving all nations of the planet (and the oceans and atmosphere)." *Id.*

Nor does the federal common law doctrine "swallow" the complete preemption rule. (Mot. 10–11.) Complete preemption occurs where challenged claims "fall within the scope of federal statutes intended by Congress completely to displace all state law on the given issue." *Devon Energy*, 693 F.3d at 1205. Defendants' federal common law argument is not premised on *replacing* state law with federal law. Instead, Defendants contend that Plaintiffs' claims are necessarily grounded in "[f]ederal common law and not the varying common law of the individual States." *NYC*, 2018 WL 3475470, at *3.

18

7.    **Any Potential Displacement of Plaintiffs' Federal Common Law Claims Does Not Create State Common Law Claims**

Plaintiffs wrongly assert that, because *AEP* and *Kivalina* held that the CAA displaced federal common law remedies, state law may take the place of the now-displaced federal common law.  (Mot. 14.)  This would turn *Erie* on its head.  Federal common law governs a claim when, *inter alia*, the claim implicates "uniquely federal interests" that make it "inappropriate for state law to control."  *Tex. Indus.*, 451 U.S. at 640–41.  That Congress then enacts a statutory scheme that so comprehensively addresses the subject as to leave no room for federal common law remedies does not mean that *state* common law remedies suddenly become viable.  If anything, a comprehensive federal statutory framework existing in an area previously occupied by federal common law—especially an area like interstate pollution, where state law has *never* applied—reinforces that it would be "inappropriate for state law to control" except to the extent that Congress authorizes it.  *Id.* at 641; *see also Ouellette*, 479 U.S. at 492.  Plaintiffs' claims therefore arise only under federal common law—not state law.

Moreover, displacement of federal common law affects only the availability of a federal *remedy*—not this Court's *jurisdiction*.  As the Supreme Court explained in *AEP*, "the [CAA] and the EPA actions it authorizes displace any federal common law right to seek abatement" of GHG emissions that allegedly cause global warming.  *AEP*, 564 U.S. at 424.  Accordingly, federal courts cannot "set limits on [GHG] emissions in face of a law empowering EPA to set the same limits."  *Id.* at 429.  That holding is consistent with the axiom that "[j]udicial power can afford no remedy unless a right that is subject to that power is present."  *Kivalina*, 696 F.3d at 857.  In short, "displacement of a federal common law right of action means displacement of remedies."  *Id.*

The absence of a valid cause of action under federal common law does not affect subject

matter jurisdiction or alter the federal character of Plaintiffs' claims. *See Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Neither *AEP* nor *Kivalina* suggested that the CAA converted plaintiffs' federal common law claims into state law claims. On the contrary, the effect of Congress enacting the CAA was to refine the available remedies for interstate and global air pollution. And far from holding that the CAA obliterated federal common law so as to deprive federal courts of jurisdiction, the Supreme Court and the Ninth Circuit held only that plaintiffs' necessarily federal claims were invalid. *See AEP*, 564 U.S. at 415; *Kivalina*, 696 F.3d at 853.

*AEP* and *Kivalina* thus direct a two-step analysis: *first*, to decide whether, given the nature of the claims, federal law governs; and, *second*, to decide whether claims have been stated upon which relief may be granted. *See AEP*, 564 U.S. at 422; *Kivalina*, 696 F.3d at 855. This is precisely the approach followed in *Kivalina*. In Section II.A of that opinion, the Ninth Circuit addressed the "threshold question[]" of whether plaintiffs' nuisance theory was "viable under federal common law." *Kivalina*, 696 F.3d at 855. Then, after answering that question in the affirmative, it determined, in Sections II.B and II.C, that dismissal was required because a federal statute had displaced the remedy plaintiffs sought. *Id.* at 856–58; *see also GMC*, 2007 WL 2726871, at *16.

Plaintiffs' remand motion implicates the first (jurisdictional) step of the analysis, not the second. And, as Defendants have explained, Plaintiffs' claims arise under federal common law because disputes about global climate change are inherently federal in nature. *Kivalina*, 696 F.3d at 855. Here, Plaintiffs ask the Court to assess the reasonableness of Defendants' worldwide fossil fuel production insofar as those activities have led to GHG emissions by countless third parties around the world, which, in turn, have allegedly increased global temperatures and thereby

contributed to conditions that have purportedly harmed Plaintiffs.  *Id.*[7]  Accordingly, Plaintiffs'

claims arise under federal common law, whether or not the CAA has displaced any federal

common law remedy that Plaintiffs might otherwise be able to obtain.

Plaintiffs' reliance on the flawed decision in *San Mateo*, 294 F. Supp. 3d at 937, should be

rejected.  (Mot. 1.)  There, the court erred by leaping to the second step of the analysis without

addressing the first.  294 F. Supp. 3d at 937.  The court compounded that error when it held that

displacement meant federal common law "no longer exists" and thus "does not govern" plaintiffs'

claims.  *Id.*  Displacement merely eliminates an otherwise available *remedy*—it does not, where

uniquely federal interests are implicated, create a jurisdictional vacuum that state common law can

then fill.

