**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-01672-WJM-SKC

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY;
BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY; and
CITY OF BOULDER,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.;
SUNCOR ENERGY SALES INC.;
SUNCOR ENERGY INC.; and
EXXON MOBIL CORPORATION,

      Defendants.

---

## ORDER

---

Plaintiffs brought Colorado common law and statutory claims in Boulder County, Colorado District Court for injuries occurring to their property and citizens of their jurisdictions, allegedly resulting from the effects of climate change.  Plaintiffs sue Defendants in the Amended Complaint ("Complaint") "for the substantial role they played and continue to play in causing, contributing to and exacerbating climate change." (ECF No. 7 ¶ 2.)  Defendants filed a Notice of Removal (ECF No. 1) on June 29, 2018.  Plaintiffs filed a Motion to Remand (ECF No. 34) on July 30, 2018.

For the reasons explained below, the Court grants Plaintiffs' Motion to Remand. Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67), is denied as the Court finds that a hearing is not necessary.

## I. BACKGROUND

Plaintiffs assert six state law claims: public nuisance, private nuisance, trespass, unjust enrichment, violation of the Colorado Consumer Protection Act, and civil conspiracy.  The Complaint alleges that Plaintiffs face substantial and rising costs to protect people and property within their jurisdictions from the dangers of climate alteration.  (ECF No. 7 ¶¶ 1–4, 11, 221–320.)  Plaintiffs allege that Defendants substantially contributed to the harm through selling fossil fuels and promoting their unchecked use while concealing and misrepresenting their dangers.  (*Id*. ¶¶ 2, 5, 13–18, 321–435.)  The fossil fuel activities have raised the emission and concentration of greenhouse gases ("GHGs") in the atmosphere.  (*Id*. ¶¶ 7, 15, 123–138, 321–38.)

As a result of the climate alterations caused and contributed to by Defendants' fossil fuel activities, Plaintiffs allege that they are experiencing and will continue to experience rising average temperatures and harmful changes in precipitation patterns and water availability, with extreme weather events and increased floods, drought, and wild fires.  (ECF No. 7 ¶¶ 145–179.)  These changes pose a threat to health, property, infrastructure, and agriculture.  (*Id*. ¶¶ 1–4, 180–196.)  Plaintiffs allege that they are sustaining damage because of services they must provide and costs they must incur to mitigate or abate those impacts.  (*Id*. ¶¶ 1, 4–5, 221–320.)  Plaintiffs seek monetary damages from Defendants, requiring them to pay their *pro rata* share of the costs of abating the impacts on climate change they have allegedly caused through their tortious conduct.  (*Id*. at ¶ 6.)  Plaintiffs do not ask the Court to stop or regulate Defendants' emissions of fossil fuels (*id*. at ¶¶ 6, 542), and do not seek injunctive relief.

Defendants' Notice of Removal asserts the following: (1) federal question jurisdiction— that Plaintiffs' claims arise under federal common law, and that this action necessarily and unavoidably raises disputed and substantial federal issues that give rise to jurisdiction under *Grable & Sons Metal Products, Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ("*Grable*"); (2) complete preemption; (3) federal enclave jurisdiction; (4) jurisdiction because the allegations arise from action taken at the direction of federal officers; (5) jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b); and (6) jurisdiction under 28 U.S.C. § 1452(a) because the claims are related to bankruptcy proceedings.

While there are no dispositive cases from the Supreme Court, the United States Court of Appeals for the Tenth Circuit, or other United States Courts of Appeal, United States District Court cases throughout the country are divided on whether federal courts have jurisdiction over state law claims related to climate change, such as raised in this case. *Compare California* v. *BP p.l.c.* ("*CA I*"), 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018); *City of Oakland* v. *BP p.l.c. ("CA II*), 325 F. Supp. 3d 1017 (N.D. Cal. June 25, 2018); *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466 (S.D.N.Y. July 19, 2018) with *State of Rhode Island v. Chevron Corp.*, 2019 WL 3282007 (D. R.I. July 22, 2019); *Mayor and City Council of Baltimore v. BP P.L.C.* ("*Baltimore*"), 2019 WL 2436848 (D. Md. June 10, 2019), *appeal docketed*, No. 19-1644 (4th Cir. June 18, 2019); and *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. May 27, 2018).

## II. LEGAL STANDARD

Plaintiffs' Motion to Remand is brought pursuant to 28 U.S.C. § 1447(c).  The

Motion to Remand asserts that the Court lacks subject matter jurisdiction over the

claims in this case, which Plaintiffs contend are state law claims governed by state law.

Federal courts are courts of limited jurisdiction, "possessing 'only that power

authorized by Congress and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013)

(citation omitted).  Thus, "[f]ederal subject matter jurisdiction is elemental."  *Firstenberg*

*v. City of Santa Fe*, 696 F.3d 1018, 1022 (10th Cir. 2012).  "It cannot be consented to or

waived, and its presence must be established" in every case in federal court.  *Id*.

Here, Defendants predicate removal on the ground that the federal court has

original jurisdiction over the claims.  28 U.S.C. § 1441(a).  Diversity jurisdiction has not

been invoked.  Removal is appropriate "if, but only if, 'federal subject-matter jurisdiction

would exist over the claim.'"  *Firstenberg*, 696 F.3d at 1023 (citation omitted).  If a court

finds that it lacks subject matter jurisdiction at any time before final judgment is entered,

it must remand the case to state court.  28 U.S.C. § 1447(c).

 The burden of establishing subject matter jurisdiction is on the party seeking

removal to federal court, and there is a presumption against its existence.  *Salzer v.*

*SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014).  "Removal

statutes are to be strictly construed,. . . and all doubts are to be resolved against

removal."  *Fajen v. Found. Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir. 1982).  The

party seeking removal must show that jurisdiction exists by a preponderance of the

evidence.  *Dutcher v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016).

4

## III. ANALYSIS

### A.      Federal Question Jurisdiction

Defendants first argue that federal question jurisdiction exists.  Federal question

jurisdiction exists for "all civil actions arising under the Constitution, laws, or treaties of

the United States."  28 U.S.C. § 1331.  In determining whether such jurisdiction exists, a

court must "look to the 'face of the complaint'" and ask whether it is "'drawn so as to

claim a right to recover under the Constitution and laws of the United States'[.]"

*Firstenberg*, 696 F.3d at 1023 (quoting *Bell v. Hood*, 327 U.S. 678, 681 (1946)).

"[T]he presence or absence of federal-question jurisdiction is governed by the

'well-pleaded complaint rule', which provides that federal jurisdiction exists only when a

federal question is presented on the face of the plaintiff's properly pleaded complaint."

*Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted).  Under this rule,

a case arises under federal law 'only when the plaintiff's statement of his own cause of

action shows that it is based' on federal law."  *Devon Energy Prod. Co., L.P. v. Mosaic*

*Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012) (citation omitted).  The

court need only examine "the well-pleaded allegations of the complaint and ignore

potential defenses. . . .'"  *Id*. (citation omitted).

The well-pleaded complaint rule makes "the plaintiff the master of the claim; he

or she may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar*,

482 U.S. at 392; *see also Devon Energy*, 693 F.3d at 1202 ("By omitting federal claims

from a complaint, a plaintiff can generally guarantee an action will be heard in state

court.") (internal quotation marks omitted).  While the plaintiff may not circumvent

federal jurisdiction by artfully drafting the complaint to omit federal claims that are essential to the claim, *Caterpillar*, 482 U.S. at 392, the plaintiff "can elect the judicial forum–state of federal" depending on how the plaintiff drafts the complaint. *Firstenberg*, 696 F.3d at 1023.  "Neither the plaintiff's anticipation of a federal defense nor the defendant's assertion of a federal defense is sufficient to make the case arise under federal law." *Id*. (internal quotation marks omitted).

 For a plaintiff's well-pleaded complaint to establish that the claims arise under federal law within the meaning of § 1331, it "must establish one of two things:  'either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law.'" *Firstenberg*, 696 F.3d at 1023 (citation omitted).  The "creation' test" in the first prong accounts for the majority of suits that raise under federal law."  *See Gunn*, 568 U.S. at 257.  However, where a claim finds its origins in state law, the Supreme Court has identified a "'special and small category' of cases" in which jurisdiction lies under the substantial question prong as they "implicate significant federal interests."  *Id*. at 258; *see also Grable*, 545 U.S. at 312.

Defendants argue that both prongs of federal question jurisdiction are met.  The Court will address each of these arguments in turn.

### 1.    Whether Federal Law Creates the Cause of Action

Defendants first assert that federal question jurisdiction exists because Plaintiffs' claims arise under federal law; namely, federal common law, such that federal law creates the cause of action.  The Supreme Court has "held that a few areas, involving

'uniquely federal interests,' . . . are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988) (citations omitted); *see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 850 (1985). The issue must involve "an area of uniquely federal interest", and federal common law will displace state law only where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' . . or the application of state law would 'frustrate specific objectives' of federal legislation." *Boyle*, 487 U.S. at 507 (citations omitted).

Defendants assert that this case belongs in federal court because it threatens to interfere with longstanding federal policies over matters of uniquely national importance, including energy policy, environmental protection, and foreign affairs. They note that two courts have held that claims akin to those brought by Plaintiffs are governed by federal common law, citing the decisions in *CA I*, *CA II*, and *City of New York*.[1]

    a.    *Relevant Case Law*

Defendants state over the past century that the federal government has recognized that a stable energy supply is critical for the preservation of our economy

---

[1] Notably, in another case ExxonMobil appeared to argue the opposite of what it argues here: that there is no uniquely federal interest in this type of case and a suit does not require "'the application of federal common law, merely because the conflict is not confined within the boundaries of a single state.'" (*See* ECF No. 50-1 at 55–60) (citation omitted). Instead, it asserted that "only suits by [states] *implicating a sovereign interest* in abating interstate pollution give rise to federal common law." (*Id*. at 58–60) (emphasis added).

and national security, taken steps to promote fossil fuel production, and worked to
decrease reliance on foreign oil.  The government has also worked with other nations to
craft a workable international framework for responding to global warming.  This suit
purportedly challenges those decisions by requiring the court to delve into the thicket of
the "worldwide problem of global warming"— the solutions to which Defendants assert
for "sound reasons" should be "determined by our political branches, not by our
judiciary."  *See CA II*, 2018 WL 3109726, at *9.