### B.    By Seeking to Second-Guess Federal Regulations and Cost-Benefit Analyses, Plaintiffs' Claims Raise Disputed, Substantial Federal Issues Under *Grable*

Even if Plaintiffs' claims did not arise under federal common law, their remand motion

would have to be denied.  Plaintiffs falsely assert that federal jurisdiction does not exist here

because their claims "do not raise federal issues."  (Mot. 21.)  In fact, all of Plaintiffs' claims

depend on the resolution of disputed, substantial federal questions relating to the extraction,

processing, promotion, and consumption of global energy resources.  The Supreme Court has

"recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over

state-law claims that implicate significant federal issues."  *Grable*, 545 U.S. at 312.  *Grable*

---

[7]    *See also, e.g.*, AC ¶344 ("Defendants understood that rising $CO_2$ would trap heat and energy in the atmosphere, increasing temperature, and bringing about changes in the climate—i.e., drought, heatwaves, flooding, and sea level rise, etc.—that would have a profound effect on human lives, property and livelihoods, including in Colorado.")

recognizes federal jurisdiction over a state law claim if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013). Here, Plaintiffs' claims are removable because they are entangled with uniquely federal interests involving national security, foreign affairs, energy policy, and environmental regulation.

> **1.     The First *Grable* Prong Is Satisfied Because Plaintiffs' Claims Necessarily Raise Multiple Federal Issues**

Plaintiffs assert that Defendants have not "pointed to a specific issue of federal law that must necessarily be resolved to adjudicate the state law claims." (Mot. 31.) Yet Plaintiffs ignore the multitude of federal concerns present in this case that are "necessarily raised" by their purportedly state law claims. Plaintiffs' claims **(i)** have a significant impact on foreign affairs, **(ii)** necessarily call for an assessment of the reasonableness of Defendants' actions under federal cost-benefit analyses, and **(iii)** are thinly veiled attacks on federal regulatory decisions involving energy and the environment. Any one of these issues satisfies the first *Grable* prong.

*Plaintiffs' claims gravely impact foreign affairs.* Plaintiffs' claims raise substantial federal issues because they have far "more than [an] incidental effect on foreign affairs." *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 418 (2003) (presidential foreign affairs authority preempts state insurance requirements); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 374–80 (2000) (foreign affairs preemption over state law restricting commerce with Burma). Indeed, in *CA I*, the court held that climate change litigation "necessarily involves the relationships between the [U.S.] and all other nations" because the claims, "though pled as state-law claims, depend on a global complex of geophysical cause and effect involving all nations of the planet." *CA I*, 2018 WL 1064293, at *5. It is thus no surprise that both courts to consider the merits of these claims

dismissed them outright for "severely infring[ing] upon the foreign-policy decisions that are squarely within the purview of the political branches of the U.S. Government." *NYC*, 2018 WL 3475470, at *7; *CA II*, 2018 WL 3109726, at *7.  Because Plaintiffs' claims implicate the "exercise of state power that touches on foreign relations," state law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. at 413.

For decades, international negotiations have searched for ways to address climate change, from the adoption of the United Nations Framework Convention on Climate Change in 1992 through the 2016 adoption of the Paris Agreement.  Plaintiffs seek to supplant these international negotiations, as well as congressional and executive branch decisions, using the ill-suited tools of Colorado law and private state court litigation.  Plaintiffs' claims purport to reach all of Defendants' historical production and sales, much of which has taken place overseas and certainly outside of Colorado.  *See CA II*, 2018 WL 3109726, at *7 (plaintiffs' claims implicated "production and sale of fossil fuels worldwide").  But the Supreme Court has squarely held that states cannot supplant or supplement foreign policy.  *Garamendi*, 539 U.S. at 413.

Plaintiffs assert, however, that the foreign affairs power is not implicated here because foreign agreements are not "essential elements of any claim." (Mot. 24.)  That is irrelevant.  State action (such as a judicial ruling) need not directly contradict a pre-existing treaty or compact to impinge on the federal foreign affairs power.  In *Crosby*, for example, the Supreme Court struck down a Massachusetts statute barring state entities from transacting with companies doing business in Burma.  530 U.S. at 366–70.  The law, which sought to encourage human rights improvements

in that country, "undermine[d]" the President's capacity "for effective diplomacy" by "compromis[ing] the very capacity of the President to speak for the Nation." *Id.* at 381, 388. As the Court explained, "the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." *Id.* at 381. In short, "the President's effective voice" on foreign affairs must not "be obscured by state or local action." *Id.* Likewise, the Court in *Garamendi* invalidated California's statutory effort to encourage Holocaust reparations by European insurance carriers based on the likelihood that state legislation will produce "more than [an] incidental effect in conflict with express foreign policy of the National Government." 539 U.S. at 420. "Quite simply," the Court said, "if the California law is enforceable the President has less . . . economic and diplomatic leverage as a consequence." *Id.* at 424.

While state and local governments have roles to play in combatting climate change, there is no denying that Plaintiffs' claims implicate substantial federal issues and would interfere with U.S. foreign policy. *See Standard Oil*, 332 U.S. at 307.