Plaintiffs thus target *global* warming, and the transnational conduct that term
entails.  (ECF No. 7 ¶¶ 125–38.)  Defendants contend that the claims unavoidably
require adjudication of whether the benefits of fossil fuel use outweigh its costs—not
just in Plaintiffs' jurisdictions, or even in Colorado, but on a global scale.  They argue
that these claims do not arise out of state common law.  Defendants further assert that
this is why similar lawsuits have been brought in federal court, under federal law, and
why, when those claims were dismissed, the plaintiffs made no effort to pursue their
claims in state courts.  *See, e.g.*, *Am. Elec. Power Co., Inc.* v. *Connecticut* ("*AEP*"), 564
U.S. 410 (2011); *Kivalina* v. *ExxonMobil Corp.* ("*Kivalina*"), 696 F.3d 849 (9th Cir. 2012).
Defendants thus contend that the court has federal question jurisdiction because
federal law creates the cause of action.

The Court first addresses the cases relied on by Defendants that address similar
claims involving injury from global warming, beginning its analysis with the Supreme
Court's decision in *AEP*.  The *AEP* plaintiffs brought suit in federal court against five
domestic emitters of carbon dioxide, alleging that by contributing to global warming,

they had violated the federal common law of interstate nuisance, or, in the alternative, state tort law.  564 U.S. at 418 (citation omitted).  They brought both federal and state claims, and asked for "a decree setting carbon-dioxide emission for each defendant." *Id*.  The plaintiffs did not seek damages.

The Court in *AEP* stated what while there is no federal general common law, there is an "emergence of a federal decisional law in areas of national concern", the "new" federal common law.  564 U.S. at 421 (internal quotation marks omitted).  This law "addresses 'subjects within national legislative power where Congress has so directed' or where the basic scheme of the Constitution so demands." *Id*. (citation omitted).  The Court found that environmental protection is "undoubtedly an area within national legislative power, one in which federal courts may fill in statutory interstices, and, if necessary, even fashion federal law." *Id*. (internal quotation marks omitted).  It further stated that when the court "deal[s] with air and water in their ambient or interstate aspects, there is federal common law.'" *Id*. (*quoting Illinois v. City of Milwaukee*, 406 US. 91, 103 (1972)).

*AEP* also found that when Congress addresses a question previously governed by federal common law, "'the need for such an unusual exercise of law-making by federal courts disappears.'"  564 U.S. at 423 (citation omitted).  The test for whether congressional legislation excludes the declaration of federal common law is "whether the statute 'speak[s] directly to [the] questions at issue." *Id*. at 424 (citation omitted). The Court concluded that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from

9

fossil-fuel fired power plants," *i.e.,* the Clean Air Act spoke directly "to emissions of carbon dioxide from the defendants' plants." *Id.* Since it found that federal common law was displaced, *AEP* did not decide the scope of federal common law, or whether the plaintiffs had stated a claim under it. *Id.* at 423 (describing the question as "academic"). It also did not address the state law claims. *Id.* at 429.

In *Kivalina*, the plaintiffs alleged that massive greenhouse gas emissions by the defendants resulted in global warming which, in turn, severely eroded the land where the City of Kivalina sat and threatened it with imminent destruction. 696 F.3d at 853. Relying on *AEP*, the Ninth Circuit found that the Clean Air Act displaced federal common law nuisance claims for damages caused by global warming. *Id.* at 856. It recognized that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855 (citing *City of Milwaukee*, 406 US. at 103). Thus, *Kivalina* stated that "federal common law can apply to transboundary pollution suits," and noted that most often such suits are, as in that case, founded on a theory of public nuisance. *Id.* The *Kivalina* court found that the case was governed by *AEP* and the finding that Congress had "directly addressed the issue of greenhouse gas commissions from stationary sources," thereby displacing federal common law. *Id.* at 856. The fact that the plaintiffs sought damages rather than an abatement of emissions did not impact the analysis, according to *Kivalina*, because "the type of remedy asserted is not relevant to the applicability of the doctrine of displacement." *Id.* at 857. The *Kivalina* court affirmed the district court's dismissal of plaintiffs' claims. *Id.* at 858.

Both *AEP* and *Kivalina* were brought in federal court and asserted federal law claims.  They did not address the viability of state claims involving climate change that were removed to federal court, as is the case here.  This issue was addressed by the United States District Court for the Northern District of California in *CA I* and *CA II*.  In the *CA* cases, the Cities of Oakland and San Francisco asserted a state law public nuisance claim against ExxonMobil and a number of other worldwide producers of fossil fuels, asserting that the combustion of fossil fuels produced by the defendants had increased atmospheric levels of carbon dioxide, causing a rise in sea levels with resultant flooding in the cities.  *CA I*, 2018 WL 1064293, at *1.  Like the instant case, the plaintiffs did not seek to impose liability for direct emissions of carbon dioxide. Instead, they alleged "that—despite long-knowing that their products posed severe risks to the global climate—defendants produced fossil fuels while simultaneously engaging in large scale advertising and public relations campaigns to discredit scientific research on global warming, to downplay the risks of global warming, and to portray fossil fuels as environmentally responsible and essential to human well-being."  *Id*.  The plaintiffs sought an abatement fund to pay for infrastructure necessary to address rising sea levels.  *Id*.

*CA I* found that the plaintiffs' state law "nuisance claims—which address the national and international geophysical phenomenon of global warming—are necessarily governed by federal common law," citing *AEP*, *City of Milwaukee*, and *Kivalina*.  *CA I*, 2018 WL 1064293, at *2–3.  It stated that, as in those cases, "a uniform standard of decision is necessary to deal with the issues," explaining:

11

> If ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints, a problem centuries in the making (and studying) with causes [including] the combustion of fossil fuels. The range of consequences is likewise universal—warmer weather in some places that may benefit agriculture but worse weather in others, . . . and—as here specifically alleged—the melting of the ice caps, the rising of the oceans, and the inevitable flooding of coastal lands. . . . [T]he scope of the worldwide predicament demands the most comprehensive view available, which in our American court system means our federal courts and our federal common law. A patchwork of fifty different answers to the same fundamental global issue would be unworkable.

*Id*. at *3.

The *CA I* court also found that federal common law applied despite the fact that "plaintiffs assert a novel theory of liability," *i.e.,* against the *sellers* of a product rather than direct *dischargers* of interstate pollutants. *CA I*, 2018 WL 1064293, at *3 (emphasis in original). Again, that is the situation in this case. The *CA I* court stated that "the transboundary problem of global warming raises exactly the sort of federal interests that necessitate a uniform solution," which is no " less true because plaintiffs' theory mirrors the sort of state-law claims that are traditionally applied to products made in other states and sold nationally." *Id*. The court found, however, that federal common law was not displaced by the Clean Air Act and the EPA as in *AEP* and *Kivalina* because the plaintiffs there sought only to reach domestic conduct, whereas the plaintiffs' claims in *CA I* "attack behavior worldwide." *Id*. at 4. It stated that those "foreign emissions are outside of the EPA and Clean Air Acts' reach." *Id*. Nonetheless, as the claims were based in federal law, the court found that federal jurisdiction existed and denied the plaintiffs' motions to remand. *Id*. at 5.

In *CA II*, the court granted the defendants' motion to dismiss.  325 F. Supp. 3d at 1019.  It reaffirmed that the plaintiffs' nuisance claims "must stand or fall under federal common law," including the state law claims.  *CA II*, 325 F. Supp. 3d at 1024.  It then held that the claims must be dismissed because they ran counter to the presumption against extraterritoriality and were "foreclosed by the need for federal courts to defer to the legislative and executive branches when it comes to such international problems."  *Id*. at 1024–25.  The *CA II* court concluded that "[i]t may seem peculiar that an earlier order refused to remand this action to state court on the ground that plaintiffs' claims were necessarily governed by federal law, while the current order concludes that federal common law should not be extended to provide relief."  *Id*. at 1028.  But it found "no inconsistency," as "[i]t remains proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach" of the claims.  *Id*. at 1028–29.

The *City of New York* case followed the rationale of *CA I* and *CA II*, and dismissed New York City's claims of public and private nuisance and trespass against multinational oil and gas companies related to the sale and production of fossil fuels.  325 F. Supp. 3d at 471–76.  On a motion to dismiss, the court found that the City's claims were governed by federal common law, not state tort law, because they were "based on the 'transboundary' emission of greenhouse gases" which "require a uniform standard of decision."  *Id*. at 472 (citing *CA I*, 2018 WL 10649293, at *3).  It also found that to the extent the claims involved domestic greenhouse emissions, the Clean Air Act displaced the federal common law claims pursuant to *AEP.  Id.*  To the extent the claims implicated foreign greenhouse emissions, they were "barred by the presumption

against extraterritoriality and the need for judicial caution in the face of 'serious foreign policy consequences.'"  *Id*. at 475 (citation omitted).  The court in *City of New York* did not address federal jurisdiction or removal jurisdiction.

In summary, the above cases suggest that claims related to the emission or sale, production, or manufacture of fossil fuels are governed by federal common law, even if they are asserted under state law, but may displaced by the Clean Air Act and the EPA. At first blush these cases appear to support Defendants' assertion that Plaintiffs' claims arise under federal law and should be adjudicated in federal court, particularly given the international scope of global warming that is at issue.

However, the Court finds that *AEP* and *Kivalina* are not dispositive.  Moreover, while the *CA I* decision has a certain logic, the Court ultimately finds that it is not persuasive.  Instead, the Court finds that federal jurisdiction does not exist under the creation prong of federal question jurisdiction, consistent with *San Mateo* and the two most recent cases that have addressed the applicable issues, as explained below.