**Plaintiffs' claims require reassessment of cost-benefit analyses committed to, and already conducted by, the Government.** Plaintiffs allege that Defendants' conduct "unreasonably interfered with" their property interests. (AC ¶459.) Accordingly, Plaintiffs' claims "necessarily raise[]" direct considerations of whether any alleged harms caused by Defendants' conduct in extracting, refining, and promoting fossil fuels outweigh the enormous societal benefits of those activities. *See Safe Sts. All.* v. *Hickenlooper*, 859 F.3d 865, 886 (10th Cir. 2017); *CA II*, 2018 WL 3109726, at *5–6 (claims required "balancing of policy concerns"). Indeed, Congress has *already* weighed the costs and benefits of fossil fuel production and use. For decades, federal law has

required agencies to strike the appropriate balance. *See, e.g.*, 42 U.S.C. §13384 ("Assessment of alternative policy mechanisms for addressing [GHG] emissions"); *id.* §13389(c)(1) ("[GHG] intensity reducing strategies").[8]  These federal statutes do not merely "create ordinary preemption questions." (Mot. 22.)  Rather, they require exactly the kind of cost-benefit analyses that are only proper in a federal forum. *See, e.g.*, *AEP*, 564 U.S. at 428–29; *CA I*, 2018 WL 1064293, at *2.

Further, these congressional directives have regulatory teeth.  All federal agencies must assess the costs and benefits of significant regulations, where applicable, and impose a regulation "only upon a reasoned determination that the benefits . . . justify its costs."  Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).  But regulating energy production involves even more stringent and detailed cost-benefit analyses.  For example, the Bureau of Land Management **(i)** requires federal oil and gas lessees to drill in a manner that "results in maximum ultimate economic recovery of oil and gas with minimum waste," 43 C.F.R. §3162.1(a), but **(ii)** retains the power to impose "reasonable measures" to "minimize adverse impacts to other resource values," including ecological values, *id.* §§3101.1–2.  Likewise, regulations governing offshore drilling require lessees to maximize recovery of energy resources, prevent waste, and minimize environmental damage.  *See* 30 C.F.R. §550.120.

This complex federal regulatory regime is "necessarily raised," and must govern, the cost-benefit analyses required by Plaintiffs' claims.  Adjudicating these claims would require interpretation of federal regulations, assessment of the balance federal agencies have struck

---

[8]    A non-exhaustive list of federal laws calling for this balancing include: CAA, 42 U.S.C. §7401(c); Mining and Minerals Policy Act, 30 U.S.C. §21a; Coastal Zone Management Act, 16 U.S.C. §1451; Federal Lands Policy Management Act, 43 U.S.C. §1701(a); National Environmental Policy Act, 42 U.S.C. §§4321–70.

between energy and environmental needs, and evaluation of Defendants' compliance with the same.  *See Tenn. Gas*, 850 F.3d at 721, 725–26.  Accordingly, any basis for liability must be "drawn from federal law."  *Id.* at 723.

***Plaintiffs' claims are a collateral attack on federal regulatory oversight of energy and the environment.***  Federal jurisdiction under *Grable* also exists where, as here, a suit amounts to a "collateral attack" on a federal agency's regulatory decisions.  *Bader Farms, Inc.* v. *Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017).  This principle is particularly salient in public nuisance cases, where courts are hesitant to find that conduct undertaken pursuant to "a comprehensive set of legislative acts or administrative regulations" is actionable.  Restatement (Second) of Torts §821B cmt.f (Am. Law Inst. 1977).  Where a comprehensive regulatory scheme is in place, nuisance claims constitute "a collateral attack on" that scheme because they are "premised on the notion that [it] provides inadequate protection."  *Tenn. Gas*, 850 F.3d at 724.  In general, Plaintiffs' claims seek a different balance of social harms and benefits than that struck by Congress pursuant to a comprehensive scheme of statutes that empowers agencies to regulate the production, marketing, and sale of fossil fuels, as well as the associated environmental impacts.

Federal jurisdiction over Plaintiffs' claims, which attack the merits of federal agencies' balancing with respect to fossil fuels, is therefore required under *Grable*.  *See Tenn. Gas*, 850 F.3d at 725.  Numerous cases have held that such collateral attacks give rise to federal question jurisdiction.  *See Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint presented "a substantial federal question because it directly implicate[ed] actions" of a federal agency); *McKay* v. *City & Cty. of S.F.*, 2016 WL 7425927, at *4–6 (N.D. Cal. Dec. 23, 2016) (denying remand because state law claims were "tantamount to" asking court to

26

"second guess" a federal agency decision).  Here, too, Plaintiffs' claims (however labeled) raise

substantial federal questions regarding whether Defendants' global production—and the resulting

emissions—purportedly exceeded levels authorized by the CAA and EPA regulations.

> **2.       The Second and Third *Grable* Prongs Are Satisfied Because the Federal
> Interests at Issue Are Both Substantial and Disputed**

Plaintiffs cannot deny that the federal questions presented here are disputed.  The AC itself

raises these disputes.  (*See, e.g.*, AC ¶¶321–26.)  Plaintiffs, however, assert that "[n]one" of their

claims "rely on federal law, and none seek to adjudicate compliance with any federal statute."

(Mot. 8.)  Not so.  The AC questions whether, pursuant to a host of federal statutes, regulators

should have struck a different balance between the harms and benefits of Defendants' conduct.

(*See* AC ¶111.)  This pursuit is a collateral attack on federal policies that expressly encourage the

precise conduct on which Plaintiffs predicate their claims.  (*See supra* Part IV.B.1.)

The necessary federal questions raised in this case are also substantial.  This case sits at the

intersection of federal energy and environmental regulations, while necessarily implicating foreign

policy and national security considerations.  The substantiality inquiry is satisfied when the federal

issues in a case concern even one of these subjects.  *See Bennett* v. *Sw. Airlines Co.*, 484 F.3d 907,

910 (7th Cir. 2007) ("[A] federal forum [is] especially appropriate for contests arising from a

federal agency's performance of duties under federal law."); *In re Nat'l Sec. Agency Telecomms.*

*Records Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (similar); *Grynberg Prod. Corp.* v.