The Court first notes that in *AEP* and *Kivalina*, the plaintiffs expressly invoked federal claims, and removal was neither implicated nor discussed.  Moreover, both cases addressed interstate emissions, which are not at issue here.  Finally, the cases did not address whether the state law claims were governed by federal common law. The *AEP* Court explained that "the availability *vel non* of a state lawsuit depend[ed], *inter alia*, on the preemptive effect of the federal Act," and left the matter open for consideration on remand.  564 U.S. at 429.  Thus, "[f]ar from holding (as the defendants bravely assert) that state claims related to global warming are superseded

14

by federal common law, the Supreme Court [in *AIG*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve)."  *San Mateo*, 294 F. Supp. 3d at 937.

Moreover, while *AEP* found that federal common law governs suits brought by a state to enjoin emitters of pollution in another state, it noted that the Court had never decided whether federal common law governs similar claims to abate out-of-state pollution brought by "political subdivisions" of a State, such as in this case.  564 U.S. at 421–22.  Thus, *AEP* does not address whether state law claims, such as those asserted in this case and brought by political subdivisions of a state, arise under federal law for purposes of removal jurisdiction.  The Ninth Circuit in *Kivalina* also did not address this issue.

The Court disagrees with the finding in *CA I* that removal jurisdiction is proper because the case arises under federal common law.  *CA I* found that the well-pleaded complaint rule did not apply and that federal jurisdiction exists "if the claims necessarily arise under federal common law.  2018 WL 1064293, at *5.  It based this finding on a citation to a single Ninth Circuit case, *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1184–85 (9th Cir. 2002).  *Id*.  *Wayne*, however, recognized the well-pleaded complaint rule, and did not address whether a claim that arises under federal common law is an exception to the rule.  294 F.3d at 1183-85.  Moreover, *Wayne* cited *City of Milwaukee* in support of its finding that federal jurisdiction would exist if the claims arose under federal law.  *City of Milwaukee* was, however, filed in federal court and

15

invoked federal jurisdiction such that the well-pleaded complaint rule was not at issue.

Thus, *CA I* failed to discuss or note the significance of the difference between removal jurisdiction, which implicates the well pleaded complaint rule, and federal jurisdiction that is invoked at the outset such as in *AEP* and *Kivalina*.  This distinction was recognized by the recent decision in *Baltimore*, which involved similar state law claims as to climate change that were removed to federal court.  2019 WL 2436848, at *1.  *Baltimore* found *CA I* was "well stated and presents an appealing logic," but disagreed with it because the court looked beyond the face of the plaintiffs' well pleaded complaint.  *Id*. at *7–8.  It also noted that *CA I* "did not find that the plaintiffs' state law claims fell within either of the carefully delineated exceptions to the well-pleaded complaint rule—*i.e.*, that they were completely preempted by federal law or necessarily raised substantial, disputed issues of federal law."  *Id*. at *8.  *Baltimore* found that the well-pleaded complaint rule was plainly not satisfied in that case because the City did not plead any claims under federal law.  *Id*. at *6.

>    b.    *The Well-Pleaded Complaint Rule as Applied to Plaintiffs' Claims*

In a case that is removed to federal court, the presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, which gives rise to federal jurisdiction only when a federal question is presented on the face of the complaint.  *Caterpillar*, 482 U.S. at 392.  The Tenth Circuit has held that to support removal jurisdiction, "the required federal right or immunity must be an essential element of the plaintiff's cause of action, and . . . the federal controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for

removal." *Fajen*, 683 F.2d at 333 (citation and internal quotation marks omitted).

In this case, the Complaint on its face pleads only state law claims and issues, and no federal law or issue is raised in the allegations.  While Defendants argue that the Complaint raises inherently federal questions about energy, the environment, and national security, removal is not appropriate under the well-pleaded complaint rule because these federal issues are not raised or at issue in Plaintiffs' claims.  A defendant cannot transform the action into one arising under federal law, thereby selecting the forum in which the claim will be litigated, as to do so would contradict the well-pleaded complaint rule.  *Caterpillar*, 489 U.S. at 399.  Defendants, "in essence, want the Court to peek beneath the purported state-law facade of the State's public nuisance claim, see the claim for what it would need to be to have a chance at viability, and convert it to that (i.e., into a claim based on federal common law) for purposes of the present jurisdiction analysis."  *State of Rhode Island*, 2019 WL 3282007, at *2.  That court found nothing in the artful-pleading doctrine which sanctioned the defendants' desired outcome.  *Id*.

Defendants cite no controlling authority for the proposition that removal may be based on the existence of an unplead federal common law claim—much less based on one that is questionable and not settled under controlling law.  Defendants rely on the Supreme Court's holding that the statutory grant of jurisdiction over cases arising under the laws of the United States "will support claims founded upon federal common law."  *Nat'l l Farmers Union Ins. Cos.*, 471 U.S. at 850–53.  However, the plaintiffs invoked federal jurisdiction in that case.  The same is true in other cases cited by Defendants,

including *City of Milwaukee* and *Boyle*, both of which were filed by plaintiffs in federal court and invoked federal jurisdiction. *See, e.g.*, *State of Rhode Island*, 2019 WL 3282007, at *2 n. 2 (*Boyle* "does not help Defendants" as it "was not a removal case, but rather one brought in diversity"); *Arnold by and Through Arnold v. Blue Cross & Blue Shield*, 973 F. Supp. 726, 737 (S.D. Tex. 1997) (*Boyle* did not address removal jurisdiction, nor did it modify the *Caterpillar* rule that federal preemption of state law, even when asserted as an inevitable defense to a . . . state law claim, does not provide a basis for removal"), *overruled on other grounds*, *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1997).   Removal based on federal common law being implicated by state claims was not discussed or sanctioned in Defendants' cases.

A thoughtful analysis of the limits that removal jurisdiction poses on federal question jurisdiction was conducted in *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384 (S.D.N.Y. 1998).   That court noted that removal jurisdiction is "a somewhat different animal than original federal question jurisdiction—i.e., where the plaintiff files originally in federal court." *Id*. at 389.   It explained:

> When a plaintiff files in federal court, there is no clash between the principle that the plaintiff can control the complaint—and therefore, the choice between state and federal forums—and the principle that federal courts have jurisdiction over federal claims; the plaintiff, after all, by filing in a federal forum is asserting reliance upon both principles, and the only question a defendant can raise is whether plaintiff has a federal claim.
>
> On the other hand, when a plaintiff files in state court and purports to only raise state law claims, for the federal court to assert jurisdiction it has to look beyond the complaint and partially recharacterize the plaintiffs' claims—which places the assertion of jurisdiction directly at odds with the principle of plaintiff as the master of the complaint.   It is for this reason that removal jurisdiction must be viewed with a somewhat more skeptical eye; the

fact that a plaintiff in one case chooses to bring a claim as a federal one and thus invoke federal jurisdiction does not mean that federal *removal* jurisdiction will lie in an identical case if the plaintiff chooses not to file a federal claim.

*Id*. at 389–90.  The Court agrees with this well-reasoned analysis.

The cases cited by Defendants from other jurisdictions that found removal of state law claims to federal court was appropriate because the claims arose under or were necessarily governed by federal common law are not persuasive.  *See Wayne*, 294 F.3d at 1184–85; *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997); *CA I*, 2018 WL 1064293, at *2; *Blanco v. Fed. Express Corp*., No. 16-561, 2016 WL 4921437, at *2–3 (W.D. Okla. Sept. 15, 2016).  Those cases contradict *Caterpillar* and the tenets of the well-pleaded complaint rule.  They also fail to cite any Supreme Court or other controlling authority authorizing removal based on state law claims implicating federal common law.  While many of those cases relied on *City of Milwaukee* as authority for their holdings, the plaintiff in that case invoked federal common law and federal jurisdiction.  *City of Milwaukee* does not support a finding that a defendant can create federal jurisdiction by re-characterizing a state claim.

c.  *Ordinary Preemption*

Ultimately, Defendants' argument that Plaintiffs' state law claims are governed by federal common law appears to be a matter of ordinary preemption which—in contrast to complete preemption, which is discussed in Section III.B, *infra*,–would not provide a basis for federal jurisdiction.  *See Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1352

(11th Cir. 2003) (cited with approval in *Devon Energy*, 693 F.3d at 1203).[2]  "Ordinary preemption 'regulates the interplay between federal and state laws when they conflict or appear to conflict . . . .'" *Baltimore*, 2019 WL 2436848, at *6 (citation omitted).  The distinction between ordinary and complete preemption "is important because if complete preemption does not apply, but the plaintiff's state law claim is arguably preempted . . .  the district court, being without removal jurisdiction, cannot resolve the dispute regarding preemption." *Colbert v. Union Pac. R. Co.*, 485 F. Supp. 2d 1236, 1243 (D. Kan. 2007) (internal quotation marks omitted).

When ordinary preemption applies, the federal court "'lacks the power to do anything other than remand to the state court where the preemption issue can be addressed and resolved.'" *Colbert*, 485 S. Supp. 2d at 1243 (citation omitted). Ordinary preemption is thus a defense to the complaint, and does not render a state-law claim removable to federal court.  *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011); *see also Caterpillar*, 482 U.S. at 392–93 (under the well-pleaded complaint rule, courts must ignore potential defenses such as preemption).

Thus, the fact that a defendant asserts that federal common law is applicable "does not mean the plaintiffs' state law claims 'arise under' federal law for purposes of jurisdictional purposes." *E. States Health*, 11 F. Supp. 2d at 394.  As that court explained, "[c]ouch it as they will in 'arising under' language, the defendants fail to explain why their assertion that federal common law governs . . . is not simply a

---

[2] The three forms of preemption that are frequently discussed in judicial opinions—express preemption, conflict preemption, and field preemption—are characterized as ordinary preemption.  *Devon Energy*, 693 F.3d at 1203 n. 4.

preemption defense which, while it may very well be a winning argument on a motion to dismiss in the state court, will not support removal jurisdiction." *Id*.