*British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) ("[Q]uestions of international

relations are almost always substantial.").  That the federal issues here concern all four subjects

leaves no doubt that the issues are substantial enough to support federal jurisdiction under *Grable*.

The federal issues in this case are nothing like the "fact-bound and situation-specific" legal

malpractice question in *Gunn*.  568 U.S. at 263.  And Plaintiffs' effort to hold a small subsection of energy companies liable for the effects of global climate change—given decades of federal policy under which Defendants' conduct was lawful and encouraged—will reverberate far beyond Colorado.  The issues are of great "importance" to the "federal system as a whole," making federal jurisdiction appropriate.  *Id.* at 260.  As in *Tennessee Gas*, the validity of Plaintiffs' claims "would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law."  850 F.3d at 724.  "The implications for the federal regulatory scheme of the sort of holding that [Plaintiffs] seek[] . . . are substantial."  *Id.*

### 3.    The Fourth *Grable* Prong Is Satisfied Because Federal Jurisdiction Does Not Upset Principles of Federalism

Federal jurisdiction here is "consistent with congressional judgment about the sound division of labor between state and federal courts."  *Grable*, 545 U.S. at 313.  Plaintiffs' claims embody traditional federal issues: environmental regulation, regulation of vital national resources, foreign and economic policies, and national security.  Federal courts traditionally adjudicate these issues.  And the volume of significant federal issues raised by the AC confirms that they belong in federal court.  (*See* Notice of Removal, ECF No. 1 ("NOR"), at ¶¶42–44.)

Plaintiffs' contention that common law causes of action to address pollution have "been part of the historic police powers of the states" is misleading.  (Mot. 17.)  Indeed, it ignores compelling evidence that Congress intended federal courts to resolve the claims asserted here.  As the Supreme Court explained, the "sovereign prerogatives" to force reductions in GHG emissions "are now lodged in the [f]ederal [g]overnment."  *Massachusetts*, 549 U.S. at 519.  The "balance of federal and state judicial responsibilities" therefore requires a federal forum.  *Grable*, 545 U.S. at 314.  *Grable* rejected the idea that federal jurisdiction does not exist if a federal cause of action

is not available.  *Id.* at 317.  While the absence of a federal claim may weigh against jurisdiction in a "garden variety state tort" suit, this is not such a case.  *Id.* at 318.  Denying such a forum here would "threaten" the federal system.  *Id.* at 319.

Furthermore, Congress has made clear that collateral challenges to CAA emissions standards belong in federal court.  *See, e.g.*, 42 U.S.C. §7607(b).  The CAA was designed to "channel[] review of final EPA action exclusively to the courts of appeals, regardless of how the grounds for review are framed."  *Cal. Dump Truck Owners Ass'n* v. *Nichols*, 784 F.3d 500, 506 (9th Cir. 2015) (emphasis omitted).  Similarly, Congress vested the federal judiciary with jurisdiction over private CAA enforcement actions.  *See* 42 U.S.C. §7604(a).  Thus, contrary to Plaintiffs' argument (Mot. 27–28), this *is* a case in which Congress provided federal courts with jurisdiction to hear challenges akin to Plaintiffs' claims.  *See, e.g.*, *McKay*, 2016 WL 7425927, at *5 (finding *Grable* standard met for state law claims based on pollution attributable to changed flight paths over residences).  Remand therefore would be improper.

### C.  This Case Is Removable Because It Is Completely Preempted by Federal Law

Plaintiffs contend that Defendants have raised only an "ordinary preemption" defense to their claims, which is not a basis for removal.  (Mot. 28.)  In fact, Plaintiffs' state law causes of action are *completely* preempted by the Government's foreign affairs power and the CAA.

As an initial matter, for the reasons set forth above (*supra* Part IV.B.1), litigating inherently transnational activities intrudes on the Government's foreign affairs power.  *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also GMC*, 2007 WL 2726871, at *14 (dismissing claims where

Government "ha[d] made foreign policy determinations regarding the [U.S.'s] role in the international concern about global warming," and noting, a "global warming nuisance tort would have an inextricable effect on . . . foreign policy"); *CA II*, 2018 WL 3109726, at *7 ("Nuisance suits in various [U.S.] judicial districts regarding conduct worldwide are far less likely to solve the problem and, indeed, could interfere with reaching a worldwide consensus."); *NYC*, 2018 WL 3475470, at *6 ("[T]he City's claims are barred by the presumption against extraterritoriality and the need for judicial caution in the face of serious foreign policy consequences.").  This intrusion implicates complete preemption because the Government has exclusive power over foreign affairs.

Plaintiffs' claims are also completely preempted by the CAA, which provides "the exclusive cause of action for the claim[s] asserted." *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 8 (2003). The CAA "establishes a complete regulatory procedure whereby various pollutants are identified, air quality standards are set, and procedures for strict enforcement are created." *United States* v. *Questar Gas Mgmt. Co.*, 2010 WL 5279832, at *4 (D. Utah Dec. 14, 2010).  At the heart of this regulatory scheme are emissions limits, permitting, and related programs, which reflect the CAA's goal of promoting "the public health and welfare and the productive capacity" of citizens. 42 U.S.C. §7401(b)(1).[9]  The CAA outlines specific procedures for parties, including state and local governments, to challenge nationwide emissions standards or EPA permitting requirements. *See, e.g.*, 5 U.S.C. §553(e); 42 U.S.C. §§7604, 7607.  Because the CAA sweeps so broadly, courts have recognized that it can preempt state law claims. *See Questar Gas*, 2010 WL 5279832, at *4.