This finding is consistent with the decision in *Baltimore*. The court there found the defendants' assertion that federal question jurisdiction existed because the City's nuisance claim "is in fact 'governed by federal common law'" was "'a cleverly veiled [ordinary] preemption argument." *Baltimore*, 2019 WL 2436848, at *6 (citing *Boyle*, 487 U.S. at 504). As the *Baltimore* defendants' argument amounted to an ordinary preemption defense, it did "not allow the Court to treat the City's public nuisance claim as if it had been pleaded under federal law for jurisdictional purposes." *Id*. The court also found that the *CA I* ruling was "at odds with the firmly established principle that ordinary preemption does not give rise to federal question jurisdiction." *Id*. at *8.

Because an ordinary preemption defense does not support remand, Defendants' federal common law argument could only prevail under the doctrine of complete preemption. Unlike ordinary preemption, complete preemption "is so 'extraordinary' that it 'converts an ordinary state law common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (citation omitted).

>   2.   Whether Plaintiffs' Right to Relief Necessarily Depends on  Resolution of a Substantial Question of Federal Law (*Grable* Jurisdiction)

Defendants also argue that federal jurisdiction exists under the second prong of the "arising under" jurisdiction, as Plaintiffs' claims necessarily depend on a resolution of a substantial question of federal law under *Grable*. They contend that the Complaint

raises federal issues under *Grable* "because it seeks to have a court determine for the entire United States, as well as Canada and other foreign actors, the appropriate balance between the production, sale, and use of fossil fuels and addressing the risks of climate change." (ECF No. 1 ¶ 37.) Such an inquiry, according to Defendants, "necessarily entails the resolution of substantial federal questions concerning important federal regulations, contracting, and diplomacy." (*Id.*) Thus, they assert that the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing . . . federal and state judicial responsibilities." *Grable*, 545 U.S. at 313–14.

The substantial question doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. To invoke this branch of federal question jurisdiction, the Defendants must show that "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

Jurisdiction under the substantial question doctrine "is exceedingly narrow—a special and small category of cases." *Firstenberg*, 696 F.3d at 1023 (citation and internal quotation marks omitted). "[M]ere need to apply federal law in a state-law claim will not suffice to open the 'arising under' door" of jurisdiction. *Grable*, 545 U.S. at 313. Instead, "'federal jurisdiction demands not only on a contested federal issue, but a

22

substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" *Id*. (citation omitted).

        a.    *Necessarily Raised*

      The Court finds that the first prong of substantial question jurisdiction is not met because Plaintiffs' claims do not necessarily raise or depend on issues of federal law. The discussion of this issue in *Baltimore* is instructive.  In that case, the defendants contended that *Grable* jurisdiction existed because the claims raised a host of federal issues.  *Baltimore*, 2019 WL 2436848, at *9.  For example, the defendants asserted that the claims "'intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.'"  *Id*. (citation omitted).  They also asserted that the claims "'have a significant impact on foreign affairs,' 'require federal-law-based cost-benefit analyses,'" and "'amount to a collateral attack on federal regulatory oversight of energy and the environment.'"  *Id*. (citation omitted).  These allegations are almost identical to what Defendants assert in this case. (*See* ECF No. 48 at 22—"Plaintiffs' claims gravely impact foreign affairs"; 24—"Plaintiffs' claims require reassessment of cost-benefit analyses committed to, and already conducted by the Government"; 26—the claims "are a collateral attack on federal regulatory oversight of energy and the environment").

      *Baltimore* found that these issues were not "'necessarily raised' by the City's claims, as required for *Grable* jurisdiction."  2019 WL 2436848, at *9–10.  As to the alleged significant effect on foreign affairs, the court agreed that "[c]limate change is certainly a matter of serious national and international concern."  *Id*. at *10.  But it found

that defendants did "not actually identify any foreign policy that was implicated by the City's claims, much less one that is necessarily raised." *Id*. "They merely point out that climate change '*has* been the subject of international negotiations for decades.'" *Id*. *Baltimore* found that "defendants' generalized references to foreign policy wholly fail to demonstrate that a federal question is 'essential to resolving' the City's state law claims." *Id*. (citation omitted).

The Court finds the analysis in *Baltimore* equally persuasive as to Defendants' reliance on foreign affairs in this case, as they point to no specific foreign policy that is essential to resolving the Plaintiffs' claims. Instead, they cite only generally to non-binding, international agreements that do not apply to private parties, and do not explain how this case could supplant the structure of such foreign policy arrangements. Certainly Defendants have not shown that any interpretation of foreign policy is an essential element of Plaintiffs' claims. *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012).

The *CA I* and *City of New York* decisions do not support Defendants' argument that the foreign policy issues raise substantial questions of law. Defendants note, for example, that the *City of New York* court dismissed the claims there on the merits "for severely infring[ing] upon the foreign-policy decisions that are squarely within the purview of the political branches of the U.S. Government." 325 F. Supp. 3d at 476. But as Defendants have acknowledged, at least at this stage of these proceedings, the Court is not considering the merits of Plaintiffs' claims or whether they would survive a motion to dismiss, only whether there is a basis for federal jurisdiction. (*See* ECF No. 1

24

¶ 20.)  While *CA I* and *City of New York* may ultimately be relevant to whether Plaintiffs'

claims should be dismissed, they do not provide a basis for *Grable* jurisdiction.  *See*

*Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944, 948

(10th Cir. 2014) (federal law that is alleged as a barrier to the success of a state law

claim "is not a sufficient basis from which to conclude that the questions are

'necessarily raised'") (citation omitted).

Baltimore also rejected cost-benefit analysis and collateral attack arguments as a

basis for *Grable* jurisdiction, finding that they "miss[ ] the mark."  2019 WL 2436848, at

*10.  This is because the nuisance claims were, as here, based on the "extraction,

production, promotion, and sale of fossil fuel products without warning consumers and

the public of their known risks", and did "not rely on any federal statutes or regulations"

or violations thereof.  *Id.*  "Although federal laws and regulations governing energy

production and air pollution may supply potential defenses," the court found that federal

law was "plainly not an element" of the City's state law nuisance claims.  *Id.*

The same analysis surely applies here.  Plaintiffs' state law claims do not have

as an element any aspect of federal law or regulations.  Plaintiffs do not allege that any

federal regulation or decision is unlawful, or a factor in their claims, nor are they asking

the Court to consider whether the government's decisions to permit fossil fuel use and

sale are appropriate.

As to jurisdiction under *Grable*, the Baltimore court concluded that, "[t]o be sure,

there are federal *interests* in addressing climate change."  2019 WL 2436848, at *11

(emphasis in original).  "Defendants have failed to establish, however, that a federal

*issue* is a 'necessary element' of the City's state law claims." *Id.* (citation omitted) (emphasis in original).  Thus, even without considering the remaining requirements for *Grable* jurisdiction, the *Baltimore* court rejected the defendants' assertion that the case fell within "the 'special and small category' of cases in which federal question jurisdiction exists over a state law claim. *Id.* (citation omitted).

Two other courts have recently arrived at the same conclusion.  The court in *State of Rhode Island* found that the defendants had not shown that federal law was "'an element and an essential one, of the [State]'s cause[s] of action.'"  2019 WL 3282007, at *4 (citation omitted).  Instead, the court noted that the State's claims "are thoroughly state-law claims", and "[t]he rights, duties, and rules of decision implicated by the complaint are all supplied by state law, without reference to anything federal." *Id.* The court concluded:

> By mentioning foreign affairs, federal regulations, and the navigable waters of the United States, Defendants seek to raise issues that they may press in the course of this litigation, but that are not perforce presented by the State's claims. . . .These are, if anything, premature defenses, which even if ultimately decisive, cannot support removal.

*Id.* (internal citations omitted).

Similarly, the court in *San Mateo* found that the defendants had not pointed to a specific issue of federal law that necessarily had to be resolved to adjudicate the state law claims.  294 F. Supp. 3d at 938.  Instead, "the defendants mostly gesture to federal law and federal concerns in a generalized way." *Id.*  The court found that "[t]he mere potential for foreign policy implications", the "mere existence of a federal regulatory regime", or the possibility that the claims involved a weighing of costs and benefits did

not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction. *Id*. *San Mateo* concluded, "[o]n the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable", and "*Grable* does not sweep so broadly." *Id*.

The Court agrees with the well-reasoned analyses in *Baltimore*, *State of Rhode Island*, and *San Mateo*, and adopts the reasoning of those decisions. To the extent Defendants raise other issues not addressed in those cases, the Court finds that they also are not necessarily raised in Plaintiffs' Complaint.

Defendants here assert that Plaintiffs' claims raise a significant issue under *Grable* because they attack the decision of the federal government to enter into contracts with Defendant ExxonMobil to develop and sell fossil fuels. (ECF No. 1 ¶ 43.) Further, they argue that the Complaint seeks to deprive the federal government of a mechanism for carrying out vital governmental functions, and frustrates federal objectives. (*Id*. ¶ 44.)

Plaintiffs' claims, however, assert no rights under the contracts referenced by Defendants. Nor do they challenge the contracts' validity, or require a court to interpret their meaning or importance. The Complaint does not even mention the contracts. Defendants' argument appears to be based solely on their unsupported speculation about the potential impact that Plaintiffs' success would have on the government's ability to continue purchasing fossil fuels. (*Id*. ¶¶ 43–44.) Even if Defendants' speculation was well-founded, this would be relevant only to the substantiality prong of the *Grable* analysis. *See Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (10th Cir.