---

[9]   EPA has already promulgated numerous regulations to address Plaintiffs' climate change concerns. *See, e.g.*, 40 C.F.R. §§51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of GHGs through CAA permitting program).  Indeed, the AC itself acknowledges the Government's authoritative voice on climate change policies.  (*See* AC ¶¶139, 141–42.)

Here, Plaintiffs' claims would necessarily conflict with the CAA.  "If courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern."  *See N.C. ex rel. Cooper* v. *Tenn. Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010).  "An EPA-sanctioned state permit may set one standard, a judge in a nearby state another, and a judge in another state a third.  Which standard is the hapless source to follow?"  *Id.* at 302.  As the contested emissions cross state lines, Plaintiffs seek to impose new, stricter nationwide standards, effectively rendering the CAA moot.

Plaintiffs' contrary arguments are unpersuasive.  *First*, Plaintiffs say the Supreme Court has applied complete preemption to only three statutes.  (Mot. 28.)  But Plaintiffs neglect to mention the other decisions in which federal courts have held that other statutes completely preempt state law causes of action.[10]  And, although Plaintiffs point to cases that declined to find that the CAA completely preempted particular state law claims (*see* Mot. 29), those cases are distinguishable.  Unlike the claims here, those claims sought to regulate only *in-state* emissions.  *See, e.g.*, *Her Majesty The Queen in Right of the Province of Ont.* v. *City of Detroit*, 874 F.2d 332, 343 (6th Cir. 1989) (emissions-based nuisance claim against Michigan waste facility); *Cerny* v. *Marathon Oil Corp.*, 2013 WL 5560483, at *1, 8 (W.D. Tex. Oct. 7, 2013) (nuisance claim based on oilfield emissions "around Plaintiffs' home").

*Second*, Plaintiffs contend that the CAA "expressly preserves *state* common law causes of action."  (Mot. 30.)  This misreads the CAA's savings clause.  The statute carves out a limited

---

[10]   *See, e.g.*, *In re Miles*, 430 F.3d 1083, 1092 (9th Cir. 2005) (§303(i) of Bankruptcy Code); *Fadhliah* v. *Societe Air Fr.*, 987 F. Supp. 2d 1057, 1064 (C.D. Cal. 2013) (Montreal Convention).

space for state common law; the savings clause does not extend to multistate and multinational GHG emissions issues.[11]  "Where Congress has chosen to grant states an extensive role in the [CAA's] regulatory regime . . . field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted." *Tenn. Valley Auth.*, 615 F.3d at 303.

*Third*, Plaintiffs argue that the CAA provides no action for tort damages.  (Mot. 30.)  But "[f]or complete preemption to operate, the federal claim need not be co-extensive with the ousted state claim.  On the contrary, the superseding federal scheme may be more limited or different in its scope and still completely preempt." *Fayard* v. *Ne. Vehicle Servs., LLC*, 533 F.3d 42, 45 (1st Cir. 2008).  Indeed, it is immaterial whether the CAA encompasses a state law cause of action if it provides an exclusive federal remedy.  *See Nichols*, 784 F.3d at 506.  Whether Plaintiffs are satisfied with the remedy Congress has prescribed has no bearing on complete preemption.

Because Plaintiffs' claims are completely preempted by the Government's foreign affairs power and the CAA, removal is proper.

**D.    This Action Is Removable Because It Is Based on Defendants' Activities That Occurred at the Direction of the Federal Government, on Federal Lands, and on the Outer Continental Shelf**

**1.    The Action Is Removable Under the Federal Officer Removal Statute**

Removal is appropriate because the conduct that forms the basis of Plaintiffs' claims was undertaken at the direction of federal officers.  Plaintiffs contend that Federal Officer Removal

---

[11]  Plaintiffs' reliance on *Devon Energy*, 693 F.3d at 1204, and *Colorado ex rel. Salazar* v. *ACE Cash Express, Inc.*, 188 F. Supp. 2d 1282, 1285 (D. Colo. 2002) as "foreclos[ing] Defendants' complete preemption argument" is misplaced.  (Mot. 31.)  Neither case dealt with **(i)** transboundary suits, or **(ii)** the availability of damages under the CAA—which would regulate Defendants' conduct in a manner "irreconcilable" with the CAA.  (*Supra* Part IV.A.5.)

does not apply here because Defendants were acting "for their own commercial purposes." (Mot. 38.) This misstates the law. A private corporation may remove a case under 28 U.S.C. §1442 if it can show that **(i)** it acted under the direction of a federal officer; **(ii)** there is a causal nexus between plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and **(iii)** there is a colorable federal defense to plaintiff's claims. *Greene* v. *Citigroup, Inc.*, 2000 WL 647190, at *2 (10th Cir. May 19, 2000). Section 1442 requires courts to credit a defendant's allegations about the causal connection and colorable defense elements of the jurisdictional inquiry. *Jefferson Cty.* v. *Acker*, 527 U.S. 423, 432 (1999). The statute should not be read in a "narrow" manner, nor should the policy underlying it "be frustrated by a narrow, grudging interpretation." *See, e.g.*, *Willingham* v. *Morgan*, 395 U.S. 402, 406–07 (1969); *Arizona* v. *Manypenny*, 451 U.S. 232, 242 (1981). Here, all federal officer removal elements are satisfied.