27

2007).  Defendants have not established the first requirement—that the issue is necessarily raised by the Plaintiffs.

        b.   *Substantiality*

The Court also finds that the second prong, substantiality, is not met.  To determine substantiality, courts "look[] to whether the federal law issue is central to the case."  *Gilmore*, 694 F.3d at 1175.  Courts distinguish "between 'a nearly pure issue of law' that would govern 'numerous' cases and issues that are 'fact-bound and situation-specific.'"  *Id*. at 1174 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 700–11 (2006)).  When a case "'involve[s] substantial questions of state as well as federal law,' this factor weighs against asserting federal jurisdiction."  *Id.* at 1175 (citation omitted).

The Court finds that the issues raised by Defendants are not central to Plaintiffs' claims, and the claims are "rife with legal and factual issues that are not related" to the federal issues.  *See Stark-Romero v. Nat'l R.R. Passenger Co. (Amtrak)*, No. CIV-09-295, 2010 WL 11602777, at *8 (D.N.M. Mar. 31, 2010).  This case is quite different from those where jurisdiction was found under the substantial question prong of jurisdiction.  For example, in *Grable*, "the meaning of the federal statute . . . appear[ed] to be the only legal or factual issue contested in the case."  545 U.S. at 315.  Similarly, in a Tenth Circuit case finding jurisdiction under *Grable*, "construction of the federal land grant" at issue "appear[ed] to be the only legal or factual issue contested in the case."  *Nicodemus v. Union Pac. Corp.,* 440 F.3d 1227, 1236 (10th Cir. 2006).  Here, it is plainly apparent that the federal issues raised by Defendants are not the only legal or

factual issue contested in the case.  Plaintiffs' claims also do not involve a discrete legal question, and are "fact-bound and situation-specific," unlike *Grable*.  *See Empire Healthchoice Assurance*, 547 U.S. at 701; *Bennett*, 484 F.3d at 910–11.  Finally, the case does not involve a state-law cause of action that "is 'brought to enforce' a duty created by [a federal statute]," where "the claim's very success depends on giving effect to a federal requirement."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, ___ U.S. ___, 136 S. Ct. 1562, 1570 (2016).

The cases relied upon by Defendants are distinguishable, as Plaintiffs have shown in their briefing.  For example, while Defendants cite *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), that case involved preemption under the Supremacy Clause because of a conflict between a state law and Congress's imposition of sanctions.  It did not address *Grable* jurisdiction, and thus does not support Defendants' assertion that it is "irrelevant" to the jurisdictional issue that the "foreign agreements are not 'essential elements of any claim.'"  (ECF No. 48 at 23.)

Based on the foregoing, the Court finds that federal jurisdiction does not exist under the second prong of the "arising under" jurisdiction, because Plaintiffs' claims do not  necessarily depend on a resolution of a substantial question of federal law.  As Defendants have not met the first two prongs of the test for such jurisdiction under *Grable*, the Court need not address the remaining prongs.

**B.     Jurisdiction Through Complete Preemption**

Defendants also rely on the doctrine of complete preemption to authorize removal.  Defendants argue that Plaintiffs' claims are completely preempted by the

government's foreign affairs power and the Clean Air Act, which they claim govern the United States' participation in worldwide climate policy efforts and national regulation of GHG emissions.

The complete preemption doctrine is an "independent corollary'" to the well-pleaded complaint rule. *Caterpillar*, 482 U.S. at 393.  "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Id*.  The complete preemption exception to the well-pleaded complaint rule is "quite rare," *Dutcher*, 733 F.3d at 985, representing "extraordinary pre-emptive power." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).  The Supreme Court and the Tenth Circuit have only recognized statutes as the basis for complete preemption.  *See, e.g.*, *Caterpillar*, 482 U.S. at 393 (the doctrine "is applied primarily in cases raising claims pre-empted by § 301 of the" Labor Management Relations Act ("LMRA")); *Devon Energy*, 693 F.3d at 1204–05 (complete preemption is "so rare that the Supreme Court has recognized compete preemption in only three areas:  § 301 of the [LMRA], § 502 of [the Employee Retirement Income Security Act]," and actions for usery under the National Bank Act).

Complete preemption is ultimately a matter of Congressional intent.  Courts must decipher whether Congress intended a statute to provide the exclusive cause of action.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003); *Metro. Life Ins. Co.*, 481 U.S. at 66 ("the touchstone of the federal district court's removal jurisdiction is not the 'obviousness' of the pre-emption defense, but the intent of Congress").  If

Congress intends preemption "completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assurance*, 547 U.S. at 698.

"Thus, a state claim may be removed to federal courts in only two circumstances": "when Congress expressly so provides,. . . or when a federal statute wholly displaces the state law cause of action through complete pre-emption." *Beneficial Nat'l Bank*, 539 U.S. at 8.  The court must ask, first, whether the federal question at issue preempts the state law relied on by the plaintiff and, second, whether Congress intended to allow removal in such a case, as manifested by the provision of a federal cause of action.  *Devon Energy*, 693 F.3d at 1205.

1.     Complete Preemption Based on Emissions Standards

Defendants argue that Congress allows parties to seek stricter nationwide emissions standards by petitioning the EPA, which is the exclusive means by which a party can seek such relief.  *See* 42 U.S.C. § 7426(b).  They assert that Plaintiffs' claims go far beyond the authority that the Clean Air Act reserves to states to regulate certain emissions within their own borders; Plaintiffs seek instead to impose liability for global emissions.  Because these claims do not duplicate, supplement, or supplant federal law, *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004), Defendants argue they are completely preempted.

The Court rejects Defendants' argument.  First, Defendants mischaracterize Plaintiffs' claims.  Plaintiffs do not challenge or seek to impose federal emissions regulations, and do not seek to impose liability on emitters.  They are also not seeking

31

review of EPA regulatory actions related to GHGs, even those emissions created by the

burning of Defendants' products, and are not seeking injunctive relief.  Plaintiffs sue for

harms caused by Defendants' sale of fossil fuels.  The Clean Air Act is silent on that

issue; it does not remedy Plaintiffs' harms or address Defendants' conduct.  And neither

EPA action, nor a cause of action against EPA, could provide the compensation

Plaintiffs seek for the injuries suffered as a result of Defendants' actions.

For a statute to form the basis for complete preemption, it must provide a

"replacement cause of action" that "substitute[s]" for the state cause of action.

*Schmeling v. NORDAM*, 97 F.3d 1336, 1342–43 (10th Cir. 1996).  "[T]he federal

remedy at issue must vindicate the same basic right or interest that would otherwise be

vindicated under state law."  *Devon Energy*, 693 F.3d at 1207.  The Clean Air Act

provides no federal cause of action for damages, let alone one by a plaintiff claiming

economic losses against a private defendant for tortious conduct.  Moreover, the Clean

Air Act expressly preserves many state common law causes of action, including tort

actions for damages.  *See* 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict

any right . . . under any statute or common law to seek enforcement of any emission

standard or limitation or to seek any other relief").  From this, it is apparent that

Congress did not intend the Act to provide exclusive remedies in these circumstances,

or to be a basis for removal under the complete preemption doctrine.

To the extent Defendants rely on *AEP*, the Supreme Court there held only that

the Clean Air Act displaced federal common law nuisance action related to climate

change; it did not review whether the Clean Air Act would preempt state nuisance law.

32

564 U.S. at 429.  In fact, the Court stated that "[n]one of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law," and the Court thus left "the matter open for consideration" by the state court on remand. *Id*.  Every court that has considered complete preemption in this type of climate change case has rejected it, including the Baltimore, *State of Rhode Island*, and *San Mateo* courts.

In *Baltimore*, the court stated that while the Clean Air Act provides for private enforcement in certain situations, there was "an absence of any indication that Congress intended for these causes of action . . . to be the exclusive remedy for injuries stemming from air pollution."  2019 WL 2436848, at *13.  To the contrary, it noted that the Clean Air Act "contains a savings clause that specifically preserves other causes of action."  *Id*.

Similarly, the *State of Rhode Island* court stated, "statutes that have been found to completely preempt state-law causes of action . . . all do two things:  They 'provide[] the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.'"  2019 WL 3282007, at *3 (citation omitted). The court found that the defendants failed to show that the Clean Air Act does these things, and stated that "[a]s far as the Court can tell, the [Act] authorizes nothing like the State's claims, much less to the exclusion of those sounding in state law."  *Id*.  Further, it noted that the Act "itself says that controlling air pollution is 'the primary responsibility of States and local governments,'" and that the Act has a savings clause for citizen suits.  *Id*. at *3–4 (citation omitted).  The court concluded:

A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression of Congress's 'extraordinary pre-emptive power' to convert state-law claims into federal-law claims. *Metro. Life Ins. Co.*, 481 U.S. at 65.  No court has so held, and neither will this one.

*Id*. at *4.

Finally, the *San Mateo* court noted that the defendants did "not point to any applicable statutory provision that involves complete preemption."  294 F. Supp. 3d at 938. To the contrary, the Clean Air Act and the Clean Water Act both contain savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'"  *Id*. (citations omitted).

Other courts have held similarly, rejecting federal jurisdiction on the basis of complete preemption of state law claims by the Clean Air Act.  The United States District Court for the Southern District of New York held that the Clean Air Act did not completely preempt the plaintiffs' state law claims for temporary nuisance, trespass, and negligence arising from alleged contamination from a steel mill, and thus did not provide a basis for federal jurisdiction.  *Keltner v. SunCoke Energy, Inc.*, 2015 WL 3400234, at *4–5 (S.D. Ill. May 26, 2015).  Similarly, the Northern District of Alabama found that federal jurisdiction did not exist because the Clean Air Act did not completely preempt the plaintiff's state law claims arising out of the operation of a coke plant. *Morrison v. Drummond Co.*, 2013 WL 1345721, at *3–4 (N.D. Ala. Mar. 23, 2015).  *See also Cerny v. Marathon Oil Corp.*, 2013 WL 5560483, at *3–8 (W.D. Tex. Oct. 7, 2013) (complete preemption did not apply to the plaintiffs' state law claims arising from the

defendants' oil field operations so as to create federal jurisdiction).