*First*, Defendants allege that the purportedly improper conduct was undertaken, in part, while acting under the direction of federal officials. As the Supreme Court has made clear, "[t]he words 'acting under' are broad." *Watson* v. *Phillip Morris Co., Inc.*, 551 U.S. 142, 147 (2007). A private actor satisfies this element so long as it operates under federal "subjection, guidance, or control." *Id.* at 151. The private actor must also be involved with "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152. Plaintiffs' core allegations concern the extraction, production, and sale of fossil fuels.

ExxonMobil pursued these activities under the direct supervision, direction, and control of federal officers. Specifically, federal officers exercised control over ExxonMobil through government leases issued to it. (*See* NOR ¶¶60, 69, 70–73.) Under these leases, ExxonMobil was *required* to explore, develop, and produce fossil fuels. (NOR, Ex. C §9.) For example, OCS leases

obligated ExxonMobil to diligently develop the leased area, which included—under the direction of Department of the Interior ("DOI") officials—carrying out exploration, development, and production activities for the express purpose of maximizing the ultimate recovery of hydrocarbons from the leased area. *See California* v. *Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981) (OCSLA "has an objective—the expeditious development of OCS resources"). Likewise, the Secretary of the Interior must develop serial leasing schedules that "he determines will best meet national energy needs for the five-year period" following the schedule's approval. 43 U.S.C. §1344(a). Those leases provide that ExxonMobil "*shall*" drill for oil and gas pursuant to government-approved exploration plans. (NOR, Ex. C §9.) DOI may cancel the leases if ExxonMobil does not comply with federal terms governing land use.[12] Given these directives and obligations, ExxonMobil has plainly acted under a federal officer's direction within the meaning of Section 1442(a)(1).

Plaintiffs nonetheless argue that the federal leases were "an arm's-length commercial transaction" whereby ExxonMobil contracted "for the right to use government-owned land for [its] own commercial purposes." (Mot. 38.) This "narrow" and "grudging" analysis is at odds with Supreme Court precedent. *See Willingham*, 395 U.S. at 406–07; *Manypenny*, 451 U.S. at 242. Defendants do not, as Plaintiffs suggest, ask this Court to accept that mere compliance with regulations is equivalent to acting under the direction of a federal officer. (*See* Mot. 39.) As the *Watson* Court explained, private contractors "act[] under" the direction of federal officers when

---

[12] *See* 30 C.F.R. §§550.181–85; *see also* 30 C.F.R. §§250.168–77 (permitting DOI to grant a suspension of production for a lessee to avoid cancellation); Complaint for Declaratory & Injunctive Relief, *Exxon Mobil Corp.* v. *Salazar*, 2011 WL 3612296 (W.D. La. Aug. 12, 2011) (suit challenging DOI refusal to grant suspension of production); Settlement Agreement at 4, *Exxon Mobil Corp.* v. *Salazar*, No. 11-1474 (W.D. La. Jan. 17, 2012), ECF No. 18 (granting suspension after ExxonMobil agreed to "Activity Schedule" set by DOI).

they are "helping the Government to produce an item that it needs." *Watson*, 551 U.S. at 153. This is especially relevant where—as here—"in the absence of a contract with a private firm, the Government itself would have had to perform" the job. *Id.* at 153–54.[13]

*Second*, there is a causal nexus between Plaintiffs' claims and the acts ExxonMobil performed at a federal officer's direction. Plaintiffs are suing Defendants over their "production, promotion, refining, marketing and sale of fossil fuels." (AC ¶¶2, 321–26.) The Government specifically dictated much of ExxonMobil's production, extraction, and refinement of fossil fuels. Accordingly, there is a "causal connection between what" Defendants did at the direction of federal officers and Plaintiffs' claims. *Mesa* v. *California*, 489 U.S. 121, 131 (1989).[14]

*Third*, ExxonMobil has not "fail[ed] to establish the last prong—the existence of a colorable federal defense." (Mot. 39–40.) On the contrary, Defendants have shown a compelling defense in the form of federal preemption, most notably pursuant to the Government's foreign affairs power and the CAA. (*See supra* Part IV.C.) As Plaintiffs concede, the federal preemption defense may "be a winning argument on a motion to dismiss." (Mot. 10.)

Federal Officer Removal applies to Plaintiffs' claims. Remand would be improper.

---

[13]   That the *Watson* Court ultimately remanded the case to state court offers Plaintiffs no solace. In *Watson*, respondent failed to provide evidence of any "delegation of legal authority," let alone "any contract, any payment, any employer/employee relationship, or any principal/agent arrangement" with a federal agency. 551 U.S. at 156. Here, Defendants *do* offer specific agreements with federal agencies that supply the requisite "special relationship" needed to establish that Defendants are acting under the direction of federal officials. (*See* NOR Ex. B.)

[14]   The *San Mateo* court's rejection of any "causal nexus" provides no support to Plaintiffs. (Mot. 39.) Indeed, the court's rejection was, at most, conclusory and did not address why defendants had failed to establish any causal nexus. 294 F. Supp. 3d at 939. In any event, Defendants here provide sufficient support to establish the requisite causal connection between Plaintiffs' claims and the acts performed by Defendants at the direction of federal officers.