While Defendants argue that Plaintiffs are attempting to do indirectly what they could not do directly, *i.e.,* "regulate the conduct of out-of-state sources," *Int'l Paper Co. v. Oulette*, 479 U.S. 481, 495 (1987), that is not an accurate characterization of the Plaintiffs' claims.  Plaintiffs do not seek to regulate the conduct of the Defendants or their emissions, nor do they seek injunctive relief to induce Defendants to take action to reduce emissions.  Defendants also rely on *Oulette* in arguing that suits such as this seeking damages, whether punitive or compensatory, can compel producers to "adopt different or additional means of pollution control" than those contemplated by Congress's regulatory scheme.  479 U.S. at 498 n.19.  For these reasons, Defendants assert that the Supreme Court recognized in *Oulette* that damages claims against producers of interstate products would be "irreconcilable" with the Clean Water Act (which Defendants analogize to the Clean Air Act), and the uniquely federal interests involved in regulating interstate emissions.  *Id.*

*Oulette* appears to involve only ordinary preemption, however, as there is no discussion of complete preemption.[3]  The same is true of another case relied on by Defendants, *North Carolina v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010). Indeed, the Fourth Circuit stated that it "need not hold flatly that Congress has entirely preempted the field of emissions regulation."  *Id.* at 302.  Moreover, *Oulette* allowed state law claims based on the law of the source state under the saving clause, since the

---

[3] "Complete preemption is a term of art for an exception to the well-pleaded complaint rule."  *Meyer v. Conlon*, 162 F.3d 1264, 1268 n. 2 (10th Cir. 1998).  The Tenth Circuit has held that the doctrines of ordinary and complete preemption are not fungible.  *Id.*

Clean Water Act expressly allows source states to enact more stringent standards.  479 U.S. at 498–99.

Here, Defendants have not cited to any portion of the Clean Air Act or other statute that regulates the conduct at issue or allows states to enact more stringent regulations, such that similar restrictions on application of state law would apply.  And Plaintiffs note that there no federal programs that govern or dictate how much fossil fuel Defendants produce and sell, or whether they can mislead the public when doing do.  Plaintiffs assert that the EPA does not determine how much fossil fuel is sold in the United States or how it is marketed, nor does it issue permits to companies that market or sell fossil fuels.  Rather, the EPA regulates sources that emit pollution and sets emission "floors," which states can exceed.  *See* 42 U.S.C. § 7416.  Defendants have not shown that the conduct alleged in this case conflicts with any of those efforts.

Plaintiffs' claims also do not relate to or impact Defendants' emissions, and the claims for monetary relief presents no danger of inconsistent state (or state and federal) emission standards.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n. 7 (2008) ("private claims for economic injury do not threaten similar interference with federal regulatory goals," unlike cases where nuisance claims seeking injunctive relief amounted to arguments for discharge standards different that those provided by statute).  In any event, the issues raised by Defendants need to be resolved in connection with an ordinary preemption defense, a matter that does not give rise to federal jurisdiction.

2.    Complete Preemption Based on the Foreign Affairs Doctrine

Defendants also argue that complete preemption is appropriate based on the

foreign affairs doctrine.  They assert that litigating inherently transnational activities

intrudes on the government's foreign affairs power.  See *Am. Ins. Assoc. v. Garamendi*,

539 U.S. 396, 418 (2003) ("[S]tate action with more than incidental effect on foreign

affairs is preempted, even absent any affirmative federal activity in the subject area of

the state [action], and hence without any showing of conflict.").

Defendants also cite *California v. GMC*, 2007 WL 2726871, at *14 (N.D. Cal.

Sept. 17, 2007) (dismissing claims where the government "ha[d] made foreign policy

determinations regarding the [U.S.'s] role in the international concern about global

warming," and stating, a "global warming nuisance tort would have an inextricable effect

on . . . foreign policy"); *CA II*, 2018 WL 3109726, at *7 ("[n]uisance suits in various

United States judicial districts regarding conduct worldwide are far less likely to solve

the problem and, indeed, could interfere with reaching a worldwide consensus."); and

*New York City*, 2018 WL 3475470, at *6 ("[T]he City's claims are barred by the

presumption against extraterritoriality and the need for judicial caution in the face of

serious foreign policy consequences.").  Complete preemption is implicated, according

to Defendants, because the government has exclusive power over foreign affairs.

The Court finds that Defendants' argument is without merit.  First, none of the

above cases cited by Defendants dealt with or addressed complete preemption, and

they do not support Defendants' arguments.  The Supreme Court in *Garamendi*

discussed only conflict or field preemption.  539 U.S. at 419.  As the *Baltimore* court

noted, those types of preemption are "forms of ordinary preemption that serve only as federal defenses to a state law claim." 2019 WL 2436848, at *5 (internal quotation marks omitted). In addition, the *GMC, CA II*, and *City of New York* cases did not address preemption at all, and certainly not complete preemption as providing a basis for removal jurisdiction.

Moreover, *Garamendi* is distinguishable. It dealt with the executive authority of the President to decide the policy regarding foreign relations and to make executive agreements with foreign countries or corporations. 539 U.S. at 413–15. The Court found that federal executive power preempted state law where, as in that case, "there is evidence of clear conflict between the policies adopted by the two." *Id*. at 420–21. The Court stated, "[t]he question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.'" *Id*. at 427 (citation omitted). Here, no executive action is at issue, and Defendants have not demonstrated a clear conflict between Plaintiffs' claims and any particular foreign policy.

Accordingly, Defendants have not met their burden of showing that complete preemption applies based on the foreign affairs doctrine. While they suggest there might be an unspecified conflict with some unidentified specific policy, they have not shown that Congress expressly provided for complete preemption under the foreign-affairs doctrine, or that a federal statute wholly displaces the state law cause of action on this issue. *Beneficial Nat'l Bank*, 539 U.S. at 8.

The Court's finding that the foreign affairs doctrine does not completely preempt

Plaintiffs' claims is also supported by the *Baltimore* and *State of Rhode Island* cases. In *Baltimore*, the court held that the foreign affairs doctrine is "inapposite in the complete preemption context." 2019 WL 2436848, at *12. It explained that "complete preemption occurs only when Congress intended for federal law to provide the 'exclusive cause of action' for the claim asserted." *Id*. "That does not exist here." *Id*. "That is, there is no congressional intent regarding the preemptive force of the judicially-crafted foreign affairs doctrine, and the doctrine obviously does not supply any substitute causes of action." *Id*. The *State of Rhode Island* court also rejected complete preemption under the foreign affairs doctrine, relying on *Baltimore* and finding the argument to be "without a plausible legal basis." 2019 WL 3282007, at *4 n. 3.

    3.    <u>Complete Preemption Under Federal Common Law</u>

Finally, while Defendants do not rely on federal common law as the basis for their complete preemption argument, federal common law would not provide a ground for such preemption. As one court persuasively noted, "[w]hen the defendant asserts that federal common law preempts the plaintiff's claim, there is no congressional intent which the court may examine—and therefore congressional intent to make the action removable to federal court cannot exist." *Merkel v. Fed. Express Corp.*, 886 F. Supp. 561, 566 (N.D. Miss. 1995) (emphasis omitted); *see also Singer v. DHL Worldwide Express, Inc.*, No. 06-cv-61932, 2007 U.S. Dist. LEXIS 37120, at *13-14 (S.D. Fla. May 22, 2007) (same).

Based on the foregoing, the Court rejects complete preemption as a basis for federal jurisdiction.

C.      **Federal Enclave Jurisdiction**

Causes of action "which arise from incidents occurring in federal enclaves" may also be removed as a part of federal question jurisdiction.  *Akin* v. *Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).  "The United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'or the erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings.'" *Id*. (quoting U.S. Const. art. I, § 8, cl. 17.)  These are federal enclaves within which the United States has exclusive jurisdiction.  *Id*.

Here, Plaintiffs seek relief for injuries occurring "within their respective jurisdictions" (ECF No. 7 ¶ 4), and allege that they "do not seek damages or abatement relief for injuries to or occurring on federal lands."  (*Id.* at ¶ 542.)  Plaintiffs assert that ends the inquiry.  *See, e.g.*, *Washington v. Monsanto Co.,* 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (because plaintiff "assert[ed] that it does not seek damages for contamination to waters and land within federal territory, . . . none of its claims arise on federal enclaves").

Defendants argue, however, that Plaintiffs have alleged injuries in federal enclaves including: (i) an insect infestation across Rocky Mountain National Park (ECF No. 7 ¶183), that Defendants assert is partially within Boulder County; (ii) increased flood risk in the San Miguel River in San Miguel County (*id.* ¶¶ 31, 236), which Defendants assert is located in the Uncompahgre National Forest ("Uncompahgre"); and (iii) "heat waves, wildfires, droughts, and floods" which Defendants assert occur in Rocky Mountain National Park and Uncompahgre (*id.* ¶¶ 3, 162–63).  Plaintiffs do not

dispute that Rocky Mountain National Park and Uncompahgre are federal enclaves, but argue that the injury they have alleged did not occur there such that there is no federal enclave jurisdiction.

The Court finds that Defendants have not met their burden of showing that subject matter jurisdiction exists under the federal enclave doctrine.  Uncompahgre National Forest is not mentioned in the Complaint.  Rocky Mountain National Park is referenced only as a descriptive landmark (*see* ECF No. 7 ¶¶ 20, 30, 35), and to provide an example of the regional trends that have resulted from Defendants' climate alteration.  (*Id.* ¶ 183.)  The actual injury for which Plaintiffs seek compensation is injury to "their property" and "their residents," occurring "within their respective jurisdictions." (*See, e.g., id*. ¶¶ 1-4, 10, 11, 532-33.)  They specifically allege that they "**do not** seek damages or abatement relief for injuries to or occurring to federal lands."  (*Id*. ¶ 542 (emphasis in original).)