## 2.   The Action Is Removable Under the Federal Enclave Doctrine

Plaintiffs assert that the federal enclave doctrine does not apply here because they disclaimed damages for injuries that arose on federal land.  (Mot. 35–36.)  This argument, however, construes the doctrine too narrowly.  Causes of action "which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."  *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  Federal enclave jurisdiction will lie as long as "pertinent events" on which liability is based took place on a federal enclave.  *Rosseter* v. *Indus. Light & Magic*, 2009 WL 210452, at *2 (N.D. Cal. Jan. 27, 2009).  This is true even where plaintiffs fail to disclose the federal enclave status and location where pertinent events occurred.  *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).

Defendants base removal on injuries in federal enclaves alleged by Plaintiffs: **(i)** an insect infestation across Rocky Mountain National Park (the "Rocky Mountains") (AC ¶183); **(ii)** increased flood risk in the San Miguel River in Uncompahgre National Forest ("Uncompahgre") (*id.* ¶¶31, 236); and **(iii)** "heat waves, wildfires, droughts, and floods" in the Rocky Mountains and Uncompahgre (*id.* ¶¶3, 162–63).  Each of these allegations refer to land within federal enclaves.

Plaintiffs nonetheless improperly downplay the importance of federal enclaves to their claims.  *First*, Plaintiffs claim they referenced the Rocky Mountains "only as a descriptive landmark."  (Mot. 35.)  But in alleging global warming harms, Plaintiffs specifically note that a recent "bark beetle epidemic[]" in "Rocky Mountain National Park was the most severe ever seen."  (AC ¶183.)  *Second*, Defendants' NOR explained why some of San Miguel County's claims appear to arise from incidents occurring in Uncompahgre.  (*See* NOR ¶¶55–56 (noting that riverine

flooding from the San Miguel River within Uncompahgre is apparently to blame for specific damages in the AC).)  *Finally*, a study highlighted in the AC reveals the relevance of federal enclaves.  (AC ¶232.)  That study analyzed the impact of climate trends on the San Miguel River—which includes Uncompahgre.[15]  Thus, Plaintiffs' claims partially arise from federal enclaves.

Nor can Plaintiffs sidestep federal jurisdiction by disclaiming damages for injuries occurring on federal lands.  What matters is that pertinent events in the AC took place in federal enclaves.  *See Fung*, 816 F. Supp. at 571; *Richards* v. *Lockheed Martin Corp.*, 2012 WL 13081667, at *2 (D.N.M. Feb. 24, 2012) (stating that dismissal, not remand, is appropriate where injuries arose from a federal enclave and "plaintiff does not base [its] claim upon federal (or federalized) law").  Plaintiffs' attempt to avoid federal enclave jurisdiction fails.

### 3. Plaintiffs' Claims Arise Out of Defendants' Operations on the Outer Continental Shelf

Claiming they have not "challenge[d] conduct on any offshore submerged lands," Plaintiffs assert that this Court does not have jurisdiction under OCSLA.  (Mot. 36.)  But OCSLA grants federal jurisdiction over actions that arise out of, or in connection with, "any operation conducted on" the outer Continental Shelf ("OCS").  43 U.S.C. §1349(b)(1).  And OCSLA operations involve "*exploration, development, or production* of the minerals, of the subsoil and seabed" of the OCS or "rights to such minerals."  *Id.* (emphasis added).  Courts, moreover, have adopted a "broad reading of the jurisdictional grant of section 1349."  *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  Here, both elements of OCSLA jurisdiction are satisfied:

---

[15]  *See* Carol Howe et al., *Climate Change Watershed Vulnerability Assessment Pilot* 2, 8, 14, 16, 18 (May 26, 2011), http://sanmiguelwatershed.org/wp-content/uploads/2012/05/JuneWatershedVulnerabilityAssessmentPilot_SMWC.pdf.

(**i**) Defendants' complained-of activities "constituted an operation conducted on the [OCS] that involved the exploration and production of minerals," and (**ii**) the "case arises out of, or in connection with the operation." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).

Defendants easily satisfy the first prong of OCSLA's jurisdictional test, as ExxonMobil has participated in the OCSLA leasing program for decades. (NOR ¶64.) Indeed, Plaintiffs do not dispute that ExxonMobil operates extensively on the OCS, nor does Plaintiffs' pleading distinguish between fossil fuels extracted from the OCS and those found elsewhere.

Defendants also satisfy the second prong of OCSLA's jurisdictional test. Under Plaintiffs' theory, their claims "arise[] out of or in connection with" OCS operations. *Deepwater*, 745 F.3d at 163. (*See, e.g.*, AC ¶¶5, 15, 16, 82.) Specifically, Plaintiffs assert that Defendants' fossil fuel "production" "exacerbated" climate change by releasing "billions of tons of the excess [GHG] emissions in the atmosphere." (*Id.* ¶¶2, 15, 445.) In other words, their claims focus on Defendants' fossil fuel production, not merely "downstream uses" of fossil fuels. (Mot. 37.) Accordingly, Plaintiffs' claims sweep in Defendants' activities on the OCS involving the "exploration and production of minerals." *Deepwater*, 745 F.3d at 163. Contrary to Plaintiffs' contention, a dispute may arise in connection with an OCS operation even if it does not "*directly* arise" from such operations. (Mot. 36.) Courts have held that OCSLA jurisdiction attaches where a dispute more broadly "threatens to impair the total recovery of the federally-owned minerals" underlying the OCS. *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).