"[T]he location where Plaintiff was injured" determines whether "the right to removal exists."  *Ramos v. C. Ortiz Corp.*, 2016 WL 10571684, at *3 (D.N.M. May 20, 2016).  It is not the defendant's conduct, but the injury, that matters.  *See Akin,* 156 F.3d at 1034–35 & n.5 (action against chemical manufacturers fell within enclave jurisdiction where the claimed exposure to the chemicals, not their manufacture or sale, "occurred within the confines" of U.S. Air Force base); *Baltimore*, 2019 WL 2436848, at *15 ("courts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there").

Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims

and injuries are alleged to have arisen exclusively on non-federal land.  That the alleged

climate alteration by Defendants may have caused similar injuries to federal property

does not speak to the nature of Plaintiffs' alleged injuries for which they seek

compensation, and does not provide a basis for removal.  *See State of Rhode Island*,

2019 WL 3282007, at *5 (finding no federal enclave jurisdiction because while federal

land that met the definition of a federal enclave in Rhode Island and elsewhere "may

have been the site of Defendants' activities, the State's claims did not arise there,

especially since its complaint avoids seeking relief for damages to any federal lands");

*Baltimore*, 2019 WL 2436848, at *15 ("The Complaint does not contain any allegations

concerning defendants' conduct on federal enclaves and in fact, it expressly defines the

scope of injury to exclude any federal territory . . . . [I]t cannot be said that federal

enclaves were the 'locus' in which the City's claims arose merely because one of the

twenty-six defendants . . . conducted some operations on federal enclaves for some

unspecified period of time.").

### D.    Federal Officer Jurisdiction

Defendants also argue that removal is appropriate under 28 U.S.C. § 1442

because the conduct that forms the basis of Plaintiffs' claims was undertaken at the

direction of federal officers.  Section 1442(a)(1) provides that a civil action that is

commenced in a State Court may be removed to the district court of the United States if

the suit is "against or directed to . . . the United States or any agency thereof or any

officer (or any person acting under that officer) of the United States or of any agent

thereof in an official or individual capacity, for or related to any act under color of such

office. . . ."

For § 1442(a)(1) to constitute a basis for removal, a private corporation must show: "(1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims." *Greene v. Citigroup, Inc.*, 2000 WL 647190, at *6 (10th Cir. May 19, 2000). "The words 'acting under' are broad," and § 1442(a)(1) must be construed liberally. *Watson* v. *Phillip Morris Co., Inc.*, 551 U.S. 142, 147 (2007). "At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969).

Thus, the federal officer removal statute should not be read in a "narrow" manner, nor should the policy underlying it "be frustrated by a narrow, grudging interpretation." *Willingham*, 395 U.S. at 406; *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). Under the statute, "suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 431. Such jurisdiction is thus an exception to the rule that the federal question ordinarily must appear on the face of a properly pleaded complaint. *Id*. "Federal jurisdiction rests on a 'federal interest in the matter', . . . the very basic interest in the enforcement of federal law through federal officials." *Willingham*, 395 U.S. at 406.

Private actors invoking the statute bear a special burden of establishing the

official nature of their activities.  *See Freiberg v. Swinerton & Walberg Prop. Servs.*, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002).  The federal officer removal statute "authorizes removal by private parties 'only' if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law." *Watson*, 551 U.S. at 151 (quoting *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966)).  "That relationship typically involves 'subjection, guidance, or control.'"  *Id*. (citation omitted).  "[T]he private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Id*. at 152 (emphasis in original).  This "does *not* include simply *complying* with the law."  *Id*. (emphasis in original).  As the *Watson* court stated:

> it is a matter of statutory purpose. When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court "prejudice.". . . . Nor is a state-court lawsuit brought against such a company likely to disable federal officials from taking necessary action to enforce federal law. . . . Nor is such a lawsuit likely to deny a federal forum to an individual entitled to assert a federal claim of immunity.

*Id.* (internal citations omitted).

Here, Defendants assert that the conduct at issue in Plaintiffs' claims was undertaken, in part, while acting under the direction of federal officials.  Specifically, Defendants assert that federal officers exercised control over ExxonMobil through government leases issued to it.  (*See* ECF No. 1 ¶¶ 60, 69, 70–73, Exs. B and C.)  Under these leases, ExxonMobil contends that it was required to explore, develop, and produce fossil fuels.  (ECF No 1, Ex. C § 9.)

For example, Defendants assert that leases related to the outer Continental

Shelf ("OCS") obligated ExxonMobil to diligently develop the leased area, which included—under the direction of Department of the Interior ("DOI") officials—carrying out exploration, development, and production activities for the express purpose of maximizing the ultimate recovery of hydrocarbons from the leased area.[4]  Defendants argue that those leases provide that ExxonMobil "*shall*" drill for oil and gas pursuant to government-approved exploration plans (ECF No. 1, Ex. C § 9), and that the DOI may cancel the leases if ExxonMobil does not comply with federal terms governing land use. Given these directives and obligations, Defendants submit that ExxonMobil has acted under a federal officer's direction within the meaning of § 1442(a)(1).

The Court rejects Defendants' argument, finding that Defendants have not shown that they acted under the direction of a federal officer, or that there is a causal connection between the work performed under the leases and Plaintiffs' claims.  The federal leases were commercial leases whereby ExxonMobil contracted "for the exclusive right to drill for, develop, and produce oil and gas resources. . . ." (*See* ECF No. 1, Ex. B, p. 1)   While the leases require that ExxonMobil, like other OCS lessees, comply with federal law and regulations (*see* ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), compliance with federal law is not enough for "acting under" removal, even if the company is "subjected to intense regulation."  *Watson*, 551 U.S. at 152-53.  Defendants also point to the fact that the leases require the timely drilling of wells and production

---

[4] Defendants cite *California* v. *Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981) (the Outer Continental Shelf Lands Act "has an objective—the expeditious development of OCS resources").  They further note that the Secretary of the Interior must develop serial leasing schedules that "he determines will best meet national energy needs for the five-year period" following the schedule's approval.  43 U.S.C. §1344(a).

(ECF No. 1, Ex. B ¶ 10, Ex. C §§ 10, 11), but the government does not control the

manner in which Defendants drill for oil and gas, or develop and produce the product.

Similarly, Defendants have not shown that a federal officer instructed them how

much fossil fuel to sell or to conceal or misrepresent the dangers of its use, as alleged

in this case.  They also have not shown that federal officer directed them to market

fossil fuels at levels they knew would allegedly cause harm to the environment.  At

most, the leases appear to represent arms-length commercial transactions whereby

ExxonMobil agreed to certain terms (that are not in issue in this case) in exchange for

the right to use government-owned land for their own commercial purposes.

Defendants have not shown that this is sufficient for federal officer jurisdiction.

Defendants have also not shown that this lawsuit is "likely to disable federal officers

from taking necessary action designed to enforce federal law", or "to deny a federal

forum to an individual entitled to assert a federal claim of immunity."  *Watson*, 551 U.S.

at 152.

To the extent Defendants claim there is jurisdiction because ExxonMobil is

"helping the government to produce an item that it needs," *Watson*, 551 U.S. at 153,

this also does not suffice to provide jurisdiction in this Court.  Federal officer jurisdiction

requires an "unusually close" relationship between the government and the contractor.

In *Watson*, the Supreme Court noted an example of a company that produced a

chemical for the government for use in a war.  *Id*. (discussing *Winters v. Diamond

Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998)).  As *Winters* explained in more

detail, the Defense Department contracted with chemical companies "for a specific

46

mixture of herbicides, which eventually became known as Agent Orange"; required the companies to produce and provide the chemical "under threat of criminal sanctions"; "maintained strict control over the development and subsequent production" of the chemical; and required that it "be produced to its specifications." 149 F.3d at 398–99. The circumstances in *Winters* were far different than the circumstances in this case, and Defendants have thus not shown an unusually close relationship between ExxonMobil and the government.

Defendants also cite no support for their assertion that the government "specifically dictated much of ExxonMobil's production, extraction, and refinement of fossil fuels" (ECF No. 48 at 35), much less that it rises to the level of government control set forth in *Winters*.  As Plaintiffs note, under Defendants' argument, "any state suit against a manufacturer whose product has at one time been averted and adapted for [government] use . . . would potentially be subject to removal, seriously undercutting the power of state courts to hear and decide basic tort law."  *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 951 (E.D.N.Y. 1992).

*Baltimore* also counsels against finding federal jurisdiction under the federal officer removal statute.  It found that the defendants failed plausibly to show that the charged conduct was carried out "for or relating to" the alleged official authority, as they did not show "that a federal officer controlled their total production and sales of fossil fuels, nor is there any indication that the federal government directed them to conceal the hazards of fossil fuels or prohibited them from providing warnings to consumers." *Baltimore*, 2019 WL 2436848, at *17.  The court concluded, "[c]ase law makes clear

that this attenuated connection between the wide array of conduct for which defendants

have been sued and the asserted official authority is not enough to support removal

under § 1442(a)."  *Id.*; *see also State of Rhode Island*, 2019 WL 3282007, at *5 (finding

no causal connection between any actions Defendants took while "acting under" federal

officers or agencies, and thus no grounds for federal-officer removal); *San Mateo*, 294

F. Supp. 3d at 939 (defendants failed to show a "causal nexus" between the work

performed under federal direction and the plaintiffs' claims for injuries stemming from

climate change because the plaintiffs' claims were "based on a wider range of

conduct").

**E.     Jurisdiction Under the Outer Continental Shelf Lands Act**

Defendants next argue that Plaintiffs' claims arise out of Defendants' operations

on the OCS.  Federal courts have jurisdiction "of cases and controversies rising out of,

or in connection with (A) any operation conducted on the [OCS] which involves

exploration, development, or production of the minerals, of the subsoil and seabed of

the [OCS], or which involves rights to such minerals. . . ."  43 U.S.C. § 1349(b)(1).

When assessing jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"),

courts consider whether "(1) the activities that caused the injury constituted an

operation conducted on the [OCS] that involved the exploration and production of

minerals, and (2) the case arises out of, or in connection with the operation."  *In Re*

*Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (internal quotation marks

omitted).