Here, Plaintiffs seek potentially billions of dollars in abatement funds that inevitably would discourage OCS production. (*See* AC, Relief Requested.) This relief would substantially interfere with the congressionally mandated goal of obtaining the largest "total recovery of the federally-

owned minerals" underlying the OCS.  *Amoco*, 844 F.2d at 1210.  Plaintiffs' lawsuit therefore qualifies as the type of legal dispute relating to resource development on the OCS that Congress intended to have heard in federal court.  *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985); 43 U.S.C. §1802(1)–(2).  Because Plaintiffs' alleged injuries plainly arose out of OCS operations, removing this action to federal court would not "dramatically expand" OCSLA's scope.  (Mot. 36–37.)

### E.      The Action Is Removable Under the Bankruptcy Code

Because Plaintiffs' claims are related to bankruptcy proceedings, removal under the Bankruptcy Code is appropriate.   Plaintiffs incorrectly maintain that federal jurisdiction is improper because **(i)** this case is not "related to" any bankruptcy case, and **(ii)** they may sue under their governmental police powers.  (Mot. 40.)  These contentions do not withstand scrutiny.

The Bankruptcy Code permits removal of "any claim or cause of action in a civil action" if the proceedings are "related to" bankruptcy.  28 U.S.C. §§1452(a), 1334(b).  An action is "related to" bankruptcy if it "could conceivably have any effect on" an "estate being administered in bankruptcy."  *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990).  Removal is proper even after a bankruptcy plan has been confirmed if the case would impact a creditor's recovery under the plan.  *See In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).  Plaintiffs' claims relate to ongoing bankruptcy proceedings because they could impact the estates of *other* bankrupt entities that are necessary and indispensable parties to this case.  Indeed, 134 oil and gas producers filed for bankruptcy in the U.S. between 2015 and 2017.[16]  Peabody Energy and Arch

---

[16]   *See* Haynes and Boone, LLP, Oil Patch Bankruptcy Monitor, (Oct. 31, 2017), http://www.haynesboone.com/~/media/files/energy_bankruptcy_reports/2017/2017_oil_patch_monitor_20171031.ashx/.

Coal, in particular, emerged from Chapter 11 bankruptcy in 2016.[17]  As Peabody argued, the types of claims brought by Plaintiffs are irreconcilable with the "implementation," "execution," and "administration" of Peabody's "confirmed plan."  *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013); Mem. Op., *In re Peabody Energy Corp.*, No. 16-42529 (Bankr. E.D. Mo. Oct. 24, 2017), ECF No. 3514.  This case is thus related to bankruptcy and is therefore removable.

The government "police or regulatory powers" removal exemption is not applicable here. (Mot. 40.)  The police power exemption is "intended to be given a narrow construction," and does not apply where an action "primarily seeks to protect the government's pecuniary interest."  *City & Cty. of S.F.* v. *PG & E Corp.*, 433 F.3d 1115, 1124 & n.9 (9th Cir. 2006).  The AC concedes that Plaintiffs primarily sued Defendants for monetary damages to mitigate impacts purportedly related to climate change.  (AC ¶532 (listing costs Plaintiffs seek to mitigate climate change impacts).)  Given the windfall sought here, Plaintiffs are more aptly described as seeking "to protect the government's pecuniary interest" by asserting a private right of contribution or indemnity.  *PG & E*, 433 F.3d at 1124–25.  Plaintiffs' police powers argument fails.

## V.    CONCLUSION

For these reasons, and those set forth in the NOR, the remand motion should be denied. To do otherwise would upend firmly established case law, and call into question the Government's exclusive authority to regulate GHG emissions.  Questions of such national and global magnitude are properly heard in federal court.  Our federal system does not permit the uniquely federal controversy here to be resolved under state law.

---

[17]    *See In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Oct. 4, 2017), ECF No. 1598; *In re Peabody Energy Corp.*, No. 16-42529 (Bankr. E.D. Mo. Aug. 28, 2017), ECF No. 3362.

Dated: October 12, 2018

Respectfully submitted,

*/s/ Daniel J. Toal*
Theodore V. Wells, Jr.
Daniel J. Toal
Jaren Janghorbani
Nora Ahmed
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com
Email: jjanghorbani@paulweiss.com
Email: nahmed@paulweiss.com

Colin G. Harris
FAEGRE BAKER DANIELS LLP
1470 Walnut St., Suite 300
Boulder, Colorado 80302
Telephone: (303) 447-7700
Fax: (303) 447-7800
Email: colin.harris@FaegreBD.com

*Attorneys for Defendant Exxon Mobil
Corporation*

*/s/ Hugh Q. Gottschalk*
Hugh Q. Gottschalk
Evan Bennett Stephenson
Wheeler Trigg O'Connell LLP
370 17th Street, Suite 4500
Denver, Colorado 80202
Telephone: 303-244-1800
Fax: 303-244-1879
Email: gottschalk@wtotrial.com
Email: stephenson@wtotrial.com

*Attorneys for Defendants
Suncor Energy (U.S.A.) Inc., Suncor
Energy Sales Inc., and Suncor Energy Inc.*