Here, Defendants assert that jurisdiction is established because the case arises

out of or in connection with an operation conducted on the OCS in connection with the OCSLA leasing program in which ExxonMobil participated.  Plaintiffs seek potentially billions of dollars in abatement funds that inevitably would, according to Defendants, discourage OCS production and substantially interfere with the congressionally mandated goal of recovery of the federally-owned minerals.  ExxonMobil has participated in the OCSLA leasing program for decades, and continues to conduct oil and gas operations on the OCS.  By making all of Defendants' conduct the subject of their lawsuit, Defendants argue that Plaintiffs necessarily sweep in ExxonMobil's activities on the OCS.  Plaintiffs purportedly do not dispute that ExxonMobil operates extensively on the OCS, and Plaintiffs' claims do not distinguish between fossil fuels extracted from the OCS and those found elsewhere.  Thus, Defendants assert that at least some of the activities at issue arguably came from an operation conducted on the OCS.  The Court rejects Defendants' argument, as they have not shown that the case arose out of, or in connection with an operation conducted on the OCS.

The Court agrees with Plaintiffs that for jurisdiction to lie, a case must arise directly out of OCS operations.  For example, courts have found OCSLA jurisdiction where a person is injured on an OCS oil rig "exploring, developing or producing oil in the subsoil and seabed of the continental shelf." *Various Plaintiffs v. Various Defendants ("Oil Field Cases")*, 673 F. Supp. 2d 358, 370 (E.D. Pa. 2009); where oil was spilled from such a rig, *Deepwater Horizon*, 745 F.3d at 162, or in contract disputes directly relating to OCS operations, *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985); *cf. Fairfield Indus., Inc. v. EP Energy E&P Co.*,

2013 WL 12145968, at *5 (S.D. Texas May 2, 2013) (finding claims involving performance of contracts "would not influence activity on the OCS, nor require either party to perform physical acts on the OCS", and that the claims thus did not "have a sufficient nexus to an operation on the OCS to fall within the jurisdictional reach of OCSLA").  The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection.

As the *Baltimore* court found, "[e]ven under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit [in *Deepwater Horizon*], defendants fail to demonstrate that OCSLA jurisdiction exists."  2019 WL 2436848, at *16. "Defendants were not sued merely for producing fossil fuel products, let alone for merely producing them on the OCS."  *Id*.  "Rather, the City's claims are based on a broad array of conduct, including defendants' failure to warn consumers and the public of the known dangers associated with fossil fuel products, all of which occurred globally."  *Id*.  The defendants there offered "no basis to enable th[e] Court to conclude that the City's claims for injuries stemming from climate change would not have occurred but for defendants' extraction activities on the OCS."  *Id.*; *see also San Mateo*, 294 F. Supp. 3d at 938–39 ("Removal under OCSLA was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf" (emphasis in original)).

Defendants cite no case authority holding that injuries associated with downstream uses of OCS-derived oil and gas products creates OCSLA jurisdiction.

The cases cited by Defendants instead involved a more direct connection. *See*, *e.g.,* *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988) (finding that the exercise of take-or-pay rights, minimum-take rights, or both, by Sea Robin necessarily and physically had an immediate bearing on the production of the particular well at issue, "certainly in the sense of the volume of gas actually produced", and would have consequences as to production of the well).

Moreover, as Plaintiffs note, jurisdiction under OCSLA makes little sense for injuries in a landlocked state that are alleged to be caused by conduct that is not specifically related to the OCS. No court has read OCSLA so expansively. Defendants' argument would arguably lead to the removal of state claims that are only "tangentially related" to the OCS. *See Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Texas 2014) (recognizing that the "but-for" test articulated by the Fifth Circuit in the *Deepwater Horizon* case "is not limitless," and that "a blind application of this test would result in federal court jurisdiction over all state law claims even tangentially related to offshore oil production on the OCS"; "Defendants' argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results").

The downstream impacts of fossil fuels produced offshore also does not create jurisdiction under OCSLA because Plaintiffs do not challenge conduct on any offshore "submerged lands." 43 U.S.C. § 1331(a). Defendants' argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury would, again, dramatically expand the statute's scope. Any spillage of oil or

gasoline involving some fraction of OCS-sourced oil—or any commercial claim over such a commodity—could be removed to federal court.  It cannot be presumed that Congress intended such an absurd result.  Plaintiffs' claims concern Defendants' overall conduct, not whatever unknown fraction of their fossil fuels was produced on the OCS.  No case holds removal is appropriate if some fuels from the OCS *contribute* to the harm.  A case cannot be removed under OCSLA based on speculative impacts; immediate and physical impact is needed.  *See Amoco Prod. Co.*, 844 F.2d at 1222–23.  Accordingly, the Court does not have jurisdiction under OCSLA.

**F.    Jurisdiction as the Claims Relate to Bankruptcy Proceedings**

Finally, Defendants argue that this Court has jurisdiction and this action is removable because Plaintiffs' claims are related to bankruptcy proceedings within the meaning of 28 U.S.C. §§ 1452(a).  Subject to certain exceptions, that statute allows a party to remove any claim or cause of action in a civil action . . . to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  Section 1334(b) of the Bankruptcy Code states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

The Tenth Circuit has held that an action is "related to" bankruptcy if it "'could conceivably have any effect on the estate being administered in bankruptcy.'"  *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990) (citation omitted).  "Although the proceeding need not be against the debtor or his property, the proceeding is related to the bankruptcy if the outcome could alter the debtor''s rights, liabilities, options, or

52

freedom of action in any way, thereby impacting on the handling and administration of the bankruptcy estate." *Id*.  Removal is proper even after a bankruptcy plan has been confirmed if the case would impact a creditor's recovery under the reorganization plan. *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998).

Defendants assert that Plaintiffs' claims relate to ongoing bankruptcy proceedings because they could impact the estates of other bankrupt entities that are necessary and indispensable parties to this case.  They note in that regard that 134 oil and gas producers filed for bankruptcy in the United States between 2015 and 2017. Peabody Energy and Arch Coal ("Peabody"), in particular, is alleged to have emerged from Chapter 11 bankruptcy in 2016.  Defendants argue that the types of claims brought by Plaintiffs are irreconcilable with the "implementation," "execution," and "administration" of Peabody's "confirmed plan," citing *In Re Wiltshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013).  Defendants thus assert that this case is related to a bankruptcy proceeding and is therefore removable.

The Court, too, rejects Defendants' final argument.  As the Ninth Circuit noted in the *Wiltshire Courtyard* case, "'to support jurisdiction, there must be a close nexus connecting a proposed [bankruptcy proceeding] with some demonstrable effect on the debtor or the plan of reorganization.'"  729 F.3d at 1289 (citation omitted).  "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'"  *Id*. (citation omitted).

Here, none of the Defendants have  filed for bankruptcy.  To the extent

Defendants argue that this case may effect other oil and gas producers who filed for

bankruptcy, including Peabody or other unspecified bankrupt entities, this is entirely

speculative.  Defendants have not shown any nexus, let alone a close nexus, between

the claims in this case and a bankruptcy proceeding.  Thus, Defendants offer no

evidence of how Plaintiffs' claims relate to any estate or affect any creditor's recovery,

including Peabody.  Defendants suggest bankrupt entities are indispensable parties,

but joint tortfeasors are not indispensable.  *See Temple v. Synthes Corp.*, 498 U.S. 5, 7

(1990).  Nor would it matter if Defendants have third-party claims against bankruptcy

estates.  *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984); *Union Oil Co. of

California v. Shaffer*, 563 B.R. 191, 198–200 (E.D. La. 2016).  Plaintiffs do not seek any

relief from a debtor in bankruptcy, advantage over creditors, or to protect any interest in

the debtor's property.  *City & Cnty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115,

1124–25 (9th Cir. 2006).  Thus, Defendants have failed to show that jurisdiction is

proper under the bankruptcy removal statute.

As discussed in *Baltimore*, "Defendants fail to demonstrate that there is a 'close

nexus' between this action and any bankruptcy proceedings . . . at most, defendants

have only established that some day a question *might* arise as to whether a previous

bankruptcy discharge precludes the enforcement of a portion of the judgment in this

case against" the defendant.  2019 WL 2436848, at *19 (emphasis in original).  "This

remote connection does not bring this case within the Court's "related to" jurisdiction

under 28 U.S.C. § 1334(b).  *Id*.

Moreover, one of the exceptions to removal are proceedings "by a governmental unit to enforce such governmental unit's police or regulatory powers." 28 U.S.C. § 1452(a). *Baltimore* noted that an action such as this where the plaintiffs "assert claims for injuries stemming from climate change" are actions "on behalf of the public to remedy and prevent environmental damage, punish wrongdoers, and deter illegal activity." 2019 WL 2436848, at *19. It found that "[a]s other courts have recognized, such an action falls squarely within the police or regulatory exception to § 1452." *Id.* *See also Rhode Island*, 2019 WL 3282007, at *5; *San Mateo*, 294 F. Supp. 3d at 939. This Court agrees and adopts the *Baltimore* court's analysis on this point. Accordingly, removal is also inappropriate because this case is a proceeding "by a governmental unit to enforce such governmental unit's police or regulatory powers." 28 U.S.C. § 1452.

## IV. CONCLUSION

Plaintiffs' claims implicate important issues involving global climate change caused in part by the burning of fossil fuels. While Defendants assert, maybe correctly, that this type of case would benefit from a uniform standard of decision, they have not met their burden of showing that federal jurisdiction exists. Accordingly, the Court ORDERS as follows:

1.      Defendants' Motion to Reschedule Oral Argument on Plaintiffs' Motion to Remand (ECF No. 67) is DENIED.

2.      Plaintiffs' Motion to Remand (ECF No. 34) is GRANTED; and

3.      The Clerk shall REMAND this case to Boulder County District Court, and shall terminate this action.

Dated this 5th day of September, 2019.

BY THE COURT:

_____
William J. Martínez
United States District Judge